**Nos. 2024-1207, 2024-1208, 2024-1210**

# United States Court of Appeals for the Federal Circuit

GOOGLE LLC,

*Appellant,*

*v.*

TOUCHSTREAM TECHNOLOGIES INC,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in
Nos. IPR2022-00793, IPR2022-00794, IPR2022-00795

**BRIEF OF APPELLANT GOOGLE LLC**

Evan McLean
JONES DAY
1755 Embarcadero Rd.
Palo Alto, CA 94303
(650) 687-4149

I. Sasha Mayergoyz
JONES DAY
110 North Wacker Dr.
Suite 4800
Chicago, IL 60606
(312) 269-1572

Jennifer L. Swize
John R. Boulé III
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939

This consolidated appeal concerns claims 1-5, 8, 11-12, 14-15, and 27-28 of U.S. Patent No. 8,782,528; claims 1-2 and 6-8 of U.S. Patent No. 8,904,289; and claims 1-2 and 5-9 of U.S. Patent No. 8,356,251. Claim 1 of each patent is illustrative and reproduced below.

U.S. Patent No. 8,782,528:

1. A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device;

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

loading the particular media player in the content presentation device; and

using the particular media player to execute the programming code with respect to the file.

U.S. Patent No. 8,904,289:

1. A method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file wherein the media player is a computer application operable to present content and control presentation of the content, (iv) identify a location of the particular media player, and (v) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device; and

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player,

wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file.

U.S. Patent No. 8,356,251:

1. A machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media players, the method comprising:

assigning, by a server system, a synchronization code to the display device;

receiving, in the server system,  a message from a personal computing device that is separate from the server system and separate from the display device, wherein the message includes the synchronization code;

storing, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code;

receiving, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player,

converting, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player; and

storing, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command.

## CERTIFICATE OF INTEREST

Case Nos. 2024-1207, 2024-1208, 2024-1210

*Google LLC v. Touchstream Technologies, Inc*

Filing Party/Entity:  Appellant Google LLC

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  April 11, 2024          Signature:    */s/ I. Sasha Mayergoyz*

                             Name:      I. Sasha Mayergoyz

**1.  Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Google LLC

**2.  Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None/Not Applicable

**3.  Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

XXVI Holdings Inc.

Alphabet Inc.

**4.  Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Erika Arner                    Gracie Mills
Kara Specht                    Finnegan, Henderson, Farabow,
Neal Larson                       Garrett & Dunner, LLP

**5. Related Cases** – Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under <u>Fed. Cir. R. 47.5(a)</u>?  If yes, concurrently file a separate Notice of Related Case Information that complies with <u>Fed. Cir. R. 47.5(b)</u>.  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  <u>Fed. Cir. R. 47.5(b)</u>.

Yes.  *See* Notices of Related Case Information filed on April 11, 2024, in Appeal No. 2024-1207.

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under <u>Fed. R. App. P. 26.1(b)</u> (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  <u>Fed. Cir. R. 47.4(a)(6)</u>.

None/Not Applicable

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................vi

TABLE OF ABBREVIATIONS ...........................................................ix

STATEMENT OF RELATED CASES ....................................................xi

STATEMENT OF JURISDICTION.........................................................1

INTRODUCTION .............................................................................1

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE...............................................................4

    A.    Streaming Technology And The Challenged Claims .........................4

    B.    Google's IPR Petitions And The Prior Art .........................................9

        1.    Muthukumarasamy:  Devices Using Server-Mediated Control To Present Content On A Separate Display ...............10

        2.    Hayward:  Multiple Media Players Presenting Internet-Based Content on Displays .......................................16

    C.    Institution.........................................................................................17

    D.    Touchstream's Patent Owner Response.............................................18

    E.    The Board's Final Written Decisions.................................................19

SUMMARY OF THE ARGUMENT .....................................................21

STANDARD OF REVIEW .................................................................26

ARGUMENT ..................................................................................26

I.    UNDER A PROPER OBVIOUSNESS ANALYSIS, MUTHUKUMARASAMY RENDERS THE CLAIMS UNPATENTABLE..........................................................................27

    A.    The Parties Agree On The Bulk Of Relevant Facts ...........................27

    B.    Muthukumarasamy Renders The "Receiving" Limitation Obvious ...........................................................................................30

        1.    Skilled Artisans Would Have Understood That Muthukumarasamy's Messages Satisfy The "Receiving" Limitation's Content Requirement ..........................................31

# TABLE OF CONTENTS
## (continued)

Page

2.    Skilled Artisans Would Have Understood That Muthukumarasamy's Server System Receives Messages Satisfying The "Receiving" Limitation's Path Requirement ............................................................................36

C.    Skilled Artisans Would Have Understood That Muthukumarasamy Renders Obvious The "Obtaining" Limitation In The '528 Patent And The "Loading" Limitation In The '528 And '289 Patents .............................................43

II.    THE BOARD COMMITTED LEGAL ERROR BY APPLYING INCORRECT OBVIOUSNESS STANDARDS ...........................................45

A.    The Board Wrongly Conflated A Single-Reference Obviousness Analysis With Anticipation And Improperly Discounted The Skilled Artisan's Perspective ...................................46

1.    The Board Erred By Requiring Google To Show Where Muthukumarasamy Disclosed The "Receiving" Limitation As Arranged In The Claims ...................................46

2.    The Board Improperly Disregarded Expert Testimony Explaining How Skilled Artisans Would Have Understood Muthukumarasamy's Teachings ..........................50

B.    The Board Legally Erred By Failing To Analyze Muthukumarasamy As A Whole, Instead Dissecting And Isolating Its Teachings .......................................................53

1.    The Board Dissected Muthukumarasamy's Teachings ...........54

2.    The Board Failed To Analyze Muthukumarasamy For Everything It Teaches ..............................................58

C.    The Board's Conclusions Implicitly And Improperly Rely On Teaching Away Or A Requirement That The Prior Art Must Disclose The Best Approach To the Claimed Invention...................60

1.    The Board Erred By Implicitly Relying On Teaching Away Based On Muthukumarasamy's Silence .......................61

# TABLE OF CONTENTS
(continued)

**Page**

2.  The Board Erred By Implicitly Requiring Muthukumarasamy To Teach The Most Desirable Approach To Arrive At The Challenged Claims .....................62

III.  MUTHUKUMARASAMY COMBINED WITH HAYWARD ALSO RENDERS THE CLAIMS OBVIOUS .......................................................64

CONCLUSION ........................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014) .................................................................*passim*

*Bayer Pharma AG v. Watson Labs., Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) ...................................................25, 62

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ...................................................31, 53

*Bradium Techs. LLC v. Iancu*,
923 F.3d 1032 (Fed. Cir. 2019) ...................................................3, 54

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) .........................................................27

*DyStar Textilfarben GmbH v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ...................................................40, 42

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985) .........................................................31

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ................................................*passim*

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)...........................................................................27

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ...........................................24, 26, 58

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) .......................................................59

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Fulton*,
391 F.3d 1195 (Fed. Cir. 2004) .................................................................62, 63

*In re Inland Steel Co.*,
265 F.3d 1354 (Fed. Cir. 2001) ........................................................................53

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ...........................................................25, 61, 62

*Incept LLC v. Palette Life Scis., Inc.*,
77 F.4th 1366 (Fed. Cir. 2023) .......................................................................46

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .......................................................................62

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
Nos. 2022-1258, 2022-1307, 2024 WL 1355733 (Fed. Cir. Apr. 1,
2024) ....................................................................................................*passim*

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...........................................................................23, 26, 46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................................................52

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) .......................................................................52

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ......................................................45, 47, 50, 53

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*,
528 F.3d 1365 (Fed. Cir. 2008) .......................................................2, 23, 31, 36

*SIBIA Neuroscis., Inc. v. Cadus Pharm. Corp.*,
225 F.3d 1349 (Fed. Cir. 2000) .................................................................*passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Weber, Inc. v. Provisur Techs., Inc.*,
   92 F.4th 1059 (Fed. Cir. 2024) .................................................46, 52

*Wyers v. Master Lock Co.*,
   616 F.3d 1231 (Fed. Cir. 2010) ..........................................................50

**STATUTES**

28 U.S.C. § 1295(a)(4)(A) ...........................................................................1

35 U.S.C. § 141(c) ........................................................................................1

35 U.S.C. § 319 ............................................................................................1

# TABLE OF ABBREVIATIONS

*Parties*

| Abbreviation | Term |
|---|---|
| Google | Google LLC |
| Touchstream | Touchstream Technologies, Inc. |

*Terms*

| Abbreviation | Term |
|---|---|
| '251 patent | U.S. Patent No. 8,356,251 (Appx163-182) |
| '528 patent | U.S. Patent No. 8,782,528 (Appx125-143) |
| '289 patent | U.S. Patent No. 8,904,289 (Appx144-162) |
| Board | Patent Trial and Appeal Board |
| challenged claims | claims 1-5, 8, 11-12, 14-15, and 27-28 of the '528 patent; claims 1-2 and 6-8 of the '289 patent; and claims 1-2 and 5-9 of the '251 patent |
| content requirement of the "receiving" limitation | "wherein the one or more messages, taken together, … identify a particular media player for playing content from the file [and] identify a location of the particular media player" (Appx142 (11:23-28)) |
| DBCS | device-based control system |
| Hayward | U.S. Patent No. 8,918,812 (Appx2475-2493) |
| IED | internet-enabled device |
| IPR | *inter partes* review |
| IR | infrared |
| Muthukumarasamy | U.S. Patent Application 2010/0241699 (Appx2434-2474) |
| "loading" limitation | "loading the particular media player in the content presentation device" (Appx142 (11:45-46)) |
| "obtaining" limitation | "obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider" (Appx142 (11:42-44)) |

| path requirement of the "receiving" limitation | "receiving, in a server system, one or more messages from a personal computing device" (Appx142 (11:20-21)) |
| --- | --- |
| RCIBS | remote-controlled internet browser software |
| "receiving" limitation | "receiving, in a server system, one or more messages from a personal computing device … wherein the one or more messages, taken together, … identify a particular media player for playing content from the file, [and] identify a location of the particular media player" (Appx142 (11:20-28)) |
| Sky | zSky software agent |
| URL | uniform resource locator |

*** All emphasis is added throughout, unless otherwise indicated.**

*** All internal case citations are omitted from citations, unless otherwise indicated.**

*** Reference numbers are omitted from quotations of patents and prior-art references, unless otherwise indicated.**

*** Citations to documents that were filed in each of the appealed-from IPRs are to the version filed in IPR2022-00793 regarding the '528 patent (Appeal No. 2024-1207), and citations to the appellate docket are to Appeal No. 2024-1207, unless otherwise indicated.**

## <u>STATEMENT OF RELATED CASES</u>

Touchstream asserted the '251 patent, the '528 patent, and the '289 patent in the following patent-infringement litigation:

- *Touchstream Technologies, Inc. v. Google LLC*, No. 6:21-cv-560-ADA (W.D. Tex.).

Touchstream also has asserted the '251 patent in the following patent-infringement litigations:

- *Touchstream Technologies, Inc. v. Charter Communications, Inc. et al.*, No. 2:23-cv-00059-JRG (E.D. Tex.).

- *Touchstream Technologies, Inc. v. Altice USA, Inc. et al.*, No. 2:23-cv-00060-JRG (E.D. Tex.) (pending transfer to E.D.N.Y.).

- *Touchstream Technologies, Inc. v. Comcast Communications, LLC d/b/a/ Xfinity et al.*, No. 2:23-cv-00062-JRG (E.D. Tex.).

**STATEMENT OF JURISDICTION**

This consolidated appeal arises from three IPRs filed by Google.  On September 27 and October 2, 2023, the Board entered its Final Written Decisions.  Appx1-124.  On November 28, 2023, Google filed notices of appeal.  Appx858-903; Appx4121-4164; Appx7680-7725.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

**INTRODUCTION**

The Board's patentability determination should be reversed (or at minimum vacated) because it rests on multiple legal errors in a single-reference obviousness analysis.  By misapplying the controlling law, the Board's derivative findings lack substantial evidence.  Under the proper standard, the only record-supported conclusion is that the challenged claims would have been obvious.

This appeal concerns a single limitation, the relevant portion of which recites "receiving, in a server system, one or more messages from a personal computing device … wherein [the] message[s] identify a particular media player … [and] a location of the particular media player."  The central prior-art reference is Muthukumarasamy.  The parties agree on the majority of Muthukumarasamy's teachings, including that the reference discloses:  (1) the claimed path for sending messages—Muthukumarasamy's internet-enabled device ("IED") sends messages to control non-internet media devices, and those messages

are received and processed by the media control network; and (2) the claimed message content—messages to an internet media device, identifying a selected media player and its location. The only dispute is whether skilled artisans would have read Muthukumarasamy to disclose, or at least suggest, that the same path through which the IED sends commands to communicate with non-internet media devices would also be used to send commands to internet media devices. Under a proper legal analysis, the answer is yes.

This appeal is akin to circumstances previously addressed by this Court because "the undisputed teaching[s] of [Muthukumarasamy] lead[] one to within a hairsbreadth of anticipation…. The express teachings in the art provide the motivation and suggestion to modify [Muthukumarasamy] such that" the purportedly missing limitation is met. *See SIBIA Neuroscis., Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1359 (Fed. Cir. 2000). Here, the "relatively small logical gap between the prior art and the claim"—applying Muthukumarasamy's disclosed path for communicating with non-internet media devices to internet media devices disclosed in the same reference—"is closed by a [skilled artisan] 'pursu[ing] known options within his or her technical grasp.'" *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1382 (Fed. Cir. 2008). That is especially true given the parties' agreement on the applicable skill level and Muthukumarasamy's primary objective of providing "a device-agnostic and source-agnostic" system.

The Board's contrary conclusion stems from legal errors that materially affected its analysis and render its findings devoid of substantial evidence. The Board erroneously applied an anticipation analysis by demanding express disclosure of the claimed combinations, rather than applying the flexible analysis for obviousness that takes into account the perspective, common sense, and creativity of skilled artisans when reading a reference for all it teaches.

The Board similarly erred by dissecting Muthukumarasamy into disparate teachings and then requiring Google to provide independent motivations to combine teachings within the same reference. Muthukumarasamy permits no such dissected treatment, and Google bore no such burden. Muthukumarasamy emphasizes its goal of providing a comprehensive device- and source-agnostic system, which supplies ample suggestion for skilled artisans to arrive at the claims. As this Court instructs, "an invention in the prior art … is more than the sum of its individual elements," and Google did not need to "re-do the work already done in the prior art reference" making obvious the claims. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020).

Simply put, skilled artisans do not miss the forest for the trees. They consider a reference "not only for what it expressly teaches, but also for what it fairly suggests." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019). The Board's analysis needed to do the same, but it failed to do so here.

- 3 -

## **STATEMENT OF THE ISSUES**

1.    Given Muthukumarasamy's undisputed goal of providing a source-
and device-agnostic system, would skilled artisans have understood
Muthukumarasamy to teach or at least suggest that the disclosed path for sending
commands to non-internet media devices could also be used for sending commands
to the disclosed internet media devices?

2.    Whether the Board legally erred by (i) conflating a single-reference
obviousness analysis with an anticipation analysis and disregarding the skilled
artisan's perspective and expert testimony providing that perspective; (ii) failing to
read Muthukumarasamy for all it teaches and suggests by unduly dissecting the
reference's disclosures; and (iii) implicitly and improperly relying on teaching
away or requiring Muthukumarasamy to disclose the best approach to the claimed
invention.

## **STATEMENT OF THE CASE**

### **A.    Streaming Technology And The Challenged Claims**

Streaming media over the internet was available long before the challenged
claims' priority date (2011).  Internet content from sources such as Netflix could
be streamed through web browsers (2007), television set-top boxes (2008), smart
televisions (2009), and smartphones (2010).  Appx2065 ¶ 53; Appx3360 ¶ 81.
Using personal computing devices for controlling electronic media devices to play

content was also known.  Appx2464 ¶ 3.  This included smartphones sending

requests to a mediating server to control content on a separate display device, such

as a television.  Appx2464-2465 ¶¶ 3, 26-27.

Founded in 2011, Touchstream attempted to develop software for using

smartphones to control media on a display device.  Appx2499-2500.  Failing as a

technology company, Touchstream became a patent-assertion entity and filed suits

against companies with which it purportedly sought to collaborate.  *E.g.*,

Appx2622-2673.  In June 2021, Touchstream sued Google in the Western District

of Texas.  Touchstream then sued fourteen companies in the cable industry,

including Charter, Time Warner, and Comcast.  *Supra* at vii.  In the Google suit,

Touchstream asserted the '251 patent, the '528 patent, and the '289 patent.  That

lawsuit resulted in a jury awarding $338 million to Touchstream.  These patents

are the subject of this appeal.

The patents issued between January 2013 and December 2014.  Appx125;

Appx144; Appx163.  Because the patents share a common specification, this brief

cites the '528 patent as representative.

The patents purport to allow users of personal computing devices (*e.g.*,

smartphones) to control presentation of internet content on a separate device (*e.g.*,

a television).  Appx125 (abstract); Appx137 (1:14-31); Appx138 (3:51-57).

The '528 patent states that "user-initiated play commands can be passed from the

user's personal computing device, through the server system, to the display

device." Appx137 (2:26-28).  In Figure 1, the personal computing device (20)

identifies content from various sources (box 30) that the user may select for display

on the content presentation device (23).[1]  Appx138 (3:2-10, 3:59-62, 4:18-22).

After the user selects content, the personal computing device sends messages

through the server system (24), causing the selected content to be displayed on the

content presentation device.  Appx138 (3:5-13).  The messages from the personal

computing device identify the content to be played, a particular media player to

play that content, and the media player's location.  Appx138 (4:22-30).



FIG. 1

Appx202 (annotations of Appx128).

---

[1] The '528 and '289 patents use the term "content presentation device" to refer to displays like televisions, while the '251 patent uses the term "display device."  For purposes of this appeal, the terms are synonymous.

Claim 1 of the '528 patent is representative of the challenged claims:

1.  A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:

***receiving, in a server system, one or more messages from a personal computing device*** that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, ***identify a particular media player for playing content from the file, identify a location of the particular media player***, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device;

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

***obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider***;

***loading the particular media player in the content presentation device***; and

using the particular media player to execute the programming code with respect to the file.

Appx142 (11:17-48).  The first and second emphases identify the path and content

requirements of the "receiving" limitation: (i) "receiving, in a server system, one or more messages from a personal computing device" (hereafter, the "path requirement"), and (ii) "wherein the one or more messages, taken together … identify a particular media player for playing content from the file, [and] identify a location of the particular media player" (hereafter, the "content requirement"). Appx23. The table below shows the substantively equivalent "receiving" limitation in claim 1 of each patent:

| '528 patent | '289 patent | '251 patent |
|---|---|---|
| "receiving, in a server system, one or more messages … wherein the one or more messages, taken together, … identify a particular media player for playing content from the file, [and] identify a location of the particular media player" | "receiving, in a server system, one or more messages from a personal computing device … , wherein the one or more messages, taken together, … (iii) identify a particular media player for playing content from the specified file …, [and] (iv) identify a location of the particular media player" | "receiving, in the server system, one or more signals from the personal computing device, the one or more signals … identifying a particular media player for playing the video content" |

The third emphasis identifies the "obtaining" limitation, which is relevant only to the '528 patent. The fourth emphasis identifies the "loading" limitation,

relevant to claim 1 of the '528 patent and claim 2 of the '289 patent.[2]  The Board's analysis of these limitations rises and falls with the "receiving" limitation.

**B.    Google's IPR Petitions And The Prior Art**

In three IPR Petitions, Google challenged claims 1-5, 8, 11-12, 14-15, and 27-28 of the '528 patent, claims 1-2 and 6-8 of the '289 patent, and claims 1-2 and 5-9 of the '251 patent under Section 103.  Appx199; Appx3475; Appx7038.  Each Petition presented two grounds:  (i) single-reference obviousness based on Muthukumarasamy; and (ii) obviousness based on Muthukumarasamy combined with Hayward.  *E.g.*, Appx211-216.

Google's Petitions advanced multiple arguments showing why the challenged claims would have been obvious.  Google explained that Muthukumarasamy describes a system that includes the claimed "personal computing device" (Muthukumarasamy's "internet-enabled device" ("IED")), the claimed "server system" (Muthukumarasamy's "media control network," consisting of a "zHub" and "zNode," Appx2465 ¶ 44, and "internet server"), and the claimed "content presentation device" (Muthukumarasamy's "media device," *e.g.*, a television or the "RCIBS").  Appx199-200; Appx223-224.  Google also explained that Muthukumarasamy discloses that the IED sends messages to the

---

[2] Claim 1 of the '251 patent includes an additional limitation absent from the '528 and '289 patents.  Touchstream did not dispute that this additional limitation was rendered obvious by Muthukumarasamy.  Appx7335-7363.

"media control network" that identify content for presentation on a media device. Appx199-200.  Muthukumarasamy's "internet server" and "media control network" then work together to send messages to the media device to present the selected content.  Appx199-200.

### 1. Muthukumarasamy:  Devices Using Server-Mediated Control To Present Content On A Separate Display

Muthukumarasamy is a patent application published in 2010.  It teaches a system that unifies diverse media sources and devices (such as internet and non-internet media devices) to allow presentation of content on a separate display, through the use of a server that communicates with a personal device.  Appx2434 (abstract).  Muthukumarasamy was assigned to Peel Technologies, a company that developed products allowing smartphones to control different media sources and devices through a single system and present content on displays such as televisions.  Appx3055-3056; Appx2789; Appx2791.  Peel and its employees, including the inventors named on the Muthukumarasamy application, were innovating in this field before the challenged claims' earliest priority date. Appx3056.

Muthukumarasamy recognized that consumers faced complexities with their entertainment experiences given the plethora of available media content sources. Appx2434.  Addressing this problem, Muthukumarasamy provided a "Device-Based Control System" ("DBCS") with the objective of "enabl[ing] a device-

agnostic and source-agnostic entertainment experience through use of an internet-enabled device (IED)." Appx2434 (abstract); Appx2464-2465 ¶¶ 4-5, 26-27.

**The Need For "Source-Agnostic" Experience.** One complexity Muthukumarasamy identified was the breadth of content choices available to consumers. Accordingly, Muthukumarasamy emphasized the desirability of creating a "source-agnostic" system that allows consumers to "interactively research/browse through the plethora of content choices that are available for them to watch and/or listen to from numerous sources at any particular moment," including content from cable and internet media sources. Appx2464 ¶¶ 5, 47, 83.

**The Need For "Device-Agnostic" Experience.** Muthukumarasamy also identified the complexity of consumers "managing and controlling various electronic components or equipment." Appx2464 ¶ 4. Muthukumarasamy thus described the desirability of a "device-agnostic" system to control the panoply of devices. Appx2464-2465 ¶¶ 4, 27.

**Muthukumarasamy's Solution.** To solve these complexities, Muthukumarasamy teaches an IED (*e.g.*, a smartphone) that controls the presentation of content on a separate device (*e.g.*, a television) through a media control network. Appx2434 (abstract); Appx2464 ¶ 26; Appx2465 ¶¶ 31, 41, 44. By using "a combination of premise hardware, a software system, and/or internet access," Muthukumarasamy "allows consumers to select and control media content

via their internet-enabled device." Appx2465 ¶ 27. Muthukumarasamy's system "changes the way consumers select media and how they control that media across their entertainment components or devices and, as such, enables a device-agnostic and source-agnostic entertainment experience." *Id.*

Muthukumarasamy describes its system in detail, including "many specifics for the purposes of illustration." Appx2465 ¶ 28. Muthukumarasamy notes that skilled artisans "will appreciate that many variations and alterations to" its description "are within [its] scope." *Id.*

Muthukumarasamy's system comprises "a media management application running on an internet-enabled device (IED) and controlling media devices at the premise via the media control network." Appx2465 ¶ 48. In Figure 1, Muthukumarasamy illustrates an IED (4) controlling content presented on a display device (5) via messages routed through communication paths. Muthukumarasamy teaches controlling media devices through a media control network (comprising a zHub (2) and a zNode (3)) and internet server (1). Appx2465 ¶ 44; Appx2466 ¶¶ 51-52. The zHub receives "commands from the IED via a local or premise network (e.g., router, WiFi, etc.) and translates the commands to RF [radio-frequency] signals." Appx2465 ¶ 44. The zNode then "receives RF signals from the zHub and translates the RF signals to a protocol … interpretable by the media components." *Id.*



FIG.1

[Appx205](#) (annotations of Appx2435).

Muthukumarasamy's system controls various media devices that access internet sources. For example, its system communicates with "online video/music/photo services"; a "zHDStick that streams internet content over WiFi to [televisions]"; a "zSky software agent that helps manage online media viewing on TV" that "can be hosted (*e.g.*, preinstalled) on the zHDStick, or can be independently installed on a media PC"; and a computer hosting remote-controlled internet browser software ("RCIBS"). [Appx2465](#) ¶¶ 44-45; [Appx2469](#) ¶ 83. Figures 2 and 3 show aggregated content choices from a "multitude of sources," such as "broadcast media, cable, DVR, … and internet media," which are depicted as different "TV Shows" and "Movies." [Appx2465](#) ¶ 47.



FIG.2                    FIG.3

Appx2436-2437.  At set-up, Muthukumarasamy creates a device map of available devices and sources.  Appx2467-2468 ¶¶ 68-69.  This allows users to "select and control media content via their internet-enabled device" through the "media control network coupled to the internet."  Appx2465 ¶¶ 27, 48.  Figure 1 illustrates many of the sources and communication paths contemplated by Muthukumarasamy.

Muthukumarasamy explains that "[t]he RCIBS is a remote controllable internet browser optimized for internet-media consumption."  Appx2469 ¶ 83.  "The RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of a user."  Id.  Figure 18 illustrates a high-level communication diagram of the RCIBS hosted on a computer:



FIG.18

Appx2462.  Muthukumarasamy teaches that IEDs can communicate with and command the RCIBS.  Appx2469 ¶ 83.

Muthukumarasamy's media control network uses a universal set of commands to control the hardware and internet sources.  Appx2466 ¶¶ 50, 52, 57. Figure 5 illustrates these commands, which identify non-internet media devices (*e.g.*, Blu-ray/DVR) and internet media devices (*e.g.*, "a zSky software agent that helps manage online media viewing on TV," Appx2465 ¶ 45) communicating via the media control network:

| | Gesture | Watching Live TV | Watching DVR | Watching DVR/Blu-ray/Sky/VCR | Onscreen Browsing UI For TV: Guide/DVR/DVD/Blu-ray/Sky |
|---|---|---|---|---|---|
| ↑ | Up | Volume Up | Volume Up | Volume Up | Move Selection/Cursor Up |
| ↟ | Continuous Up | Continuous Volume Up | Continuous Volume Up | Continuous Volume Up | Cont. Move Selection/Cursor Up Page Up |
| ↓ | Down | Volume Down | Volume Down | Volume Down | Move Selection/Cursor Down |
| ↡ | Continuous Down | Continuous Volume Down | Continuous Volume Down | Continuous Volume Down | Cont. Move Selection/Cursor Down Page Down |
| ← | Left | Channel Down | Enter Rewind Mode | Enter Rewind Mode | Move Selection/Cursor Left |
| ↤ | Continuous Left | Continuous Channel Down | Scrub Back While Finger Down | Scrub Back While Finger Down | Cont. Move Selection/Cursor Left Page Left |
| → | Right | Channel Up | Enter Fast Forward Mode | Enter Fast Forward Mode | Move Selection/Cursor Right |
| ↦ | Continuous Right | Continuous Channel Up | Scrub Forward While Finger Down | Scrub Forward While Finger Down | Cont. Move Selection/Cursor Right Page Right |
| ↻ | Clockwise | Back in Channel History | Jump Back 10 Seconds | Jump Back 10 Seconds/Prev. Chapter | Previous Screen |
| ↺ | Counter Clockwise | Forward in Channel History | Jump Forward 30 Seconds | Jump Forward 30 Seconds/Next Chapter | Next Screen |
| ○ | Select | Mute | Play/Pause | Play/Pause | Select |
| ◎ | Menu | TV Menu | DVR Menu | DVR Menu | Menu/Up/Previous |
| ◉ | Content Required Contextual Menu | N/A | Show Info | Contextual Menu | Contextual Menu |
| ◯ | Search (Button) | Search UI & Keyboard on Device: Scoped to TV Guide | Search UI & Keyboard on Device: Scoped to DVR Content | Search UI & Keyboard on Device: Scoped to Universal Search | Search UI & Keyboard on Device: Scoped to Appropriate Service |
| ⋈ | Switch Context to Z (Button) | Switch from 10' Experience to Z Experience | | | |

10' Experience, Eyes on the TV, Until Viewer Presses Search Button

**FIG.5**

Appx568 (annotations of Appx2439).  Figure 6 illustrates likewise.

Appx2440-2441.  Figure 19 provides examples of commands for the RCIBS.

Appx2463.

### 2.    Hayward:  Multiple Media Players Presenting Internet-Based Content on Displays

Google's second ground presented Muthukumarasamy with Hayward—a combination reinforcing obviousness of the challenged claims in light of Muthukumarasamy alone.  Hayward, a patent whose application was published in 2002, describes presenting internet content (*e.g.*, "media file[s]") on a client (*e.g.*, an internet-enabled television).  Appx2487 (3:20-40).  Hayward recognizes that internet content may take "a variety of streaming media file formats" that must be presented on an appropriate "media player[]."  Appx2486 (1:8-10); Appx2487 (3:56-60); Appx2488 (5:4-47).  Hayward teaches a client that requests an

- 16 -

appropriate media player to play a selected file based on the file's format. Appx2487 (4:15-19); Appx2488 (5:24-28).

### C.    Institution

The Board instituted review on all three Petitions.  Appx381; Appx3652; Appx7216.  Noting Muthukumarasamy's disclosure of a "source-agnostic system [that] allows selection and presentation of content from disparate sources, including 'subscription media, broadcast media, cable, … and internet media,'" the Board stated that skilled artisans "would have understood each request for particular content to identify a media player associated with the particular source of the content" to render obvious "the claimed receiving of messages that 'identify a particular media player for playing content from the file.'"  Appx397; Appx399.

The Board also noted that "Muthukumarasamy's zHub functions as part of a server system, to receive messages from a computing device, translate those messages, and transmit the translated messages."  Appx399.  The Board determined that "Muthukumarasamy discloses that its IED can provide a command to select content from 'Netflix, Cinema Now, or Amazon' and that its system delivers 'selected media content and selects and controls the media devices that deliver the selected media content *according to a media type of the selected media content*.'"  Appx399 (original emphasis).  Accordingly, the Board was "sufficiently persuaded by [Google's] contention that Muthukumarasamy[] …

- 17 -

teaches a message that 'identif[ies] a particular media player for playing content from the file.'"  Appx400-401.  Reaching this conclusion, the Board credited "[Google's expert] Dr. Bederson's explanation as to how a person of ordinary skill in the art would have understood Muthukumarasamy's disclosure."  Appx401.

### D.    Touchstream's Patent Owner Response

Following institution, Touchstream opposed Google's grounds on essentially identical bases across the three IPRs.  Appx471-472; Appx3740-3741; Appx7302-7303.  Touchstream asserted that the claimed "media player" means software that does not include non-internet media devices like cable boxes.  *See* Appx524-528.  Touchstream then relied on isolating Muthukumarasamy's teachings related to internet media devices from its teachings related to non-internet media devices.

Touchstream argued that Muthukumarasamy describes "two distinct processes, which use different components of Muthukumarasamy's system to present different types of content:  the 'RCIBS' for internet content and the 'zHub and zNode' for non-internet content."  Appx477.  Touchstream asserted that Muthukumarasamy disclosed two distinct communication paths—one for non-internet media devices (*e.g.*, cable) using Muthukumarasamy's ***media control network*** (the zHub and zNode), and the other for internet media devices (*e.g.*, the RCIBS) using solely ***an internet connection.***  *See* Appx471; Appx511-521;

Appx524-534.  Touchstream contended that Google failed to show a motivation to combine the internet-media-device teachings with the non-internet-media-device teachings to satisfy the "receiving" limitation's path and content requirements. *E.g.*, Appx516-517.

Notably, though, Touchstream did not dispute that messages sent by the IED to the internet media devices meet the "receiving" limitation's content requirement. *See* Appx511-521.  Instead, Touchstream contended that these messages would not travel through the media-control-network path and thus were not received by a "server system."  *See* Appx518-521.  And while not disputing that messages traveling via the media control network satisfied the "receiving" limitation's path requirement, Touchstream asserted these messages did not meet the content requirement because they failed to identify a particular media player and its location.  *See* Appx524-534.

### E.    The Board's Final Written Decisions

The Board's Final Written Decisions concluded that Google did not prove any claim unpatentable.  Appx1; Appx43; Appx83.  The three decisions mirror each other (the differences concern language variations in the challenged claims).  For simplicity, this brief references the decision on the '528 patent.

The Board reached its conclusion through a limited analysis.  For the issues relevant to this appeal—whether skilled artisans would understand

Muthukumarasamy's internet-enabled device as restricted to using different pathways for communicating with internet versus non-internet media devices—the Board's discussion consists of summarizing the parties' positions followed by a terse analysis totaling a handful of sentences.  *See* Appx27-32 (analysis interspersed among summaries of the parties' positions).[3]  In that discussion, the Board accepted Touchstream's argument that skilled artisans would have treated Muthukumarasamy as disclosing two separate and distinct paths with the claimed message content disclosed for only the communication path with internet media devices.  *Id*.  The Board thus concluded that Google did not identify specific disclosure in Muthukumarasamy of a message that meets the "receiving" limitation.  *Id*.  The Board also determined that Google did not show Muthukumarasamy taught a message meeting the content requirement (such as a message to the RCIBS) that would travel through the identified "server system"

---

[3] At the Board, Google presented multiple arguments showing that Muthukumarasamy rendered the challenged claims obvious.  The Board's Final Written Decisions often blurred its analysis of Google's separate arguments.  For instance, in addition to its analysis at Appx27-32 (the portion relevant on appeal), the Board also addressed Google's arguments (i) that the Petitions mapped certain of Muthukumarasamy's components to the claimed "server system" (Appx23-26); (ii) that the RCIBS alone rendered the challenged claims obvious (Appx26-27); and (iii) that the media control network alone rendered the challenged claims obvious (Appx32-34).  On the whole, the Board's analysis of these separate issues is irrelevant to the issues Google advances on appeal.

(*i.e.*, the media control network).  *Id*.  The Board determined that all of the challenged claims were patentable on this same basis.  Appx35-37.[4]

Although its summary of the parties' arguments noted Google's position that skilled artisans would have been motivated by Muthukumarasamy's goal of providing a device- and source-agnostic system, the Board did not analyze this goal when addressing Google's grounds.  *Id.*  Similarly, although the Board's summary of the parties' arguments noted Dr. Bederson's expert testimony (which the Institution Decisions cited as support), the Board's discussion did not address this testimony.  *Id*.[5]

## SUMMARY OF THE ARGUMENT

I.     The challenged claims cover precisely what Muthukumarasamy previously taught and suggested.

I.A.   The parties agree on critical facts.  As a result, this appeal

---

[4] The identical analysis for the '289 patent is on Appx68-77, and for the '251 patent is on Appx110-118.

[5] Touchstream lodged two other arguments based on its view of distinct internet versus non-internet teachings in Muthukumarasamy.  First, Touchstream contended that Muthukumarasamy does not teach a control command that is independent of the particular media player.  Appx535-536.  Second, Touchstream argued that Google failed to prove that skilled artisans would have considered Muthukumarasamy's media control network and Muthukumarasamy's internet server as a single "server system."  Appx536-539.  Because these additional arguments likewise depended on Touchstream's distinction, which was the basis for the Board's determination, they could not support the Board's decision for the same reasons that Google discusses in the Argument section below.

presents a narrow issue:  whether skilled artisans would have understood Muthukumarasamy to teach or at least suggest that the disclosed path for sending commands to non-internet media devices (which meets the "receiving" limitation's path requirement) could also be used for sending commands to internet media devices (commands that meet the "receiving" limitation's content requirement).

 **I.B.** Under a proper application of the obviousness standard, the challenged claims would have been obvious.  As this Court held in similar circumstances, here "the undisputed teaching[s] of [Muthukumarasamy] lead[] one to within a hairsbreadth of anticipation….  The express teachings in the art provide the motivation and suggestion to modify [Muthukumarasamy] such that" the purportedly missing portion of the "receiving" limitation is met.  *See SIBIA*, 225 F.3d at 1359.

 Skilled artisans would have understood that Muthukumarasamy's commands sent from the IED to all media devices—both internet and non-internet—satisfy the "receiving" limitation's content requirement.  This is because skilled artisans would have understood that each request for particular content identifies the media player associated with the content and that media player's location.  Skilled artisans also would have understood Muthukumarasamy to teach the "receiving" limitation's path requirement.  When a user requests or controls content in Muthukumarasamy's system, the media control network receives that command

and, in response, sends that command to the media device associated with that content. Muthukumarasamy teaches this path for non-internet media devices. To the extent Muthukumarasamy does not teach this path for internet media devices, the evidence "shows that the relatively small logical gap between the prior art and the claim"—the IED sending messages to internet media devices via the media control network—"is closed by a person of ordinary skill in the art 'pursu[ing] known options within his or her technical grasp.'" *Scanner*, 528 F.3d at 1382.

II.      The Board reached a contrary conclusion by misapplying this Court's obviousness precedent. Because the Board's findings are derivative of three legal errors, they are unsupported by substantial evidence.

II.A.    The Board conflated a single-reference obviousness analysis with anticipation. By insisting that Muthukumarasamy disclose the elements arranged exactly as recited in the claims, the Board wrongly applied anticipation's more stringent standard rather than obviousness's "expansive and flexible approach." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007). The Board required Google to identify specific disclosure in Muthukumarasamy showing the precise message routing of the challenged claims. That is legal error in an obviousness analysis.

Compounding this error, the Board disregarded expert testimony explaining how skilled artisans would read Muthukumarasamy, which is foundational to the

obviousness inquiry.  Under the Board's approach, each single-reference obviousness challenge would be converted into one for anticipation.

**II.B.**  The Board contravened established precedent instructing that a prior-art reference must be considered for everything it teaches.  *E.g.*, *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012).  When analyzing a single prior-art reference, the reference's treatment of claim elements "as desirable is enough motivation for an artisan to combine them."  *Gen. Elec.*, 983 F.3d at 1352.  Accordingly, a party does not need to "explain why an artisan would be motivated to use each element disclosed."  *Id.*  A contrary approach (taken by the Board here) "unduly dissects prior art references into collections of individual elements."  *Id.*  Deviating from this precedent, the Board severed Muthukumarasamy's disclosure into separate teachings.  By doing so, the Board ignored *General Electric*'s lesson: "a party showing obviousness" need not "re-do the work already done in the prior art reference."  *Id.*

To achieve its goal of "enabl[ing] a device-agnostic and source-agnostic" system, Appx2434, Muthukumarasamy integrates both internet and non-internet media devices.  Using Muthukumarasamy's goal as a guide, skilled artisans would have understood that Muthukumarasamy's IED would communicate with both internet and non-internet media devices via the media control network to send messages, rendering obvious the "receiving" limitation's content and path

- 24 -

requirements.  The Board's contrary conclusion rests on legal error.

**II.C.**  The Board's conclusion implicitly and impermissibly rested on an unsupported teaching-away determination or a requirement that the prior art must disclose the most desirable approach to the claims.  A reference teaches away only when skilled artisans "would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006).  "[S]imply pointing out that the [prior-art] reference itself does not teach the modification ***is not substantial evidence*** of no motivation to modify."  *SIBIA*, 225 F.3d at 1358.  While not using the words "teaching away," the Board's conclusion hinges on the determination that skilled artisans would not have applied the teachings within Muthukumarasamy itself.  Yet the Board cited nothing to support that conclusion other than noting Muthukumarasamy's silence.  That is wrong as a matter of law:  "silence does not imply teaching away."  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 964 (Fed. Cir. 2014).

Relatedly, a prior-art reference need not suggest "the ***best*** option" to achieve the claimed invention to establish obviousness.  *Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1328 (Fed. Cir. 2017) (original emphasis).  Rather, a reference's approach need only be "a ***suitable*** option."  *Id.* (original emphasis).  The Board erred by concluding that Muthukumarasamy's media control network

communicating with an internet media device would not be the most desirable approach to achieve the claims.

**III.**    Muthukumarasamy combined with Hayward also renders the challenged claims obvious.  The Board's contrary determination relies on the same flawed analysis of Muthukumarasamy.

## STANDARD OF REVIEW

This Court "review[s] the Board's compliance with the governing legal standards *de novo* and its underlying factual determinations for substantial evidence."  *Gen. Elec.*, 983 F.3d at 1344.  "Obviousness is a question of law, based on underlying factual findings."  *Id.* at 1345.

## ARGUMENT

An obviousness inquiry requires the Board to analyze a prior-art reference "for everything that it teaches," *Applied Materials*, 692 F.3d at 1298, and "take account of the inferences and creative steps that [skilled artisans] would employ." *KSR*, 550 U.S. at 418.  Under the proper legal standard, the challenged claims would have been obvious in view of Muthukumarasamy (or Muthukumarasamy and Hayward).  *Infra* Parts I, III.  By applying an incorrect legal analysis, the Board wrongly concluded the claims were patentable.  *Infra* Parts II-III.

The discussion below focuses on claim 1 of the '528 patent, which is representative of the challenged claims.  Because the Board's determination

regarding claim 1 of the '528 patent fails, its determination regarding all the challenged claims fails.

## I.   UNDER A PROPER OBVIOUSNESS ANALYSIS, MUTHUKUMARASAMY RENDERS THE CLAIMS UNPATENTABLE

The only meaningful question in dispute for the "receiving" limitation concerns its "content" and "path" requirements—namely, that the "server system" must receive "messages" from the "personal computing device" (the path requirement), and the messages must "identify a particular media player … [and its] location" (the content requirement).  Appx142 (11:20-28).  Between the narrowness of this issue and what Muthukumarasamy teaches, there is only one evidence-supported conclusion:  the challenged claims would have been obvious. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017) (reversing nonobvious determination because the record only supported one permissible conclusion).

### A.   The Parties Agree On The Bulk Of Relevant Facts

The *prima facie* obviousness inquiry examines the level of ordinary skill, the scope and content of the prior art, and the differences between the prior art and the claims to assess whether the prior art would have rendered the claims obvious. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).  Here, the bulk of these relevant facts are undisputed.

Touchstream does not dispute that skilled artisans "would have had 'a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems.'" Appx10; *see* Appx828 (78:6-14).

Touchstream also does not dispute many of Muthukumarasamy's teachings:

*1. Muthukumarasamy's objective.* Touchstream recognizes that "Muthukumarasamy expresses a goal of providing users with a 'device-agnostic and source-agnostic entertainment experience.'" Appx502.

*2. Muthukumarasamy discloses internet media devices providing internet content.* There is no dispute that Muthukumarasamy's system uses diverse media devices, including internet media devices (*e.g.*, the remote-controlled internet browser software ("RCIBS"); an HDMI stick "that streams content over WiFi") and non-internet media devices (*e.g.*, cable). Appx504-505; Appx218. Touchstream also acknowledges that the RCIBS "provid[es] a user with access to internet media content" and is "optimized for internet-media consumption." Appx502; Appx504.

*3. Muthukumarasamy sends commands to control internet media devices that meet the "receiving" limitation's content requirement.* There is no dispute that Muthukumarasamy's internet-enabled device ("IED") (the claimed "personal

computing device") sends commands to control internet media devices, including the RCIBS.  *See* Appx511-517; Appx223-245.  Touchstream also did not dispute that the IED sends commands to the RCIBS that meet the content requirement.  *See* Appx518-521.

### 4. *Muthukumarasamy sends messages through the media control network to non-internet media devices.*  There is no dispute that the IED sends messages to control non-internet media devices, and those messages are received and processed by Muthukumarasamy's media control network.  *E.g.*, Appx514; Appx247.

Notwithstanding these undisputed facts, Touchstream attempted to drive a wedge between Muthukumarasamy's teachings related to internet and non-internet media devices.  Arguing that the term "media player" cannot include non-internet media devices (Appx524-528), Touchstream divorced and isolated teachings within the *same* reference.  Touchstream asserted that Google failed to identify any messages that disclose a particular media player and its location (the content requirement) and are received by the server system (the path requirement).  As explained in Section I.B, artisans at the defined skill level (undisputed), reading Muthukumarasamy's express goal (undisputed) and all of its disclosures, would have readily understood that Muthukumarasamy teaches, or at minimum suggests, using the already-disclosed message path for non-internet devices (undisputed) to send messages to internet media devices.

## B.     Muthukumarasamy Renders The "Receiving" Limitation Obvious

A single prior-art reference renders claims obvious when its teachings suggest the invention to skilled artisans.  *SIBIA*, 225 F.3d at 1357-58.  This suggestion "may be derived from the prior art reference itself, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved." *Id.* at 1356.  Here, "the undisputed teaching[s] of [the prior-art reference] lead[] one to within a hairsbreadth of anticipation…. The express teachings in the art provide the motivation and suggestion to modify [the prior-art reference] such that" the missing limitation is met.  *Id.* at 1359.

It is undisputed that Muthukumarasamy teaches:  (i) an IED that sends commands to internet media devices that meet the "receiving" limitation's content requirement, and (ii) a path where the IED sends commands through the media control network to non-internet media devices that meets the path requirement. *Supra* Section I.A.  The parties' dispute is whether skilled artisans would have read Muthukumarasamy to disclose (or at least suggest) that the same pathway through which the IED sends commands to non-internet media devices would also be used to communicate with internet media devices.  The only purported gap between Muthukumarasamy and the challenged claims is the sending of a message to an internet media device (fulfilling the content requirement) via the media control network (fulfilling the path requirement).  Under a proper legal analysis, the

evidence "shows that the ***relatively small logical gap*** between the prior art and the claim in this case is closed by a [skilled artisan] 'pursu[ing] known options within his or her technical grasp.'" *Scanner*, 528 F.3d at 1382.

### 1. Skilled Artisans Would Have Understood That Muthukumarasamy's Messages Satisfy The "Receiving" Limitation's Content Requirement

Touchstream did not dispute that Muthukumarasamy teaches sending messages to internet media devices that satisfy the "receiving" limitation's content requirement, *e.g.*, messages to the RCIBS.  *See* Appx518-521 (arguing only that RCIBS messages do not meet the path requirement).  And for good reason.  Skilled artisans would consider Muthukumarasamy "for everything it ***teaches*** by way of technology," especially the problem it seeks to solve.  *See EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985); *see also Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (disregarding an undisputed disclosure fails to read reference for everything it teaches).  Here, skilled artisans would read the entirety of Muthukumarasamy's teachings in view of its goal to provide a source- and device-agnostic system.  *See* Appx2055-2059 ¶¶ 37-40; Appx2066-2067 ¶¶ 56-58; Appx2434; Appx2464-2465 ¶ 27.  In doing so, skilled artisans would have understood that Muthukumarasamy's IED sends messages that satisfy the "receiving" limitation's content requirement of "identify[ing] a particular media player … [and] a location of the particular media player."

Muthukumarasamy aggregates content "from a multitude of sources, for example, subscription media, broadcast media, … and internet media." Appx2464 ¶ 47. The internet sources include "Netflix, Cinema Now, Amazon Video On Demand, etc." Appx2471 ¶ 134. Figure 1 illustrates a variety of devices that can be integrated into Muthukumarasamy's system, including media devices that access internet content and those that do not:



FIG.1

Appx205. Figure 2 illustrates the content aggregation on the IED.



FIG.2

Appx2436.

Muthukumarasamy explains that the IEDs "navigate through media or entertainment content" and "control media components … to watch and/or listen to media content."  Appx2464 ¶ 26.  The IEDs can be "smartphones, tablet computers, [and] touch-enabled devices (e.g., iPhone®, iPod®, iPad®, etc.)."  *Id.*  Figures 2 and 3 show how users select media content from the IED's interface.  Appx2436-2437; Appx2465-2466 ¶¶ 47-48; Appx2468 ¶ 77; Appx2086-2087 ¶ 97.

Muthukumarasamy also teaches "stream[ing] internet content over WiFi" to a television via an internet media device, such as Sky "hosted (e.g., preinstalled) on the zHDStick."  Appx2465 ¶ 45.  Touchstream conceded that skilled artisans would understand the zHDStick to function like the RCIBS.  Appx615; Appx3389 ¶ 118.  Muthukumarasamy teaches that, by using the RCIBS, the IED sends

commands to play content "as specified by [a] 3rd party using 3rd party [application program interfaces] and Video Players":

| Command | Result |
|---|---|
| Go to webpage with given URL | ZRCIBS loads and displays the webpage that is present at the given internet URL |
| While on webpage, Navigate: Up/down/right/left<br><br>(This is done via button presses or gestures on the Zelfy application) | ZRCIBS jumps hyperlink to next hyperlink. |
| Play video at given URL | ZRCIBS plays the video present at the given URL |
| Execute Transport Command (Play, Pause Fastforward, rewind) on currently playing video | ZRCIBS executes the transport command on the current playing video. |
| Play audio at given URL | ZRCIBS plays the audio present at the given URL |
| Execute Transport Command (Play, Pause Fastforward, rewind) on currently playing audio | ZRCIBS executes the transport command on the current playing audio. |
| Play flash swf game or other game at given URL | ZRCIBS loads and presents the game (adobe flash swf of other) present at the given URL |
| While on game: Pass game command.<br><br>(This is done via button presses or gestures on the Zelfy application) | ZIMMS executes the command in the game. |
| Play video with given video-id (as specified by 3rd party using 3rd party APIs and Video Players | ZRCIBS loads the 3rd Party Video Player specified and plays the video with given videoid |
| Play audio with given audio-id (as specified by 3rd party using 3rd party APIs and audio Players | ZRCIBS loads the 3rd Party Audio Player specified and plays the audio with given audioid |

## FIG.19

Appx2463 (highlighting added).  In response to the play command, the RCIBS "loads the 3rd Party Video Player specified and plays the video." *Id.* Muthukumarasamy further explains that the IED sends a command to "[p]lay video at [a] given URL" and loading the URL (uniform resource **locator**) for the selected video. *Id.*; *see also* Appx2464 ¶ 25; Appx2465 ¶ 45; Appx2469 ¶ 83.

Viewing Muthukumarasamy's disclosure as a whole, Google's expert Dr. Bederson explained that skilled artisans would have found that Muthukumarasamy

rendered obvious the "receiving" limitation's content requirement because:

> Muthukumarasamy teaches that a user selects media content from various disparate sources, which is then delivered to the selected media device for playback depending on the media type, in my opinion, [skilled artisans] would have **understood each request for particular content to identify a media player associated with the particular source of the content, as well as its location**, or at least information that may be used to locate the media player. That is, **because there are many media players representing many media sources**, **the request must provide information to locate the appropriate media player so the system may load the appropriate media player** to play the content.

Appx2088-2089 ¶ 100; *see* Appx2591 (Touchstream construing "receiving" limitation to mean "information that locates or may be used to locate the particular media player"). Dr. Bederson further testified that skilled artisans "would have understood that Muthukumarasamy, **by identifying different media content choices from different sources**, such as DVR or Internet media, **would also identify a location of the associated media player**, because Muthukumarasamy's content choices are derived from different hardware," including content "obtained over the Internet." Appx2089 ¶ 101.

Addressing Muthukumarasamy's disclosure of accessing internet content via the RCIBS, Dr. Bederson's testimony explained that skilled artisans "would have understood Muthukumarasamy to teach that the command sent from the IED specifies the video (a file to be acted upon), and the Video Player to play the video (*a particular media player for playing content from the file*)." Appx2089-2090 ¶ 102 (original emphasis). Based on these teachings, Dr. Bederson testified that

skilled artisans "would have understood that Muthukumarasamy's command to 'Play video at given URL' (at a given Uniform Resource **Locator**) associated with the media player identifies *a location of the particular media player* because, in my opinion, [skilled artisans] would have **understood that a URL provides an address to a media player**." *Id.*

> **2.    Skilled Artisans Would Have Understood That Muthukumarasamy's Server System Receives Messages Satisfying The "Receiving" Limitation's Path Requirement**

Skilled artisans would also understand that Muthukumarasamy discloses (or at minimum suggests) that the IED sends messages through the media control network—the claimed "server system"—to devices with internet media content, thereby meeting the path requirement of "receiving, in a server system, one or more messages from a personal computing device." Appx142 (11:20-21).

Muthukumarasamy undisputedly teaches that IEDs send commands to internet media devices. Muthukumarasamy also undisputedly teaches a path where the IED sends commands through the media control network to non-internet media devices. To the extent Muthukumarasamy does not explicitly disclose that IEDs use the same path to communicate with internet media devices, this "relatively *small logical gap* between the prior art and the claim … *is closed* by a [skilled artisan] '*pursu[ing] known options* within his or her technical grasp.'" *Scanner*, 528 F.3d at 1382.

Muthukumarasamy explains that commands between the IEDs and media devices flow through the media control network (the zNode and zHub).  Appx2465 ¶ 44.  After a user selects content on the IED, Muthukumarasamy's "software enables … gesture-based control of media components" with commands such as "pause/play."  Appx2466 ¶ 50.  The commands "enable the [user] to **access and control** media and components."  *Id*.

Muthukumarasamy teaches that the media control network works with the internet server to mediate the commands between the IEDs and media devices:

> When the IED sends a command, **the zHub receives the command** from the IED **and resolves the command into a specific instruction** directed at a specific zNode[.]

Appx2466 ¶ 57.  In particular, the media control network "receives signals or commands from the IED via a local or premise network (e.g., router, WiFi, etc.) and **translates the commands** to RF [radio-frequency] signals."  Appx2465 ¶ 44. The media control network then "translates the RF signals to a protocol … **interpretable by the media components**."  *Id*.  Muthukumarasamy discloses that "[t]he zHub can cache IR codes **or other data that may be used to control media devices**," and can "look[] up the code (e.g., from the internet server)."  Appx2466 ¶ 57.  Depicting the diversity of communication protocols through the media control network, Figure 1 shows both infrared and radio-frequency ("RF") signals sent from the media control network (via a zNode) to media devices:



[Appx2435](#) (annotated and cropped).  This disclosure of the media control network teaches the "receiving" limitation's path requirement.

Dr. Bederson's testimony confirms that Muthukumarasamy teaches the claimed path requirement.  As Dr. Bederson explained, when a user selects content, "the zHub, a component of the server system, 'receives signals or commands from the IED via a local or premise network (e.g., router, WiFi, etc.),'" and "*[i]n response,* Muthukumarasamy's [system] 'controls delivery of selected media content and selects and controls the media devices that deliver the selected media content according to a media type of the selected media content.'" [Appx2087-2088](#) ¶ 98.  Dr. Bederson further noted that, after "receiving the … commands" from the IED, "the zHub, one component of the server system,

translates commands into RF signals for controlling a particular media device (content presentation device) associated with a zNode." Appx2105 ¶ 123.

Dr. Bederson's testimony reflects how skilled artisans would read Muthukumarasamy. *See* Appx2055-2059 ¶¶ 37-40. As Dr. Bederson explained, "the IED's signal is sent to the content presentation device ***through*** a server system"—*i.e.*, "the IED sends to the zNode a command." Appx2056-2057 ¶ 38.

Dr. Bederson further explained that, to achieve Muthukumarasamy's "device-agnostic" system, skilled artisans would have understood that the media control network provides a path for messages between the IED and selected media devices (including internet media devices):

> Muthukumarasamy expressly describes how the DBCS-mediated control can create a "***device-agnostic***" experience: by translating (e.g., using a zHub and a zNode) universal commands sent by the IED into device-specific commands interpretable by the display device.

Appx2066 ¶ 57 (original emphasis); *see* Appx2073-2075 ¶¶ 70-72. The communication path through the media control network, regardless of whether the media devices access internet or non-internet content, achieves Muthukumarasamy's objective of providing a device-agnostic experience by having the media control network translate all commands sent by the IED into commands to all media devices.

Muthukumarasamy's teachings and Dr. Bederson's concrete testimony establish that skilled artisans—having a degree in "electrical engineering … and

two years of experience designing or implementing interactive systems with networked media or media playback systems," Appx10—would have been motivated to apply Muthukumarasamy's known option of the communication path between IEDs and non-internet media devices to Muthukumarasamy's disclosure of communications between IEDs and internet media devices.  Indeed, "the level of ordinary skill will often predetermine whether an implicit suggestions exists." *DyStar Textilfarben GmbH v. C.H. Patrick Co*., 464 F.3d 1356, 1370 (Fed. Cir. 2006).

Contrary to Touchstream's assertion, Muthukumarasamy never restricts the type of media devices that the IED can communicate with via the media control network.  Muthukumarasamy emphasizes that any media device can be controlled by "using a combination of premise hardware, a software system, and/or internet access" to "allow[] consumers to select and control media content via their internet-enabled device." Appx2465 ¶ 27; *see* Appx2465 ¶ 44; Appx2469 ¶ 84. Demonstrating that the media control network resolves and sends commands to diverse sources, Muthukumarasamy provides tables of exemplary commands to both internet (*e.g.*, "Sky") and non-internet (*e.g.*, DVR) media devices.  Appx2466 ¶ 52; Appx2439-2441 (Figures 5-6); Appx2465 ¶ 45 ("zSky agent can be hosted (e.g., preinstalled) on the zHDStick," a device that "streams internet content over WiFi.").

Muthukumarasamy also refutes Touchstream's attempt to limit communications between the media control network and media devices to an infrared protocol.  Muthukumarasamy expressly contemplates that the media control network uses a variety of protocols to communicate with diverse media devices.  The reference teaches that the media control network uses "a protocol … interpretable by the media components," providing infrared as one example. Appx2465 ¶ 44.  Indeed, Muthukumarasamy explains that "[t]he zHub and zNode communicate with each other using a general purpose radio that is ***compatible with other communication protocols*** and devices."  Appx2471 ¶ 133. Muthukumarasamy also discloses that "[t]he zHub can cache IR codes ***or other data that may be used to control media devices***."  Appx2466 ¶ 57.  And Muthukumarasamy even illustrates the media control network sending infrared and other radio-frequency (*i.e.*, non-infrared) signals to media devices.  Appx2435.

Muthukumarasamy additionally instructs that its components "comprise software and … hardware that listen on WiFi and transmit radio signals in the frequency of a ***remote***-controlled or ***radio***-controlled device."  Appx2471 ¶ 136. The availability of various protocols accords with Muthukumarasamy's guidance that "anyone of ordinary skill in the art will appreciate that many variations and alterations" of the media control network and other teachings "are within the scope of" the disclosure.  Appx2465 ¶ 28 (the disclosures are "illustrative" and "set forth

without any loss of generality to, and without imposing limitations on," the teachings).  Here, given the stipulated skill level, "one can assume comfortably that such an artisan will draw ideas from [electrical engineering or computer science]—without being told to do so."  *DyStar*, 464 F.3d at 1370.

Likewise, Dr. Bederson explained that skilled artisans would have understood Muthukumarasamy to convey that the media control network uses diverse protocols to communicate commands and works with the internet server to facilitate using these diverse protocols:

> [U]pon receiving the signals or commands [from the IED], the zHub, one component of the server system, ***translates commands into RF signals for controlling a particular media device*** … associated with a zNode.  In my opinion, to translate a command into an RF signal, [skilled artisans] would have understood that the RF signal is also identified.

> [T]he translated commands from zHub are then sent to the identified zNode, where the ***zNode further translates the commands into a protocol that is "interpretable by the media components" of the particular media device***.  For this second conversion, the zNode, another component of the server system, receives RF signals from the zHub and "translates the RF signals to a protocol (e.g. Infrared) interpretable by the media components" of the particular media device.  The zNode and zHub may look up and identify the code from the Internet server as part of translating the RF signal to a desired protocol."

Appx2105-2106 ¶¶ 123-124.  Given this disclosure, Dr. Bederson testified that "the zHub ***receives the command and translates it*** to correspond to the particular media device playing the selected media content in a media player."  Appx2097 ¶ 113.  Thus, regardless of whether the media content is from an internet or non-

- 42 -

internet media device, skilled artisans "would have understood the signal [sent from the media control network] to be a command for controlling the playing of video content at the display device by the particular media player." *Id.*; Appx2107 ¶ 127.

C.     **Skilled Artisans Would Have Understood That Muthukumarasamy Renders Obvious The "Obtaining" Limitation In The '528 Patent And The "Loading" Limitation In The '528 And '289 Patents**

As explained in Section I.B, skilled artisans would have understood that Muthukumarasamy teaches or at a minimum suggests that the media control network receives messages from the IED that identify a particular media device and its location and translates those messages to commands to the device. This renders the "obtaining" and "loading" limitations obvious.

Regarding the "obtaining" limitation in the '528 patent, the IED's commands would cause the media device (the claimed "content presentation device") to obtain the requested media player over a network, rendering obvious this limitation. Touchstream itself acknowledged that a request to the RCIBS, an internet media device, causes the RCIBS to "interact[] with the appropriate Online Video/Music/Photo Services [] using its WiFi connection to access the internet" and to "***retrieve[]*** the media content over the same connection." Appx505 (citing Muthukumarasamy's ¶ 83 (Appx2469) and Figures 1, 18-19 (Appx2435; Appx2462-2463)).

- 43 -

Regarding the "loading" limitation in claim 1 of the '528 patent and claim 2 of the '289 patent, the Board determined that Muthukumarasamy did not render this limitation obvious because Google did not show that "Muthukumarasamy teaches [this limitation] *in the zHub/zNode process*." Appx34; Appx75. This determination hinges on the premise that Muthukumarasamy's media control network (the zHub and zNode) does not communicate with internet media devices, such as the RCIBS. *See id.* Touchstream does not meaningfully dispute that the RCIBS, which Touchstream argues resides on the content presentation device, teaches the "loading" limitation. *See* Appx515. Nor could it. As Google explained, Muthukumarasamy expressly teaches that, on receipt of a command to play a video using a certain video player, the RCIBS "*loads the … [v]ideo [p]layer specified*." Appx219 (quoting Figure 19 of Muthukumarasamy (Appx2463)); Appx3498 (same); *see* Appx251; Appx3535. Because skilled artisans would consider the media control network's communication pathway available to internet media devices such as the RCIBS, *supra* Section I.B.2, Muthukumarasamy renders this limitation obvious.[6]

<p style="text-align:center">*     *     *</p>

---

[6] The challenged claims' preambles also include reference to loading media players, but the Board never treated the preambles as limiting. Regardless, this same analysis would render the preambles obvious.

Applying the proper legal inquiry, the only evidence-supported conclusion is that Muthukumarasamy renders obvious the challenged claims. As explained in Part II, the Board's contrary determination rests on legal errors and its findings are therefore unsupported by substantial evidence.

## II.    THE BOARD COMMITTED LEGAL ERROR BY APPLYING INCORRECT OBVIOUSNESS STANDARDS

The Board commits legal error by "narrowly focusing" on a certain part of a prior-art reference's disclosure while "ignoring the additional record evidence … to demonstrate the knowledge and perspective of [skilled artisans]." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). The Board did so here.

The Board's determination rests on three related legal errors. *First*, the Board wrongly demanded anticipation's precision rather than obviousness's flexibility. Unlike anticipation, an obviousness analysis—including single-reference obviousness here—takes into account what a reference would have suggested to skilled artisans even if not expressly disclosed in the manner claimed. *Infra* Section II.A. *Second*, the Board improperly dissected and isolated Muthukumarasamy's teachings, thereby failing to read the reference for everything it teaches. *Infra* Section II.B. *Third*, the Board's determination relied on silence to implicitly conclude that Muthukumarasamy teaches away from using the media control network with internet media devices or does not disclose that path as the best approach. This is also legal error. *Infra* Section II.C. Each legal error renders

the Board's determination without substantial evidence. *See Weber, Inc. v. Provisur Techs., Inc.*, 92 F.4th 1059, 1070-72 (Fed. Cir. 2024).

### A. The Board Wrongly Conflated A Single-Reference Obviousness Analysis With Anticipation And Improperly Discounted The Skilled Artisan's Perspective

Failing to conduct a correct single-reference obviousness analysis, the Board treated Muthukumarasamy as if Google advanced an anticipation ground by demanding express disclosure in the manner claimed and constraining the understanding of skilled artisans. Indeed, Touchstream improperly invited an anticipation analysis. *E.g.*, Appx605; Appx810-812 (60:14-62:5) (citing anticipation cases at hearing).

### 1. The Board Erred By Requiring Google To Show Where Muthukumarasamy Disclosed The "Receiving" Limitation As Arranged In The Claims

Whereas anticipation requires a prior-art reference to disclose "all of the limitations of the claim 'arranged or combined in the same way as in the claim,'" *Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1371 (Fed. Cir. 2023), obviousness involves a more "expansive and flexible approach" applying the lens of artisans having "ordinary creativity" and the ability to recognize "predictable solutions" to well-known problems, *KSR*, 550 U.S. at 415, 421. The obviousness "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim" because the Board "can take account of the inferences and

creative steps that [skilled artisans] would employ." *Id.* at 418.  Obviousness takes into account "the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications." *Randall*, 733 F.3d at 1362.  As this Court explains:

> By narrowly focusing on the … prior-art reference[] … and ignoring the additional record evidence [Petitioner] cited to demonstrate the knowledge and perspective of one of ordinary skill in the art, ***the Board failed to account for critical background information that could easily explain why an ordinarily skilled artisan would have been motivated*** to combine or modify the cited reference[] to arrive at the claimed invention[].

*Id.*  These principles require the Board to avoid taking a "cramped view of what the prior art teaches" and instead evaluate what the reference, read as a whole, would suggest to skilled artisans.  *Allergan*, 754 F.3d at 963-64.

The Board failed to adhere to these principles.  Eschewing *KSR*'s flexible analysis, the Board repeatedly faulted Google for not specifically identifying where Muthukumarasamy discloses the claimed path and content requirements precisely arranged as in the challenged claims.  As a result, the Board failed to account for the skilled artisan's creativity and common sense.

***Figure 18.***  Addressing Muthukumarasamy's Figure 18 regarding the remote-controlled internet browser software ("RCIBS"), the Board wrongly demanded anticipation's precision rather than obviousness's flexibility.  Segregating Figure 18 from Muthukumarasamy's other teachings, the Board stated

that "***Figure 18 does not disclose*** any communication between the personal computing device … and the components identified by [Google] as the server system." Appx27.  Because Figure 18 did not explicitly show the exact path recited in the claims for Muthukumarasamy's internet media devices, the Board concluded that Google "ha[d] not shown that the RCIBS disclosures teach" that requirement.  Appx27.

The Board's rigid analysis is the opposite of the obviousness inquiry.  As discussed above in Part I, Figure 18 must be read in light of Muthukumarasamy's other disclosures.  Under Section 103, it is legal error for the Board to seize on a prior-art reference's lack of disclosure while "fail[ing] to consider what the [reference] would fairly suggest" to skilled artisans.  *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, Nos. 2022-1258, 2022-1307, 2024 WL 1355733, at *10 (Fed. Cir. Apr. 1, 2024).

***The Paths in Figure 1 and Figure 18.***  Even when the Board considered Google's showing that Figure 1 read together with Figure 18 and other RCIBS disclosure suggested the claimed path requirement, the Board repeated the same legal error.  Appx28-29.  Instead of flexibly analyzing what this disclosure would suggest to skilled artisans, the Board stringently restricted its view of Muthukumarasamy's teachings only to the precise paths illustrated in the reference.  For instance, the Board stated that the disclosure in Figure 18—"a block

diagram of a home network comprising the IED along with a computer hosting the RCIBS, under an embodiment," Appx2464 ¶ 24—shows "communicat[ion] *directly between* the user's device and the RCIBS." Appx29. The Board further stated that "Figure 1 shows several 'WiFi' paths that *do not go through the zHub*." Appx28-29. From these disclosures, the Board determined that, because "Muthukumarasamy indicates that the 'Wireless Router' in Figure 1 provides the WiFi network," the "devices that are WiFi connected would communicate via the Router and bypass the 'server system' identified" by Google. Appx29. Doing so was improper because skilled artisans "can be motivated to do more than one thing." *Janssen*, 2024 WL 1355733, at *11.

*Sky.* The Board committed the same error concerning Muthukumarasamy's teachings about the "zSky software agent" ("Sky"). Google identified Sky as one example where Muthukumarasamy contemplates that messages from the IED concerning internet media devices would be received by the media control network. Appx566-569. Google specifically cited to Muthukumarasamy's Figure 5 (Appx2439) and its collective treatment of commands to Sky and non-internet media devices (*e.g.*, Blu-ray). Appx567-568.

The Board, however, faulted Google for "not direct[ing] [it] to any disclosure in Muthukumarasamy showing that commands to play content using 'Sky' flow through the zNode and the zHub." Appx28. Again wrongly truncating

its analysis, the Board stated that "Muthukumarasamy does not disclose that such a path would be used." Appx28. The Board's demand for an express disclosure invokes an anticipation analysis rather than determining what the reference as a whole would "fairly suggest" to skilled artisans. *Janssen*, 2024 WL 1355733, at *9. It is legal error to "cut short the [obviousness] analysis after identifying differences between the claims and each reference." *Id.* at *12.

In each instance, the Board erroneously took a "cramped view of what the prior art teaches." *Allergan*, 754 F.3d at 963 (rejecting pinched obviousness analysis akin to anticipation). This Court rejects such "a rigid approach to determining obviousness," *Randall*, 733 F.3d at 1362, and demands "a more 'expansive and flexible approach' in determining whether a patented invention was obvious," *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010).

### 2. The Board Improperly Disregarded Expert Testimony Explaining How Skilled Artisans Would Have Understood Muthukumarasamy's Teachings

This Court directs that it is legal error to "analyze[] the prior art without giving the needed weight to the perspective of a [skilled artisan] capable of deducing what references fairly suggest or employing ordinary creativity." *Janssen*, 2024 WL 1355733, at *9. Here, the Board compounded its errors by failing to account for Dr. Bederson's testimony about what Muthukumarasamy would suggest to skilled artisans. Setting aside summaries of each party's

positions, at no point did the Board's actual analysis discuss or engage with this expert testimony. *Compare, e.g.*, Appx27-32 (silence in the Final Written Decision regarding Dr. Bederson's testimony about the "receiving" limitation), *with* Appx230-234 (Petition discussing the "receiving" limitation in view of expert testimony); Appx574-575 (Google's reply discussing expert testimony); Appx2055-2058 ¶¶ 37-39 (Dr. Bederson's testimony about what Muthukumarasamy as a whole teaches skilled artisans); Appx2078-2090 ¶¶ 78-83, 97-103 (Dr. Bederson's testimony addressing the content and path requirements); Appx2105-2107 ¶¶ 122-127 (same).

The Board's rejection of Google's argument that "[n]othing in Muthukumarasamy suggests the presentation of internet content on a media device—even a media device employing Muthukumarasamy's RCIBS—is 'separate' or 'distinct' from the zHubs/zNodes" highlights the Board's failure to consider Dr. Bederson's testimony. Appx29 (quoting Appx560). The Board concluded that Google's "assertions about devices working together fall short of proving by preponderant evidence that Muthukumarasamy discloses the particular messaging contents and path recited." Appx30. Yet the Board reached that conclusion by completely ignoring Dr. Bederson's testimony on this precise issue—testimony that Google repeatedly presented to the Board. *See* Appx230-234; Appx574-575; Appx2055-2058 ¶¶ 37-39; Appx2078-2090 ¶¶ 78-83, 97-103;

Appx2105-2107 ¶¶ 122-127.  By doing so, the Board erred both substantively and procedurally.

Substantively, the Board "failed to meaningfully consider" Muthukumarasamy's disclosure and Dr. Bederson's "accompanying expert testimony." *Weber*, 92 F.4th at 1071-72.  By sidelining testimony explaining the skilled artisan's perspective, the Board failed to apply binding precedent.  As explained in Sections I.B.1-2 above, under a proper analysis that considers Dr. Bederson's testimony, the only evidence-supported conclusion is that skilled artisans would have found the "receiving" limitation's content and path requirements to be obvious.  "The evidence offered by [Google], showing that [Muthukumarasamy] disclose[s] the ["receiving"] limitation from claim 1 in each challenged patent, leaves the Board's contrary finding without substantial evidentiary support." *See Weber*, 92 F.4th at 1071-72.  The Board's patentability determination should be reversed.

At a minimum, the Board procedurally erred by failing to even consider Dr. Bederson's testimony, requiring vacatur.  While the Board is not obligated to address "every issue or every piece of evidence" before it, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017), the Board "***must examine the relevant data*** and articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the Board failed to engage with Dr. Bederson's testimony that directly, and in detail, addressed a pivotal issue in the Final Written Decisions. The need to address this testimony is confirmed by the Board's weighing and crediting this same testimony in its Institution Decisions. *E.g.*, Appx400-401. "The Board's failure to consider that evidence—its failure to consider the knowledge of one of skill in the art appropriately—was plainly prejudicial." *Randall*, 733 F.3d at 1363.

### B.   The Board Legally Erred By Failing To Analyze Muthukumarasamy As A Whole, Instead Dissecting And Isolating Its Teachings

The Board further erred in dissecting individual disclosures in Muthukumarasamy without evaluating its teachings as a whole. A "reference must be considered for ***everything it teaches by way of technology*** and is not limited to the particular invention it is describing and attempting to protect." *Belden*, 805 F.3d at 1076. Accordingly, "all of the disclosures in a reference … must be evaluated for what they fairly teach one of ordinary skill in the art." *In re Inland Steel Co.*, 265 F.3d 1354, 1361 (Fed. Cir. 2001).

These principles have particular force for a single-reference obviousness analysis. As this Court explained in *General Electric*, a party need not "explain why an artisan would be motivated to use each element disclosed in [a single reference]," so long as the reference "treats the claim [elements] as desirable." 983 F.3d at 1352. A contrary "approach would require a motivation to combine each

element of the claim—even those present together in a reference." *Id.* That "unduly dissects prior art references into collections of individual elements," and improperly forces "a party showing obviousness to re-do the work already done in the prior art reference." *Id.* Here, the Board repeated the same errors that this Court corrected in *General Electric*.

### 1.    The Board Dissected Muthukumarasamy's Teachings

Throughout its Final Written Decisions, the Board divorced each of Muthukumarasamy's teachings from the whole of what the reference teaches and suggests to skilled artisans. As a result, the Board viewed Muthukumarasamy's disclosures as individual trees rather than as part of the collective forest. That is precisely what this Court warns against: "an invention in the prior art … ***is more than the sum*** of its individual elements." *Gen. Elec.*, 983 F.3d at 1352. That is why the Board must consider a prior-art reference "***not only*** for what it expressly teaches, ***but also for what it fairly suggests***." *Bradium*, 923 F.3d at 1049. Failing to do so here, the Board instead "inflat[ed] the significance of minor variations between the prior art and the claims." *Janssen*, 2024 WL 1355733, at *9.

***Figure 18.*** Addressing Figure 18, which shows one embodiment of the RCIBS (Appx2464 ¶ 24), Google consistently situated the figure in the context of Muthukumarasamy's teachings as a whole. *See* Appx204-207; Appx216-220; Appx252-254; Appx566-573. Dr. Bederson's testimony did likewise. *See*

- 54 -

Appx2055-2059 ¶¶ 37-40; Appx2071-2075 ¶¶ 66-73; Appx2110-2112 ¶ 132.

By contrast, the Board isolated this figure and concluded that "messages to the RCIBS do not go through the identified 'server system'" because "***Figure 18 does not disclose*** any communication between the personal computing device … and components identified by [Google] as the server system." Appx27. Focusing exclusively on Figure 18 and no other disclosure in Muthukumarasamy, the Board improperly removed Figure 18 from the full context of Muthukumarasamy's disclosures. Such a "siloed and inflexible approach" is legal error. *Janssen*, 2024 WL 1355733, at *9.

***Sky.*** The Board's legal error is equally apparent regarding Muthukumarasamy's Sky disclosure. *See* Appx28. Rather than analyze the Sky-related disclosure within the entirety of the reference, the Board excised those teachings and concluded that Google did "not direct [it] to any disclosure in Muthukumarasamy showing that commands to play content using 'Sky' flow through the zNode and the zHub [*i.e.*, the media control network]." Appx28. The Board further concluded that "Muthukumarasamy does not disclose that such a path would be used, and it is not clear why it would when zSky is internet connected." Appx28. Like its treatment of Figure 18, the Board dislocated the Sky-related teaching from its context in Muthukumarasamy, thereby "unduly dissect[ing] [Muthukumarasamy] into [a] collection[] of individual elements." *See*

*Gen. Elec.*, 983 F.3d at 1352.

**Figure 5's Commands.** Even when the Board addressed Muthukumarasamy's Figure 5, it focused solely on a single command and entirely ignored the others. Google explained that Figure 5 shows that commands for Sky, an internet media device, are presented collectively with commands for non-internet media devices. Appx567-568.



| Gesture | | Watching Live TV | Watching DVR | Watching DVR/Blu-ray/Sky/VCR | Onscreen Browsing UI For TV: Guide/DVR/DVD/Blu-ray/Sky |
|---------|---|---|---|---|---|
| ↑ | Up | Volume Up | Volume Up | Volume Up | Move Selection/Cursor Up |
| ↑ | Continuous Up | Continuous Volume Up | Continuous Volume Up | Continuous Volume Up | Cont.Move Selection/Cursor Up Page Up |
| ↓ | Down | Volume Down | Volume Down | Volume Down | Move Selection/Cursor Down |
| ↓ | Continuous Down | Continuous Volume Down | Continuous Volume Down | Continuous Volume Down | Cont.Move Selection/Cursor Down Page Down |
| ← | Left | Channel Down | Enter Rewind Mode | Enter Rewind Mode | Move Selection/Cursor Left |
| ← | Continuous Left | Continuous Channel Down | Scrub Back While Finger Down | Scrub Back While Finger Down | Cont.Move Selection/Cursor Left Page Left |
| → | Right | Channel Up | Enter Fast Forward Mode | Enter Fast Forward Mode | Move Selection/Cursor Right |
| → | Continuous Right | Continuous Channel Up | Scrub Forward While Finger Down | Scrub Forward While Finger Down | Cont. Move Selection/Cursor Right Page Right |
| ↻ | Clockwise | Back in Channel History | Jump Back 10 Seconds | Jump Back 10 Seconds/Prev. Chapter | Previous Screen |
| ↺ | Counter Clockwise | Forward in Channel History | Jump Forward 30 Seconds | Jump Forward 30 Seconds/Next Chapter | Next Screen |
| ○ | Select | Mute | Play/Pause | Play/Pause | Select |
| ◎ | Menu | TV Menu | DVR Menu | DVR Menu | Menu/Up/Previous |
| ◉ | Content Required Contextual Menu | N/A | Show Info | Contextual Menu | Contextual Menu |
| ○ | Search (Button) | Search UI & Keyboard on Device: Scoped to TV Guide | Search UI & Keyboard on Device: Scoped to DVR Content | Search UI & Keyboard on Device: Scoped to Universal Search | Search UI & Keyboard on Device: Scoped to Appropriate Service |
| ⋈ | Switch Context to Z' (Button) | Switch from 10' Experience to Z' Experience | | | |

10' Experience, Eyes on the TV, Until Viewer Presses Search Button

FIG.5

Appx568 (highlights to Appx2439). As examples, Google cited Sky's "Volume Up," "Rewind," "Fast Forward," and "Play/Pause" commands that are listed in parity with the same commands for non-internet media devices. Appx567; Appx2439.

Rather than address the import of Muthukumarasamy's collective treatment of these commands, the Board focused only on the "Volume Up" command to conclude that "***even under [Google's] scenario*** that the 'Volume Up' command flows from the IED … through the zHub/zNode … to the TV …, this command does not 'identify a particular media player for playing content from the file.'" Appx30.  But that was not Google's "scenario" because the Board wrongly ignored Muthukumarasamy's other expressly disclosed commands that deal directly with internet media players, such as "Play/Pause," "Rewind," and "Fast Forward."  *E.g.*, Appx2439 (Figure 5 explaining that these commands cause actions on "DVR/Blu-ray/***Sky***/VCR"); Appx2466 ¶¶ 50-52; Appx2072 ¶ 68; Appx2096 ¶ 112.

Having selectively ignored these commands, the Board reached the erroneous conclusion that Google "has not shown any messages in Muthukumarasamy that 'identify a particular media player for playing content from the file' and flow from the IED through the zHub/zNode to the content presentation device."  Appx30.  The Board erred by myopically focusing on a single command divorced from its surrounding context.  That was improper because, "[i]nstead of considering the prior art in context" and "fully assessing the teachings in toto," the Board's analysis "tackle[s] the express statements of [the] reference one-by-one."  *Janssen*, 2024 WL 1355733, at *9.

### 2.    The Board Failed To Analyze Muthukumarasamy For Everything It Teaches

By dissecting Muthukumarasamy, the Board failed to read

Muthukumarasamy "for everything that it teaches." *Applied Materials*, 692 F.3d at

1298.  As explained in Sections I.B.1-2, evaluating Muthukumarasamy's

disclosure in full context and accounting for its goal to provide a source- and

device-agnostic system, shows Muthukumarasamy would have suggested to skilled

artisans that internet-media-device messages are sent from the IED to the media

control network, thereby meeting the "receiving" limitation's path requirement.

Without any accompanying analysis (Appx29-32), the Board ignored that,

among other things, Muthukumarasamy: (i) provides a unified discussion of

internet and non-internet media devices, and (ii) is entirely silent about any

separate or distinct treatment of these devices.  Appx559-582 (discussing

Muthukumarasamy's teachings).  Instead, the Board summarily concluded that

Google's "assertions about ***devices working together*** fall short of proving by

preponderant evidence that Muthukumarasamy discloses the particular messaging

contents and path recited" in the claims.  Appx30; *see* Appx31-32 (same).

The Board's conclusory statement is contrary to established legal principles.

In *General Electric*, this Court made clear that when a prior-art reference "treats

the claim [elements] as desirable," it is legal error to "requir[e] a party showing

obviousness to re-do the work already done in the prior art reference."  983 F.3d at

1352.  This Court explained that imposing such a requirement "unduly dissects" the reference "into collections of individual elements," and violates the basic rule that "the prior art must … be analyzed as a whole."  *Id.*  Here, as in *General Electric*, "the Board's approach would require a motivation to combine each element of the claim—even those present together in a reference."  *Id.*

*General Electric*'s reasoning also aligns with decisions stressing that "a suggestion or motivation to modify the teachings" in a prior-art reference "may be derived from the prior art reference itself, from the knowledge of [skilled artisans], or from the nature of the problem to be solved."  *SIBIA*, 225 F.3d at 1356; *see Allergan*, 754 F.3d at 964 (explaining that motivation "may be implicit in the prior art"); *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) (noting that claims would have been obvious when "prior art suggested the desirability of the modification").

Dr. Bederson confirmed the manner in which skilled artisans would have understood Muthukumarasamy's express desire to provide a source- and device-agnostic system.  Informed and guided by that goal, together with Muthukumarasamy's teachings for accomplishing it, skilled artisans would have the precise suggestion to develop the claims.  As Dr. Bederson testified:

> Muthukumarasamy expressly describes how the DBCS-mediated control ***can create a "device-agnostic" experience***:  by translating (e.g., using a zHub and a zNode) universal commands sent by the IED into device-specific commands interpretable by the display device.

> Muthukumarasamy *also aims to create a "source-agnostic"* experience when the source is an Internet source.… In my opinion, [skilled artisans] would have *understood Muthukumarasamy to teach that source-agnostic presentation* of Internet content is achieved because various "Video Player[s]" can be loaded to present the Internet content at the display device, *irrespective of its source*.

Appx2066-2067 ¶¶ 57-58; *see* Appx2069 ¶ 62 ("In my opinion, [skilled artisans]

implementing Muthukumarasamy would have been *motivated by*

*Muthukumarasamy's stated goal* to provide source-agnostic content presentation

at the display device.").  The Board, however, never addressed this testimony.

Instead, the Board improperly isolated individual parts of Muthukumarasamy

without accounting for the skilled artisan's understanding of the reference's stated

objectives and teaching as a whole.

### C.    The Board's Conclusions Implicitly And Improperly Rely On Teaching Away Or A Requirement That The Prior Art Must Disclose The Best Approach To the Claimed Invention

The Board's conclusion that Muthukumarasamy's internet media devices

would not be used with its media control network (Appx27-32) amounts to a

legally incorrect determination that Muthukumarasamy taught away from jointly

using those two elements.  Alternatively, the conclusion follows from an equally

incorrect determination that jointly using those two elements was not the best

option for arriving at the claimed invention.  In either case, the Board's conclusion

that the disclosed internet media devices would not be used with the disclosed

media control network rests on legal error.

### 1.    The Board Erred By Implicitly Relying On Teaching Away Based On Muthukumarasamy's Silence

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Kahn*, 441 F.3d at 990.  Nothing in Muthukumarasamy discourages skilled artisans from using its media control network with its disclosed internet media devices (such as the RCIBS).  The Board, however, repeatedly stated that such a communication path would not be used.  While not invoking the phrase "teaching away," the Board's conclusion rested on that theory.

For example, when analyzing the Sky-related disclosures, the Board criticized Google for "not direct[ing] [it] to any disclosure in Muthukumarasamy showing that commands to play content using 'Sky' flow through the zNode and the zHub." Appx28.  The silence on which the Board depends for its conclusion cannot support teaching away as a matter of law.  Mere "silence does not imply teaching away." *Allergan*, 754 F.3d at 964.

The Board made the same error when rejecting Google's argument that "[n]othing in Muthukumarasamy suggests the presentation of internet content on a media device … is 'separate' or 'distinct' from the zHub/zNodes." Appx29.  The Board was "not persuaded" because Google "ha[d] not shown any messages in Muthukumarasamy that 'identify a particular media player for playing content

from the file' and flow from the IED through the zHub/zNode to the content presentation device." Appx30. But "simply pointing out that the [prior-art] reference itself does not teach the modification *is not substantial evidence* of no motivation to modify." *SIBIA*, 225 F.3d at 1358.

For a teaching-away determination, the Board must identify evidence that skilled artisans "would be discouraged" from using Muthukumarasamy's media control network with the disclosed internet media devices or "would be led in a direction divergent from" that combination. *See Kahn*, 441 F.3d at 990. The Board did not do so and no such evidence exists.

### 2. The Board Erred By Implicitly Requiring Muthukumarasamy To Teach The Most Desirable Approach To Arrive At The Challenged Claims

Obviousness does not require disclosure of "the *best* option" to suggest the claimed invention. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023). Indeed, this Court has never required that an approach "must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention." *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004). Rather, the test is whether the approach is "a *suitable* option from which the prior art did not teach away." *Bayer*, 874 F.3d at 1328. Here, the Board erred by concluding that using Muthukumarasamy's media control

network with an internet media device would not be the best way to achieve the claims.

For example, when rejecting Google's argument that Muthukumarasamy's Sky-related disclosure suggests the "receiving" limitation, the Board stated that "it is not clear why" commands to Sky would "flow through the zNode and the zHub" "when zSky is internet connected." Appx28. That is simply a determination that using the media control network path would not have been "the preferred, or the most desirable" approach. *Fulton*, 391 F.3d at 1200. But the "'question is whether there is something in the prior art as a whole to suggest the ***desirability***…,' not whether there is something in the prior art as a whole to suggest that the combination is the ***most desirable*** combination available." *Id.* (original emphasis).

The Board made the same error when addressing Muthukumarasamy's RCIBS disclosure and Figure 1 (Appx2435). As discussed above (*supra* Section II.A.1), the Board viewed only the precise communication paths depicted in Figures 1 and 18. The Board then determined that "devices that are WiFi connected would communicate via the Router and bypass the 'server system' identified" by Google. Appx29. The Board's statement is simply that "the *best* option" for the RCIBS to communicate would be via the illustrated "Router." That is legally irrelevant because the prior art's approach need only be suitable. The Board provided no rationale as to why a communication path from the IED to the

- 63 -

media control network would not be suitable for internet media devices. At best, Muthukumarasamy's disclosure of multiple communication paths provides "alternative preferences," but that "does not teach [skilled artisans] away from" the claims. *Allergan*, 754 F.3d at 964.

## III. MUTHUKUMARASAMY COMBINED WITH HAYWARD ALSO RENDERS THE CLAIMS OBVIOUS

The Board's determination that the challenged claims would not have been obvious in light of Muthukumarasamy and Hayward depends on the same flawed analysis discussed above. The Board concluded that Google did not show how the combination "would include the required messages being received by the server (e.g., zHub/zNode), as opposed to directly by the RCIBS as discussed" when addressing Muthukumarasamy. Appx40. For the same reasons that the Board erred regarding the Muthukumarasamy ground, the Board's determination on the Muthukumarasamy-Hayward ground should be reversed.

Hayward further discloses the "receiving" limitation's content requirement by teachings that disclose requesting and then loading an appropriate media player for playing a selected file based on that file's format. Touchstream does not challenge Google's contention that skilled artisans would have been motivated to combine these teachings with Muthukumarasamy's system with a reasonable expectation of success. *E.g.*, Appx477-480 (Touchstream's Response); Appx234-238 (Google's Petition). These same teachings render obvious the

"obtaining" and "loading" limitations because Hayward explains that a request for media content would trigger downloading a media player to control the content and obtaining the required media player over the internet.  Appx212-216; Appx220-223; Appx254-255.

The Muthukumarasamy-Hayward combination thus reinforces the challenged claims would have been obvious.

## **CONCLUSION**

Google showed that the challenged claims would have been obvious.  The Board's contrary determinations should be reversed (or at a minimum, vacated and remanded).


Dated:  April 11, 2024                    Respectfully submitted,


                                          */s/ I. Sasha Mayergoyz*
                                          I. Sasha Mayergoyz
                                          JONES DAY
                                          110 North Wacker Dr.
                                          Suite 4800
                                          Chicago, IL 60606
                                          (312) 269-1572

                                          Jennifer L. Swize
                                          John R. Boulé III
                                          JONES DAY
                                          51 Louisiana Ave. NW
                                          Washington, DC 20001
                                          (202) 879-3939

Evan McLean
JONES DAY
1755 Embarcadero Rd.
Palo Alto, CA 94303
(650) 687-4149

*Counsel for Appellant Google LLC*

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Final Written Decisions

    Re: U.S. Patent No. 8,782,528 (IPR2022-00793, Paper 35) ................. Appx1-42

    Re: U.S. Patent No. 8,904,289 (IPR2022-00794, Paper 35) ............... Appx43-82

    Re: U.S. Patent No. 8,356,251 (IPR2022-00795, Paper 35) ............. Appx83-124

Patents

    U.S. Patent No. 8,782,528 (IPR2022-00793, Exhibit 1001) ........... Appx125-143

    U.S. Patent No. 8,904,289 (IPR2022-00794, Exhibit 1001) ........... Appx144-162

    U.S. Patent No. 8,356,251 (IPR2022-00795, Exhibit 1001) ........... Appx163-182

Trials@uspto.gov                                                     Paper 35
571-272-7822                                     Date: September 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GOOGLE LLC,
Petitioner,

v.

TOUCHSTREAM TECHNOLOGIES, INC.,
Patent Owner.

————————

IPR2022-00793
Patent 8,782,528 B2

————————

Before DEBRA K. STEPHENS, DANIEL J. GALLIGAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

STEPHENS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00793
Patent 8,782,528 B2

# I.  INTRODUCTION

In this *inter partes* review, Google LLC ("Petitioner") challenges claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of U.S. Patent 8,782,528 B2 (Ex. 1001 ("'528 Patent")), assigned to Touchstream Technologies, Inc. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, we determine that Petitioner has failed to prove by a preponderance of the evidence that claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of '528 Patent are unpatentable (*see* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.")).

## A.  *Procedural History*

Petitioner filed a petition for *inter partes* review (Paper 1 ("Pet." or "Petition")) challenging claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of the '528 Patent.

Petitioner relies upon the following prior art references:

| Reference | Exhibit No. |
|---|---|
| Muthukumarasamy et al., US 2010/0241699 A1, published Sept. 23, 2010 ("Muthukumarasamy") | 1008 |
| Hayward, US 8,918,812 B2, issued Dec. 23, 2014 ("Hayward") | 1009 |

2

IPR2022-00793
Patent 8,782,528 B2

(Pet. vii).  Petitioner challenges the claims on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–5, 8, 11, 12, 14, 15, 27, 28 | 103 | Muthukumarasamy |
| 1–5, 8, 11, 12, 14, 15, 27, 28 | 103 | Muthukumarasamy, Hayward |

(Pet. 2–3).  Patent Owner timely filed a Preliminary Response (Paper 6 ("Prelim. Resp.")).  With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 7), and Patent Owner filed a Sur-reply to Petitioner's Preliminary Reply (Paper 9).  We instituted trial on the asserted grounds of unpatentability (Paper 10 ("Inst. Dec." or "Institution Decision")).

After institution, Patent Owner filed a Request for Rehearing and review by the Precedential Opinion Panel (Paper 12).  The Precedential Opinion Panel denied review (Paper 19, 2).  We denied rehearing (Paper 20, 3).

During the trial, Patent Owner filed a Response (Paper 18 ("PO Resp.")), Petitioner filed a Reply (Paper 22 ("Pet. Reply" or "Petitioner Reply")), and Patent Owner filed a Sur-reply (Paper 25 ("PO Sur-reply" or "Patent Owner Sur-reply").

An oral hearing was held on June 13, 2023, a transcript of which appears in the record (Paper 34 ("Tr.")).

Petitioner relies on testimony from Dr. Benjamin B. Bederson (Ex. 1005).  Patent Owner relies on testimony from Dr. Kevin C. Almeroth (Ex. 2022).  Patent Owner entered into the record a transcript of the deposition of Dr. Bederson (Ex. 2021).  No deposition of Dr. Almeroth was entered into the record (*see* Tr. 103:22–24) (Patent Owner's counsel noting that "Petitioner did not cross-examine Dr. Almeroth").

3

IPR2022-00793
Patent 8,782,528 B2

### B. Real Parties in Interest

Patent Owner identifies itself as the real-party-in-interest (Paper 5, 1).

Petitioner identifies itself as the real-party-in-interest (Pet. 78).[1]

### C. Related Matters

Petitioner and Patent Owner indicate the '528 Patent was asserted in the following district court proceeding: *Touchstream Techs., Inc. v. Google, LLC*, No. 6-21-cv-00569 (W.D. Tex.) (Pet. 78; Paper 5, 1). Petitioner further indicates that the '528 Patent was asserted in the following district court proceeding: *Touchstream Techs., Inc. v. Vizbee, Inc.*, No. 1-17-cv-06247 (S.D.N.Y.) (Pet. 78). We are concurrently issuing final written decisions in IPR2022-00794, involving related U.S. Patent 8,904,289 B2, and IPR2022-00795, involving related U.S. Patent 8,356,251 B2.

### D. The '528 Patent (Ex. 1001)

The '528 Patent, titled "Play Control of Content on a Display Device," issued July 15, 2014 (Ex. 1001, codes (45), (54)). The '528 Patent describes a system that "allow[s] a personal computing device," e.g., a mobile phone, "to be used to select different content to be played on a remote display," e.g., a television set, and "allow[s] the user to control how the content is displayed on the display device using the personal computing

---

[1] Petitioner states that Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., and that XXVI Holdings Inc. and Alphabet Inc. are not real parties-in-interest to this proceeding (Pet. 78, n.4).

IPR2022-00793
Patent 8,782,528 B2

device" (Ex. 1001 2:11–15, 2:20–2:26).  Figure 1, reproduced below, is a
block diagram illustrating an exemplary system (Ex. 1001, 2:35–36).



FIG. 1

As shown in the block diagram of Figure 1, "a first device (e.g., a personal
computing device) 20" connects to and "acts as a controller" for "a second
device (e.g., a television set 22 with a display 23) that acts as a receiver to
play content selected by a user of the first device and to respond to
commands that originate at the personal computing device" (Ex. 1001, 2:64–
3:2).  For example, television set 22 can be commanded "to access a content
provider 30 through the Internet 21, load a specific media player, load the
media player-specific content (e.g., a video) and play the content on the
television display 23" (Ex. 1001, 3:13–18).

IPR2022-00793
Patent 8,782,528 B2

Furthermore, personal computing device 20 controls the selection of and playback of content on television set 22 through server system 24, rather than through directly controlling television set 22 (Ex. 1001, 3:2–10).

Mobile phone 20 then formats and transmits a message to the server system server system 24 (Ex. 1001, 4:22–23).

> The message from the mobile phone 20 contains a transmission code that includes data regarding . . . the secondary display it wants to connect to (e.g., television set 22 with display 23), the location and name of the media player for the selected video the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon

(Ex. 1001, 4:27–30, Fig. 3). That message "is transmitted over the Internet 21 and is received by the server system 24" (Ex. 1001, 4:35–37). Server system 24 then "converts the incoming commands from the mobile device 20 into the correct JavaScript (or other programming) code used by the [television set] 22 to control the specific player (block 120)" (Ex. 1001, 5:64–67). That is, the server "interpret[s] and convert[s] a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player" playing content on the television set 22 (Ex. 1001, 5:57–59). Then, server system 24 "copies the converted version of the message to the database 34 associated with the [television set] 22" (Ex. 1001, 5:67–6:2) and "display device 22 receives a message from the server system 24 (block 126) [and] executes the message (block 128)" (Ex. 1001, 6:26–28).

IPR2022-00793
Patent 8,782,528 B2

*1. Illustrative Claim*

Challenged claim 1, one of three challenged independent claims, is reproduced below.

1. A method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players, the method comprising:

> receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

> using the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device;

> identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

> obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

> loading the particular media player in the content presentation device; and

7

IPR2022-00793
Patent 8,782,528 B2

> using the particular media player to execute the
> programming code with respect to the file.

(Ex. 1001, 11:17–48).

## II.  ANALYSIS

### A.  Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains (*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)).  The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence[2] (*Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966)).

### B.  Level of Ordinary Skill in the Art

The level of skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis (*Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John*

---

[2]  The parties do not present arguments related to objective evidence of nonobviousness (i.e., secondary considerations) as to any of the challenged claims.

8

IPR2022-00793
Patent 8,782,528 B2

*Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991))).

Petitioner asserts a "person of skill in the art ('POSA') would have had at least a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (Pet. 12 (citing Ex. 1005 ¶¶ 45–49)).  Petitioner further asserts "[w]ith more education, for example, postgraduate degrees and/or study, less experience is needed to attain an ordinary level of skill in the art.  Similarly, more experience can substitute for formal education" (Pet. 12).

At institution, we found this definition to be consistent with the scope and content of the '528 Patent and the asserted prior art, with a modification of omitting "at least" to avoid vagueness as to the amount of educational experience—"a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (Inst. Dec. 10).

In its Response, Patent Owner contends an ordinarily skilled artisan would have had

> (1) the equivalent of a four-year, B.S. [(Bachelor of Science)] degree from an accredited institution in computer science, computer engineering or an equivalent field; (2) approximately two years of professional experience with Internet-based video delivery systems; and (3) working proficiency with network architecture, including Internet-hosted server-client systems, and with computer programming

(PO Resp. 16 (citing Ex. 2022 ¶ 43)).  Patent Owner further contends "[a]dditional graduate education could substitute for professional experience, while significant experience in the field might substitute for

IPR2022-00793
Patent 8,782,528 B2

formal education," which "is consistent with the level adopted by Petitioner" (PO Resp. 16 (citing Ex. 2023; Pet. 13)).

Petitioner does not address Patent Owner's definition in its Petitioner Reply (*see* Paper 22). Given the differences in the assertions, in the Oral Hearing, we asked Patent Owner about its concerns with the definition set forth in the Decision to Institute:

> In our Decision to Institute we had set forth a level of skill per person of ordinary skill.

> In your response, you came back with something different. And I'm wondering, what, specifically, you have concern about with the definition set forth in the Decision to Institute?

(Tr. 78:6–10). Patent Owner responded: "I don't think it makes any difference for this panel's determination" (Tr. 78:13–14). We agree and determine that the differences in the level of skill offered by the Parties are not so significant as to warrant any changes to the definition set forth in the Decision to Institute. Therefore, we maintain our determination that an ordinarily skilled artisan would have had "a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (*see* Inst. Dec. 10).

We determine this level of skill comports with the qualifications a person would have needed to understand and implement the teachings of the '528 Patent and the prior art of record (*cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (noting that the prior art itself may reflect an appropriate level of skill in the art)).

IPR2022-00793
Patent 8,782,528 B2

### C.  Claim Construction

We construe claim terms according to the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc) (37 C.F.R. § 42.100(b) (2021)).  Under *Phillips*, claim terms are afforded "their ordinary and customary meaning" (*Phillips*, 415 F.3d at 1312). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" (*Phillips*, 415 F.3d at 1313).  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" (*Phillips*, 415 F.3d at 1313).  An inventor may rebut that presumption by providing a definition of the term in the specification "with reasonable clarity, deliberateness, and precision" (*In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).  In the absence of such a definition, limitations are not to be read from the specification into the claims (*In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993)).

Petitioner asserts that we "need not construe any claims" to resolve this controversy and that it "adopts" Patent Owner's "proposed plain and ordinary meaning for all terms [from] the parallel district court action" (Pet. 12–13 (citing Ex. 1005 ¶ 50; Ex. 1014)).  Patent Owner proposes constructions for the terms "media player" and "programming code" (PO Resp. 16–24).  We address "media player" below.

### 1.  media player

Patent Owner contends, based on the "intrinsic record . . . an ordinary artisan would have understood the ordinary and customary meaning of

IPR2022-00793
Patent 8,782,528 B2

'media player' in the '528 patent refers to application software and does not encompass hardware devices" (PO Resp. 16 (citing Ex. 2022 ¶¶ 83–91, 94)).

Petitioner asserts that it "has not alleged any hardware device is a 'media player'" and thus, "the Board need not resolve whether 'hardware devices' are encompassed by 'media player'" (Pet. Reply 1). Rather, Petitioner states the media players relied upon in the Petition are all application software (Pet. Reply 1–2). Petitioner specifically states, "Petitioner has identified three 'media players' in the prior art. Two of these—Muthukumarasamy's 'Video Player[s]' and Hayward's 'media players' (Petition, 21–24)—are application software. The third 'media player' is likewise not a hardware device" (Pet. Reply 1–2). Thus, the parties agree that the term "media player" refers to software and not to a hardware device, and we apply this interpretation in our patentability analysis.

### 2. Additional Terms

In light of the record and our findings, reasonings, and conclusions discussed below, we determine that no other terms or phrases in the claims require express construction (*see Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)))).

### D. Asserted Obviousness over Muthukumarasamy

Petitioner contends claims 1–5, 8, 11, 12, 14, 15, 27, and 28 would have been obvious over Muthukumarasamy (Pet. 13–14, 18–22, 25–36, 40–44, 47–51, 53–58, 60–69, 71–74).

IPR2022-00793
Patent 8,782,528 B2

### 1. *Muthukumarasamy (Ex. 1008)*

Muthukumarasamy is a U.S. patent application publication titled "Device-Based Control System," and published September 23, 2010 (Ex. 1008, codes (43), (54)). Muthukumarasamy describes a "Device-Based Control System (DBCS) . . . that enables consumers, through the use of an internet-enabled device (IED)," e.g., a smartphone, "to navigate through media or entertainment content, control media components or equipment to watch and/or listen to media content" (Ex. 1008 ¶ 26). Figure 1, reproduced below, is "a block diagram of the Device-Based Control System (DBCS)" (Ex. 1008 ¶ 44, Fig. 1).



FIG.1

As shown in the block diagram of the DBCS of Figure 1, DBCS includes IED 4, zHub 2, zNode 3, and entertainment systems such as a television set (Ex. 1008 ¶ 44, Fig. 1). A user interacts with IED 4 to select or control content playback hosted on internet server 1 (Ex. 1008 ¶¶ 44–45). For example, IED 4 executes a media management application that presents media choices from "plurality of disparate media sources" for the user to select (Ex. 1008 ¶ 48).

13

IPR2022-00793
Patent 8,782,528 B2

"When the IED sends a [content selecting or controlling] command, the zHub receives the command from the IED and resolves the command into a specific instruction directed at a specific zNode in the house" (Ex. 1008 ¶ 57). For example, "when a user selects content that is on channel 324 to be displayed on the living room TV, the zHub translates the command into a specific RF signal directed at the zNode in the living room" (Ex. 1008 ¶ 57). In particular, zHub 2 "receives signals or commands from the IED 4 via a local or premise network (e.g., router, WiFi, etc.) and translates [those] received commands to RF signals;" zNode 3 in turn receives the translated RF signals and translates those RF signals "to a protocol (e.g., Infrared) interpretable by the media components" (Ex. 1008 ¶ 44). For example, "the infrared codes needed to control the media components" are referenced for such translation (*see* Ex. 1008 ¶ 66). Then, those translated signals are received by media components, e.g., a television set, to control the media component, "e.g., volume selection, channel selection, pause/play, etc." (*see* Ex. 1008 ¶ 50).

Additionally, in one DBCS embodiment, a remote-controlled internet browser software (RCIBS or ZRCIBS) provides "a remote controllable internet browser optimized for internet-media consumption" (Ex. 1008

14

IPR2022-00793
Patent 8,782,528 B2

¶ 83). Figure 18, reproduced below, is a "block diagram . . . of a home network" (Ex. 1008 ¶ 83).



# FIG.18

As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS connected to a WiFi or Wired Network Connection (Ex. 1008 ¶ 83, Fig. 18). The RCIBS sends and receives commands and responses, respectively, to a Zelfy application running on a user's phone, and transmits audio and video to a TV and speakers (Ex. 1008 ¶ 83, Fig. 18). In particular, Figure 18 further shows "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user" (Ex. 1008 ¶ 83, Fig. 18). Additionally, the "IED transmits commands to the RCIBS and receives responses from the RCIBS: the commands are received and executed by RCIBS" (Ex. 1008 ¶ 83, Fig. 18). For example, RCIBS provides video output to a television

15

IPR2022-00793
Patent 8,782,528 B2

(*see* Ex. 1008, Fig. 18).  Other commands from the IED include: "Play video at given URL," causing the RCIBS to "play the video present at [a] given URL" and "Play video with given video-id (as specified by 3rd party using 3rd party APIs and Video Players," causing the RCIBS to "load[] the 3rd Party Video Player specified and plays the video with given video[-]id" (Ex. 1008, Fig. 19).

### 2.  *Independent claim 1*

Petitioner contends claim 1 would have been obvious over Muthukumarasamy (Pet. 18–22, 25–36, 40–44, 47–51, 53–58, 60).  Patent Owner argues that Petitioner's contentions fail for the following limitation of claim 1:

> receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, . . . specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player

(PO Resp. 1–2).  In particular, Patent Owner contends,

> Petitioner relies on Muthukumarasamy's descriptions of two distinct processes, which use different components of Muthukumarasamy's system to present different types of content:  the "RCIBS" for internet content and the "zHub and zNode" for non-internet content.  Neither of these processes satisfies all the limitations of the challenged claims, and Petitioner fails to offer any rationale for combining features of these two processes . . .

(PO Resp. 1).  For the reasons explained below, we agree with Patent Owner.

Petitioner relies on Muthukumarasamy to teach this limitation (Pet. 25–36 (citing Ex. 1005 ¶¶ 78–105; Ex. 1008 ¶¶ 36, 44–45, 47–48, 50,

16

IPR2022-00793
Patent 8,782,528 B2

57, 64, 68–69, 77, 83, 85, 88, 116–117, 149, Figs. 1, 2, 14, 15/1, 15/2, 15/2, 15/4, 19; Ex. 1015, 2)). Petitioner offers an annotated version of Muthukumarasamy's Figure 1, reproduced below, to show the alleged components of claim 1:



FIG.1

(Pet. 27). Muthukumarasamy's Figure 1 is "a block diagram of the Device-Based Control System (DBCS)" (Ex. 1008 ¶ 44), and in the annotated version above, Petitioner identifies the internet-enabled device (IED) in green as the claimed "personal computing device," the internet server, zHub, and zNode in orange as the claimed "server system," and the devices in red labeled "Entertainment Systems" as the claimed "content presentation device" (Pet. 27).

Petitioner asserts, "Muthukumarasamy's internet server (part of the server system) receives a message from the IED, which is separate from both the internet server and the media device (content presentation device)" (Pet. 25 (citing Ex. 1005 ¶ 78); *see also* Pet. 25–26 (asserting that "the

IPR2022-00793
Patent 8,782,528 B2

'zHub receives the command from the IED'" (quoting Ex. 1008 ¶ 44))).

Petitioner contends, "Muthukumarasamy discloses signals specifying media content to be acted on by a particular media player at a certain location" (Pet. 32).  More specifically, Petitioner argues that "Muthukumarasamy teaches that the signals identify a particular media player for playing content from the file, [and] identify a location of the particular media player for two reasons" (Pet. 34 (alteration in original; emphasis omitted)).

First, Petitioner argues, "Muthukumarasamy's source-agnostic system allows selection and presentation of content from disparate sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media'" (Pet. 34 (citing Ex. 1008 ¶¶ 47–48); *see also* Pet. 18 (identifying Netflix as an example of streamed internet content), 54 (identifying examples of internet-media platforms or content providers as Netflix and Amazon Video On Demand)).  Based on that disclosure, Petitioner argues a person having ordinary skill in the art "would have understood each request for particular content to identify a media player associated with the particular source of the content, as well as its location, such as an address or website of the media player, or at least information to locate the particular media player" (Pet. 34 (citing Ex. 1008 ¶¶ 47–48; Ex. 1005 ¶¶ 99–100; Ex. 1015, 2)).

Second, Petitioner contends, "Muthukumarasamy's IED sends commands to play, through [its] RCIBS, media content 'as specified by 3rd party using 3rd party APIs and Video Players,'" which cause the RCIBS to "load[] the 3rd Party Video Player specified and play[] the video with given video[-]id" (Pet. 35 (citing Ex. 1008 ¶¶ 45, 83, Fig. 19) (fourth alteration in original)).  As such, Petitioner argues a person having ordinary skill in the art "would have understood Muthukumarasamy to teach that the command

18

IPR2022-00793
Patent 8,782,528 B2

sent from the IED specifies the video (*a video file to be acted upon*) and the Video Player to play the video (*a particular media player for playing the content*)" (Pet. 35 (citing Ex. 1005 ¶ 102)).

Patent Owner argues Petitioner fails to demonstrate obviousness because of its reliance on two separate processes described in Muthukumarasamy, neither of which teaches the limitation identified above, without explanation as to why an ordinarily skilled artisan would have found it obvious to combine the processes (PO Resp. 35). In particular, Patent Owner argues Petitioner relies on Muthukumarasamy's ZHub/zNode process and RCIBS process, "using parts of each process for different limitations of the claimed methods" (PO Resp. 35–36 (citing Pet. 21, 49–50, 53, 58)). But, Patent Owner argues, neither process discloses all the limitations of the independent claims (PO Resp. 36).

More specifically, Patent Owner contends Muthukumarasamy describes two cases: the IED sending commands to (1) "the RCIBS over a local WiFi network . . . to access and present online media content" and (2) "the zHub . . . to control media devices that require infrared signals of the type used in conventional remote controls for TV sets" (PO Resp. 38 (citing Ex. 1008 ¶¶ 45, 56–60, 66–67, 83, Fig. 1; Ex. 2022 ¶¶ 128–129)). According to Patent Owner, only one of the RCIBS process and the zHub/zNode process "would be used in presenting any particular content" (PO Resp. 38 (citing Ex. 2022 ¶ 128)). However, according to Patent Owner, these two cases do not overlap because Muthukumarasamy does not disclose that the IED sends commands to the RCIBS using the zHub and/or zNode or that the zHub/zNode process is used to access or present online media content or any internet content (PO Resp. 38–39 (citing Ex. 2022 ¶¶ 128–129)).

19

IPR2022-00793
Patent 8,782,528 B2

According to Patent Owner, "Petitioner identifies Muthukumarasamy's internet server (1), zHub (2), and zNode (3), collectively, as the *server system*"; "IED (4), which includes a 'DBCS application or software' as the *personal computing device*"; "the 'Entertainment Systems' and 'Zelfy WiFi to HDMI Plug' (5) as part of the recited *content presentation device*"; and "'remote-controlled internet browser software (RCIBS)' as part of the recited *content presentation device*" (PO Resp. 37–38 (citing Ex. 1008 ¶¶ 44–45, 83; Pet. 18–22, 27; Ex. 1005 ¶¶ 68–69, 72, 83; Ex. 2021, 121:20–122:8; Ex. 2022 ¶¶ 114–121, 125–133)). Patent Owner argues Petitioner's contention that "Muthukumarasamy discloses that its content presentation device loads any one of a plurality of different media players using the RCIBS because it discloses loading one of a plurality of video players" (PO Resp. 39 (quoting Pet. 53–54 (emphasis added by Patent Owner)), 20–22, 53–56; Ex. 2022 ¶ 130)) shows that Petitioner "relies on a *particular media player* allegedly loaded in the RCIBS during the RCIBS process" (PO Resp. 39). Patent Owner argues, however, that Petitioner does not contend "a *particular media player* is *loaded in the content presentation device* or *obtained over a network* during the zHub/zNode process (PO Resp. 39 (citing Pet. 53–56; Ex. 2022 ¶ 130)). Rather, according to Patent Owner, Petitioner relies on "the zHub/zNode process for *using the particular media player to execute the programming code with respect to the file*" and "*receiving, in the server system, messages from the personal computing device*" while relying on the RCIBS process for "*messages identify a particular media player*", without asserting Muthukumarasamy's system would have been modified or why an ordinarily skilled artisan would have made such a modification (PO Resp. 40–41 (citing Pet. 25–27, 34–35, 57–58)).

20

IPR2022-00793
Patent 8,782,528 B2

Patent Owner additionally argues the RCIBS process does not "*receiv[e] one or more messages from the personal computing device* in the components identified by Petitioner as the *server system*" (PO Resp. 42 (citing Ex. 2022 ¶ 136–139)).  In particular, Patent Owner contends Petitioner sets out that Muthukumarasamy's RCIBS is part of the content presentation device (PO Resp. 42 (citing Pet. 21–22, 54–56; Ex. 1005 ¶¶ 72, 132)).  Patent Owner further contends "Petitioner identifies Muthukumarasamy's IED as the *personal computing device* of the claims and Muthukumarasamy's internet server, zHub, and zNodes, collectively, as the *server system*" (PO Resp. 42 (citing Pet. 27)).  Patent Owner then asserts "[a]ny messages from the IED to the RCIBS, including those in Figure 19, would not use the internet server, zHub, or zNodes because they are transmitted directly to the RCIBS via the user's home network" (PO Resp. 42 (citing Ex. 2022 ¶¶ 115–119)).

Patent Owner annotates Muthukumarasamy's Figure 1, shown below, to illustrate that "none of the messages in step R1 are *received* <u>in the alleged</u>

IPR2022-00793
Patent 8,782,528 B2

*server system* of Petitioner's mapping" (PO Resp. 42–43 (citing Ex. 2022 ¶ 136; Pet. 27)).



FIG.1

Figure 1 of Muthukumarasamy, as further annotated by Patent Owner, illustrates step R1 is communication between the entertainment system and IED (Zelfy mobile); step R2 is communication between the entertainment system and the server system; and step R3 is communication between the server system and entertainment system (PO Resp. 42–43 (citing Ex. 1008, Fig. 1)).  According to Patent Owner, "[t]he 'commands' listed in Figure 19 of Muthukumarasamy are the only disclosed 'messages' involved in the RCIBS process [and] Petitioner never alleges that any other messages related to the operation of the RCIBS are *received in the server system*" (PO Resp. 43 (citing Ex. 2022 ¶ 136; Ex. 1008 ¶ 83; Pet. 35, 25–47, 71–74)). Therefore, according to Patent Owner, "[b]ecause these *messages* are *received* in the alleged *content presentation device* from the alleged *personal*

22

IPR2022-00793
Patent 8,782,528 B2

*computing device*, Petitioner fails to show the RCIBS process satisfies the limitations of the claims" (PO Resp. 43–44 (citing Ex. 2022 ¶ 137)).

Patent Owner next argues Petitioner also asserts "that Muthukumarasamy generally discloses 'stream[ing] internet content over WiFi' into a browser-based media player" (PO Resp. 44 (alteration in original; citing Pet. 35; Ex. 1008 ¶ 45)).  However, according to Patent Owner, "this disclosure is just a reference to the RCIBS, which 'is remote controllable internet browser software optimized for internet-media consumption'" (PO Resp. 44 (citing Ex. 1008 ¶ 83; Ex. 2022 ¶ 119)).  Patent Owner asserts Petitioner admits Muthukumarasamy's disclosure "regarding 'internet content' is provided by the RCIBS, using the commands in Figure 19" (PO Resp. 44 (citing Pet. 35)).  Patent Owner then contends, "Muthukumarasamy does not disclose any mechanism for streaming internet content besides the RCIBS" (PO Resp. 44 (citing Ex. 2022 ¶¶ 118, 138)).  Therefore, Patent Owner contends, Petitioner has failed to show Muthukumarasamy discloses

> receiving, in a server system, one or more messages from a personal computing device . . . wherein the one or more messages, . . . identify a particular media player for playing content from the file, identify a location of the particular media player,

as recited in claim 1 (PO Resp. 45; Ex. 1001, 11:20–32).

We agree with Patent Owner that Petitioner has not shown that Muthukumarasamy teaches this subject matter.  Initially, we note Petitioner annotates Figure 1 of Muthukumarasamy to identify the elements of claim 1 (Pet. 27).  Petitioner contends, "Figure 1, annotated below, shows that the IED [highlighted in green] (*personal computing device*) is separate from the internet server, zHub, and zNode [illustrated in orange] ([collectively,]

23

IPR2022-00793
Patent 8,782,528 B2

*server system*), and the 'media device' 'Entertainment Systems' [highlighted in red] (***content presentation device***)".



FIG.1

(Pet. 27 (reproducing Ex. 1008, Fig. 1 (annotated); Pet. 19–20)). Petitioner further contends,

> Muthukumarasamy's DBCS allows a user to the IED to select and control media played on different devices and from different media sources, including cable and streamed internet content (e.g., Netflix), onto a content presentation device, such as a media device configured with RCIBS

(Pet. 18 (citing Ex. 1008 ¶¶ 26–27, 31, 45, 83, 134)). Petitioner also argues, "the RCIBS, running on the content presentation device, 'loads the 3rd Party Video Player specified and plays the video'" (Pet. 21 (quoting Ex. 1008 ¶¶ 25, 83, Fig. 19)). Figure 18 of Muthukumarasamy, annotated by Petitioner and reproduced below, is "a block diagram of a home network

24

IPR2022-00793
Patent 8,782,528 B2

comprising the IED along with a computer hosting the RCIBS under an
embodiment" (Pet. 22; Ex. 1008 ¶ 24, Fig. 18).



FIG.18

(Pet. 21, 24 (reproducing Ex. 1008, Fig. 18 (annotated)). Figure 18 of
Muthukumarasamy, shows an IED (i.e., "User's Phone/Device") sending
commands to a ZRCIBS (also referred to as an "RCIBS" (*see* Ex. 1008
¶¶ 24, 83, Fig. 18)) hosted on a computer that provides output to a content
presentation device. In the annotated figure above, Petitioner includes the
ZRCIBS of Figure 18 in a red box, red being the color Petitioner uses to
designate the "content presentation device" (Pet. 21–22).

Thus, Petitioner expressly identifies the RCIBS as part of the content
presentation device. Petitioner's contention that "the Petition maps the
RCIBS as part of the claimed 'server system' (not part of the 'content
presentation device')" (*see* Pet. Reply 18) is incorrect, as made plain by the

25

**Appx25**

IPR2022-00793
Patent 8,782,528 B2

discussion above. More specifically, in its Reply, Petitioner contends that the "Petition states repeatedly that the RCIBS is part of the DBCS, which the Petition maps to the 'server system,'" such that "messages sent from the IED to the RCIBS are sent to the 'server system'" (Pet. Reply 22). This contention fails because Muthukumarasamy's DBCS includes the server as well as other components depicted in Figure 1, such as the software on IED 4 ("personal computing device") (Ex. 1008 ¶¶ 44–45, Fig. 1). Under Petitioner's Reply theory that the DBCS is the claimed "server system," Muthukumarasamy's disclosures of messages from the IED (part of the DBCS) to other components of the DBCS would simply disclose messages *within* a "server system," rather than messages from a "personal computing device" to a "server system." When asked in the Oral Hearing for citations in the Petition that would illustrate the RCIBS is part of the server and not the content presentation device (Tr. 17:4–13), Petitioner did not identify any persuasive disclosure (Tr. 38:11–12 (asserting that Muthukumarasamy is "not taking a position necessarily on where the RCIBS is located"), 87:21–88:15 ("it is indifferent to the obviousness of these claims whether the RCIBS is on the server on not")).

Petitioner contends,

> Muthukumarasamy's IED sends commands to play, through the RCIBS, media content "as specified by 3rd party using 3rd party APIs and Video Players." In response the RCIBS "loads the 3rd Party Video Player specified and plays the video with given video[-]id." Muthukumarasamy also discloses sending a command of "Play video at given URL" and loading the URL and the associated video in response

(Pet. 35 (alteration in original; citing Ex. 1008 ¶ 45, Fig. 19)). As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS connected to a WiFi or Wired Network Connection (Ex.

26

**Appx26**

IPR2022-00793
Patent 8,782,528 B2

1008 ¶ 83, Fig. 18).  Muthukumarasamy describes that the RCIBS communicates with a Zelfy application running on a user's phone and transmits audio and video to a TV and speakers (Ex. 1008 ¶ 83, Fig. 18).  In particular, Figure 18 further shows "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user" (Ex. 1008 ¶ 83, Fig. 18).

Figure 18 does not disclose any communication between the personal computing device (Zelfy Application running on User's Phone/Device) and components identified by Petitioner as the server system (Ex. 1008 ¶ 83, Fig. 18).  Because messages to the RCIBS do not go through the identified "server system," Petitioner has not shown that the RCIBS disclosures teach "receiving, in a server system, one or more messages from a personal computing device," as recited in claim 1.

Petitioner further argues, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process, the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do" (Pet. Reply 11 (citing PO Resp. 38)).  Petitioner points to the commands transmitted for internet content from "Sky," arguing "one embodiment of which is a 'zSky software agent . . . installed on a media PC'" is a description consistent with the RCIBS (Pet. Reply 11 (citing Ex. 1008 ¶ 45)).  Paragraph 45 discloses the following:

> The DBCS comprises a zHDStick that streams internet content over WiFi to High Definition television (HDTV).  The DBCS comprises a zSky software agent that helps manage online media viewing on TV; the zSky agent can be hosted (e.g., preinstalled) on the zHDStick, or can be independently installed on a media PC, but the embodiment is not so limited

27

IPR2022-00793
Patent 8,782,528 B2

(Ex. 1008 ¶ 45). This disclosure does not provide any detail or description as to what the ZSky agent does besides "help manage online media" and does not refer to the process disclosed in Figure 18 (*see* Ex. 1008).

Petitioner argues "[t]he RCIBS is consistent only with the zSky software agent when installed on a media PC because Muthukumarasamy states, '[t]he RCIBS is deployed on a computer that has video, audio, and internet capabilities and is connected to the home network of the user'" (Pet. Reply 11 n.2 (Ex. 1008 ¶ 83)). Petitioner then argues

> Muthukumarasamy envisions controlling, *e.g.*, "Play/Pause" of internet content being presented on a media device through Sky. Because control of the Sky internet content flows from the IED through the zNode and zHub to the media device . . . Muthukumarasamy discloses this very "overlapping use-case"

(Pet. Reply 11–12). Petitioner, however, does not direct us to any disclosure in Muthukumarasamy showing that commands to play content using "Sky" flow through the zNode and the zHub. Muthukumarasamy does not disclose that such a path would be used, and it is not clear why it would when zSky is internet connected.

Petitioner additionally argues, "while the RCIBS itself is software, it is hosted on a hardware device (e.g., computer)" and communication between the IED and the RCBIS, via computer, is over a "home network" and "the only connection labeled '*Home* WiFi'" in Figure 1 is that from the IED to the zHub (Pet. Reply 15–16). Thus, Petitioner argues, "[t]his suggests that, when presenting internet content via the RCIBS, that command flows through the zHub" (Pet. Reply 16 (citing Ex. 1008 ¶ 56)).

We do not find this argument persuasive because Muthukumarasamy's Figure 1 shows several "WiFi" paths that do not go through the zHub, including the path between IED 4 and Zelfy WiFi to

28

IPR2022-00793
Patent 8,782,528 B2

HDMI Plug 5 labeled "Commands over WiFi" and the paths between the
Database and each of Zelfy WiFi to HDMI Plug 5 and IED 4 labeled
"Webservices over WiFi." In Muthukumarasamy, Figure 18 illustrates "a
block diagram 1800 of a home network comprising a computer hosting the
RCIBS and the IED (Ex. 1008 ¶ 83), and it shows "Commands" and
"Responses" communicating directly between the user's device and the
RCIBS. Muthukumarasamy indicates that the "Wireless Router" in Figure 1
provides the WiFi network by defining "Router" as "an Internet switch that
is coupled or connected to an internet cable or digital subscriber link (DSL)
modem and enables a home network that is shared by one or more internet
protocol (IP)-based devices (e.g., personal computer (PC), WiFi devices,
etc.) in the home" (Ex. 1008 ¶ 37). Thus, based on Figure 18 and the
description in the Muthukumarasamy, devices that are WiFi connected
would communicate via the Router and bypass the "server system"
identified by Petitioner.

Petitioner also argues that "[n]othing in Muthukumarasamy suggests
the presentation of internet content on a media device——even a media
device employing Muthukumarasamy's RCIBS——is 'separate' or 'distinct'
from the zHubs/zNodes" (Pet. Reply 4). Petitioner's contentions rely on its
characterization of Muthukumarasamy as disclosing a "source-agnostic
system [that] allows selection and presentation of content from disparate
sources, including 'subscription media, broadcast media, cable, DVR, VOD
and internet media'" (Pet. 34 (citing Ex. 1008 ¶¶ 47–48)). Petitioner cites
various disclosures showing that Muthukumarasamy provides internet and
non-internet content from disparate sources in a device-agnostic
environment (Pet. Reply 5–10 (citing Ex. 1008 ¶¶ 5, 26, 27, 31, 36, 44, 45,
47, 48, 50–52, 57, 58, 61–62, 64, 68–70, 84, 134, Figs. 5, 6, 16)). Based on

29

IPR2022-00793
Patent 8,782,528 B2

these disclosures, Petitioner contends, "Muthukumarasamy's RCIBS, zHub, and zNode work together to provide the 'device-agnostic and source-agnostic entertainment experience'" (Pet. Reply 16).

Petitioner additionally contends, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process (POR, 38), the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do" (Pet. Reply 11). Petitioner cites "Volume Up" as an example of a command that would be transmitted to a TV via the zHub/zNode process regardless of "whether the content is non-internet content from 'DVR/Blue-ray/[and] VCR' or internet content from 'Sky'" (Pet. Reply 11 (alteration in original)).

We are not persuaded. Even if the zHub and the zNode would be used to control the volume on the TV on which the streamed content is displayed, this device cooperation does not show the particular messaging recited in the claim. More specifically, even under Petitioner's scenario that the "Volume Up" command flows from the IED ("personal computing device") through the zHub/zNode ("server system") to the TV ("content presentation device"), this command does not "identify a particular media player for playing content from the file." Petitioner has not shown any messages in Muthukumarasamy that "identify a particular media player for playing content from the file" and flow from the IED through the zHub/zNode to the content presentation device. Thus, Petitioner's assertions about devices working together fall short of proving by preponderant evidence that Muthukumarasamy discloses the particular messaging contents and path recited in claim 1.

As noted above, Petitioner argues that "Muthukumarasamy teaches that the signals identify a particular media player for playing content from

IPR2022-00793
Patent 8,782,528 B2

the file, [and] identify a location of the particular media player for two reasons" (Pet. 34 (alteration in original; emphasis omitted)). For the reasons explained above, Petitioner has not shown that the RCIBS disclosures teach the claimed subject matter. Petitioner's other contention is that "Muthukumarasamy's source-agnostic system allows selection and presentation of content from disparate sources, including 'subscription media, cable, DVR, VOD and internet media'" (Pet. 34 (citing Ex. 1008 ¶¶47–48)). Thus, according to Petitioner, "a [person of ordinary skill in the art] would have understood each request for particular content to identify a media player associated with the particular source of the content, as well as its location, such as an address or website of the media player, or at least information to locate the particular media player" (Pet. 34 (citing Ex. 1005 ¶¶ 99–100; Ex. 1015, 2)).

In its Reply, Petitioner argues "Muthukumarasamy discloses that the zHub/zNode process is used to present internet content. In addition to the commands to control internet content presented through Sky[,] Muthukumarasamy contemplates using an 'Apple TV device' as a media device" (Pet. Reply 12–13 (Ex. 1008 ¶ 36)).

Petitioner also contends that "distinguish[ing] hardware devices from software applications fails, as even hardware devices involve software applications" (Pet. Reply 19). Petitioner then argues, "as Patent Owner's expert recognizes, many different types of content, including cable, DVR, and VOD, 'would all be provided through [the] set-top box'" (Pet. Reply 19 (alteration in original; citing Ex. 2022, ¶ 154)).

Petitioner's arguments fail to show by preponderant evidence that messages identifying a particular media player, which the parties agree is software, would go from the IED through the zHub and zNode to the content

31

IPR2022-00793
Patent 8,782,528 B2

presentation device. For example, Petitioner identifies Muthukumarasamy's disclosure of "disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media'" (Pet. 34 (quoting Ex. 1008 ¶ 47)). Even if we accepted the identification of "internet media" may entail the identification of a software media player, Petitioner's contentions fall short for not showing the required path through the zHub and zNode, as discussed above. For other sources of media, Petitioner fails to show any of these entails identifying a software media player. For example, cable and video on demand may be provided by a TV set-top box, and Muthukumarasamy discloses that, "when a user selects content that is on channel 324 to be displayed on the living room TV, the zHub translates the command into a specific RF signal directed at the zNode in the living room" (Ex. 1008 ¶ 57). Petitioner, however, does not present evidence that the messages that go through the zHub and zNode to turn on channel 324 "identify a particular [software] media player," as required of claim 1.

Petitioner argues that a set-top box presents different types of content and that "[t]o facilitate presentation of these different sources of content, the set-top box would need software applications for each content source" (Pet. Reply 19). Petitioner, however, does not direct us to evidence that any set-top box in Muthukumarasamy operates as such (Tr. 31:18–33:2). On the other hand, Patent Owner's declarant, Dr. Almeroth, testifies regarding tuning to a particular channel that, "[e]ven if the 'command' in this example identifies a particular hardware device, that is not a *media player*" and that "the alleged *messages* do not identify any software application that might qualify as a *media player*" (Ex. 2022 ¶ 153 (citing Ex. 1008 ¶¶ 57, 68–69, Fig. 15/6)). Thus, the evidence of record does not show that messages to select content via the zHub and zNode identify a software media player.

Petitioner notes that Patent Owner "has recently accused several set-top box devices of infringing" a related patent, "stating 'media player[s]' are 'loaded' at set-top boxes to present content, including 'live TV and DVR content'" (Pet. Reply 20 n.5 (alteration in original)). Petitioner has not, however, proffered any persuasive reasoning explaining why Patent Owner's allegations in a 2023 complaint have any bearing on the question of what would have been obvious to a person of ordinary skill in the art at the time of the invention in 2011.

As to Petitioner's AppleTV assertions, Muthukumarasamy mentions that an "AppleTV device" can be used (Pet. Reply 9 (citing Ex. 1008 ¶¶ 36, 45)), but Petitioner does not show messaging to the AppleTV would go through the zHub and zNode, as opposed simply to over a WiFi connection similar to the RCIBS. Rather, Petitioner contends the following: "Users '[u]sing the IED interface, . . . select[] the content and start[] enjoying the content' on a separate media device (claimed content presentation device) such as a 'TV, DVD player, [and] Apple TV device'" (Pet. 19 (quoting Ex. 1008 ¶¶ 36, 77)). This allegation simply shows that a user selects content, which is then played in a manner transparent to the user on the content presentation device.

Petitioner contends Muthukumarasamy discloses "loading the particular media player in the content presentation device," and "obtaining by the content presentation device, the particular media player wherein the particular media player is obtained over a network from a content provider," as recited in claim 1 (Pet. 53–57). Petitioner asserts, "Muthukumarasamy teaches that a media device loads an appropriate media player, depending on the media type and source" (Pet. 53 (citing 1005 ¶¶ 66, 130), 19 (citing

IPR2022-00793
Patent 8,782,528 B2

Ex. 1005 ¶¶ 25, 47–48, 83; Ex. 1005 ¶¶ 70–72)).  Petitioner's declarant, Dr. Bederson, states "Muthukumarasamy . . . disclose(s) loading any one of a plurality of different media players on the content device" (Ex. 1005 ¶ 66). Dr. Bederson later repeats that "Muthukumarasamy teaches that a media device loads an appropriate media player depending on the media type and course," referring to the previous statements (Ex. 1005 ¶ 130).  Neither Petitioner nor Dr. Bederson provide sufficient evidence or argument to support that Muthukumarasamy teaches obtaining or loading a media player in the zHub/zNode process.  Petitioner contends,

> Muthukumarasamy "controls delivery of selected media content and selects and controls the media devices that deliver the selected media content according to a media type of the selected media content."  Because Muthukumarasamy teaches that the media device displays media content from various disparate sources depending on the media type and media source, a [person of ordinary skill in the art] would have understood the media device to load an appropriate media player depending on the media type and source

(Pet. 20–21 (citing Ex. 1008 ¶ 47; Ex. 1005 ¶¶ 70–71)).  Petitioner, however, proffers insufficient evidence or argument that the content choices described in paragraph 47 of Muthukumarasamy would have led an ordinarily skilled artisan to understand a media player is obtained and loaded in the content presentation device.  Rather, Dr. Bederson makes conclusory statements without providing evidence to support the assertions (Ex. 1005 ¶¶ 70–71).

Accordingly, we determine Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claim 1.  Therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claim 1 would have been obvious over Muthukumarasamy.

IPR2022-00793
Patent 8,782,528 B2

### 3. *Independent Claim 27*

Petitioner contends independent claim 27 would have been obvious over Muthukumarasamy referring to its arguments for claim 1 for similar recitations (*see* Pet. 71–73).

> Claim 27 is commensurately recited as claim 1 and recites in part:
>
> receiving, in a server system, a first message from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the first message includes information based on a synchronization code assigned to the content presentation device, . . .
>
> obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider; [and]
>
> loading the particular media player in the content presentation device

(Ex. 1001, 13:60–65, 14:18–22).

For the reasons set forth *supra*, we determine Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claim 27. Therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claim 27 would have been obvious over Muthukumarasamy.

### 4. *Independent Claim 28*

Petitioner contends independent claim 28 would have been obvious over Muthukumarasamy, referring to its arguments for claim 1 for similar recitations (*see* Pet. 73–74). Claim 28, in part, commensurately recites

> receiving, in a server system, one or more messages generated by a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, collectively, include

IPR2022-00793
Patent 8,782,528 B2

> information based on a unique identification associated with the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player,
>
> obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider; [and]
>
> loading the particular media player in the content presentation device

(Ex. 1001, 14:29–41, 52–56).

For the reasons explained *supra*, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claim 28 would have been obvious over Muthukumarasamy.

### 5. *Dependent claims 2–5, 8, 11, 12, 14, and 15*

Petitioner contends claims 2–5, 8, 11, 12, 14, and 15 would have been obvious over Muthukumarasamy (Pet. 60–71 (citing Ex. 1005 ¶¶ 140–148, 151–164, 167; Ex. 1008 ¶¶ 40, 44–45, 50, 56, 58, 68, 83, Figs. 1, 19)).

For the reasons explained *supra*, we find Petitioner has not shown the subject matter of independent claims 1, 27, or 28 would have been obvious over Muthukumarasamy. Dependent claims 2–5, 8, 11, 12, 14, and 15 stand with their respective independent claims. Therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claims 2–5, 8, 11, 12, 14, and 15 would have been obvious over Muthukumarasamy.

IPR2022-00793
Patent 8,782,528 B2

### 6. Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a preponderance of the evidence that claims 1–5, 8, 11, 12, 14, 15, 27, and 28 would have been obvious over Muthukumarasamy.

### E. Asserted Obviousness over Muthukumarasamy and Hayward

Petitioner contends claims 1–5, 8, 11, 12, 14, 15, 27, and 28 would have been obvious over the combination of Muthukumarasamy and Hayward (Pet. 20–74).

### 1. Hayward (Ex. 1009)

Hayward is a U.S. patent titled "Method of Sizing an Embedded Media Player Page," and issued December 23, 2014 (Ex. 1009, codes (45), (54)). Hayward describes a "method of displaying video data using an embedded media player page" in which a "media player is launched within the embedded media player page" (Ex. 1009, code (57)). Hayward explains that a user, accessing a web page, "enter[s] search criteria for a media file, such as a streaming audio or video file" (Ex. 1009, 4:25–35). After the search is complete, "media files that satisfy the search request" are returned and displayed to the user who "may then decide to view the video data contained within a video file listed in the search results displayed to the user by clicking a link to one of the video files" (Ex. 1009, 5:6–12, 5:17–23). "When the user 'clicks' on a link to a selected video file, a script file, such as a JavaScript file, transmitted to the client . . . instructs the client to request the embedded media player page from the customer system" (Ex. 1009, 5:23–29).

IPR2022-00793
Patent 8,782,528 B2

The requested

> [e]mbedded media player page includes a reference to a
> functional media player object (such as a RealPlayer plug in). A
> reference is a tag (as a file locator as a universal resource
> indicator, URI, URL, or a file/object accessed through a directory
> structure) that refers to file, media object, or executable computer
> code stored in a memory structure

(Ex. 1009, 5:38–44). The "media player object generally is resident on the

client, although the reference tag could trigger a download of a media player

applet to control the output of a media file" (Ex. 1009, 5:44–47). "The

embedded media player page includes video display area 202" for video

playback (Ex. 1009, 5:61–66). In particular, the "media player is called as

an object by the embedded media player page when launched (i.e., operated

or run) within the embedded media player page" and plays the selected

video (Ex. 1009, 6:35–42).

### 2. *Claims 1–5, 8, 11, 12, 14, 15, 27, and 28*

Petitioner contends independent claim 1 would have been obvious

over the combination of Muthukumarasamy and Hayward (Pet. 14–60

(citing Ex. 1005 ¶¶ 84–95, 97–98, 106–109; Ex. 1008 ¶¶ 27, 44–45, 47–48,

50, 64, 68, 69, 77, 84–85, 88, 116–117, 149, Figs. 2, 14, 15/2, 19; Ex. 1009,

1:11–13, 1:26–30, 4:9–19, 5:6–29, 5:24–28, 5:38–47, 8:39–41, Fig. 1A)).

Petitioner contends independent claims 27 and 28 would have been obvious

over the combination of Muthukumarasamy and Hayward for the reasons set

forth with respect to claim 1 and for the additional elements, for reasons set

forth in the Petition (Pet. 71–74).

Patent Owner contends Hayward does not cure the deficiencies of

Muthukumarasamy because Muthukumarasamy's "disclosed processes that

IPR2022-00793
Patent 8,782,528 B2

use the RCIBS do not involve the components alleged to be part of a *server system*" as previously argued (PO Resp. 46 (citing Ex. 2022 ¶ 144)).  Nor, according to Patent Owner, does Petitioner identify "any other way of combining Hayward's embedded media player pages with Muthukumarasamy" (PO Resp. 46 (citing Ex. 2022 ¶ 147; Pet. 14–18, 22–25, 36–40, 44–47, 51–54, 56–60)).  Patent Owner further argues Petitioner has not asserted the proposed combination would change that "the RCIBS is controlled by commands from the IED that are received by the RCIBS (identified as part of the *content presentation device*) and not the alleged *server system*" (PO Resp. 46–47).  Thus, Patent Owner argues because "the RCIBS would continue to be part of the alleged *content presentation device* . . . the identified messaging would still not satisfy the limitation of "receiving, in the server system, one or more messages from a personal computing device" that identify a particular media player, as recited in claim 1 (PO Resp. 47).

We determine that Hayward does not cure the deficiencies of Muthukumarasamy discussed *supra*.  In particular, Petitioner has not explained how Hayward teaches receiving the one or more messages in a system server.  Rather, Petitioner relies on Hayward to teach "identify a particular media player for playing content from the file, [and] identify a location of the particular media player" (Pet. 36–40).  More specifically, Petitioner contends "a [person of ordinary skill in the art] would have been motivated by and found it obvious from Hayward to implement the DBCS (e.g., the RCIBS) to facilitate presentation of internet content at the content presentation device using any number of media players through embedded media player pages, as described in Hayward" (Pet. 15, 38–39).

39

IPR2022-00793
Patent 8,782,528 B2

However, to the extent Petitioner's assertions rely on "implement[ing] the DBCS (e.g., the RCIBS) to facilitate presentation of internet content at the content presentation device . . ." (Pet. Reply 22), we determine Petitioner has not shown the combined process of Muthukumarasamy and Hayward would include the required messages being received by the server (e.g., zHub/zNode), as opposed to directly by the RCIBS as discussed above. Additionally, Petitioner has not shown, for the zHub/zNode process, that Hayward cures the deficiencies of Muthukumarasamy as set forth above.

Accordingly, Petitioner has not shown that the combination of Muthukumarasamy and Hayward teaches "receiving, in a server system, one or more messages from a personal computing device . . . wherein the one or more messages, . . . identify a particular media player for playing content from the file, identify a location of the particular media player," as recited in claim 1 and commensurately recited in claims 27 and 28.

Additionally, because claims 2–5, 8, 11, 12, 14, and 15 depend from claim 1, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claims 2–5, 8, 11, 12, 14, and 15 would have been obvious over the combination of Muthukumarasamy and Hayward.

Thus, for the reasons explained *supra*, we find Petitioner has not established by a preponderance of evidence that the subject matter of claims 1–5, 8, 11, 12, 14, 15, 27, and 28 would have been obvious over the combination of Muthukumarasamy and Hayward.

### 3.   Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a

IPR2022-00793
Patent 8,782,528 B2

preponderance of the evidence that claims 1–5, 8, 11, 12, 14, 15, 27, and 28 would have been obvious over the combination of Muthukumarasamy and Hayward.

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has failed to prove, by a preponderance of the evidence, that claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of the '528 Patent are unpatentable, as summarized in the table below.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 8, 11, 12, 14, 15, 27, 28 | 103 | Muthukumarasamy | | 1–5, 8, 11, 12, 14, 15, 27, 28 |
| 1–5, 8, 11, 12, 14, 15, 27, 28 | 103 | Muthukumarasamy, Hayward | | 1–5, 8, 11, 12, 14, 15, 27, 28 |
| **Overall Outcome** | | | | 1–5, 8, 11, 12, 14, 15, 27, 28 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of the '528 Patent have not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

41

IPR2022-00793
Patent 8,782,528 B2

FOR PETITIONER:

Erika Arner
Kara Specht
Neal Larson
Gracie Mills
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Erika.arner@finnegan.com
Kara.specht@finnegn.com
Neal.larson@finnegan.com
Gracie.mills@finnegan.com


FOR PATENT OWNER:

Sharon A. Israel
Kyle E. Friesen
SHOOK, HARDY & BACON L.L.P.
sisrael@shb.com
kfriesen@shb.com

Trials@uspto.gov
571-272-7822

Paper 35
Date: October 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

GOOGLE LLC,
Petitioner,

v.

TOUCHSTREAM TECHNOLOGIES, INC.,
Patent Owner.

—————————

IPR2022-00794
Patent 8,904,289 B2

—————————

Before DEBRA K. STEPHENS, DANIEL J. GALLIGAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

GALLIGAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00794
Patent 8,904,289 B2

# I.   INTRODUCTION

In this *inter partes* review, Google LLC ("Petitioner") challenges claims 1, 2, and 6–8 of U.S. Patent 8,904,289 B2 (Ex. 1001 ("'289 patent")), assigned to Touchstream Technologies, Inc. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, we determine that Petitioner has failed to prove by a preponderance of the evidence that claims 1, 2, and 6–8 of the '289 patent are unpatentable.  *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

## A.   *Procedural History*

Petitioner filed a petition for *inter partes* review (Paper 1 ("Pet." or "Petition")) challenging claims 1, 2, and 6–8 of the '289 patent.

Petitioner relies upon the following prior art references:

| Reference | Exhibit No. |
|---|---|
| Muthukumarasamy et al., US 2010/0241699 A1, published Sept. 23, 2010 ("Muthukumarasamy") | 1008 |
| Hayward, US 8,918,812 B2, issued Dec. 23, 2014 ("Hayward") | 1009 |

Pet. vi, 2.  Petitioner challenges the claims on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 6–8 | 103 | Muthukumarasamy |
| 1, 2, 6–8 | 103 | Muthukumarasamy, Hayward |

Pet. 2.  Patent Owner timely filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").  With our authorization, Petitioner filed a Reply to Patent Owner's

IPR2022-00794
Patent 8,904,289 B2

Preliminary Response (Paper 7), and Patent Owner filed a Sur-reply to Petitioner's Preliminary Reply (Paper 9). We instituted trial on the asserted grounds of unpatentability. Paper 10 ("Inst. Dec." or "Institution Decision").

After institution, Patent Owner filed a Request for Rehearing and review by the Precedential Opinion Panel. Paper 12. The Precedential Opinion Panel denied review. Paper 19, 2. We denied rehearing. Paper 20, 3.

During the trial, Patent Owner filed a Response (Paper 18 ("PO Resp.")), Petitioner filed a Reply (Paper 22 ("Pet. Reply" or "Petitioner Reply")), and Patent Owner filed a Sur-reply (Paper 25 ("PO Sur-reply" or "Patent Owner Sur-reply").

An oral hearing was held on June 13, 2023, a transcript of which appears in the record. Paper 34 ("Tr.").

Petitioner relies on testimony from Dr. Benjamin B. Bederson. Ex. 1005. Patent Owner relies on testimony from Dr. Kevin C. Almeroth. Ex. 2022. Patent Owner entered into the record a transcript of the deposition of Dr. Bederson. Ex. 2021. No deposition of Dr. Almeroth was entered into the record. *See* Tr. 103:18–24 (Patent Owner's counsel noting that "Petitioner did not cross-examine Dr. Almeroth").

### B. *Real Parties in Interest*

Patent Owner identifies itself as the real-party-in-interest. Paper 5 at 1. Petitioner identifies itself as the real-party-in-interest. Pet. 76.[1]

---

[1] Petitioner states that Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., and that XXVI Holdings Inc. and Alphabet Inc. are not real parties-in-interest to this proceeding. Pet. 76 n.4.

IPR2022-00794
Patent 8,904,289 B2

### C. Related Matters

Petitioner and Patent Owner indicate the '289 patent was asserted in the following district court proceeding: *Touchstream Techs., Inc. v. Google, LLC*, No. 6-21-cv-00569 (W.D. Tex.). Pet. 76–77; Paper 5 at 1. Petitioner further indicates that the '289 patent was asserted in the following district court proceeding: *Touchstream Techs., Inc. v. Vizbee, Inc.*, No. 1-17-cv-06247 (S.D.N.Y.). Pet. 76–77. We are concurrently issuing final written decisions in IPR2022-00793, involving related U.S. Patent 8,782,528 B2, and IPR2022-00795, involving related U.S. Patent 8,356,251 B2.

### D. The '289 Patent (Ex. 1001)

The '289 patent, titled "Play Control of Content on a Display Device," issued December 2, 2014 (Ex. 1001, codes (45), (54)). The '289 patent describes a system that "allow[s] a personal computing device," e.g., a mobile phone, "to be used to select different content to be played on a remote display," e.g., a television set, and "allow[s] the user to control how the content is displayed on the display device using the personal computing

4

IPR2022-00794
Patent 8,904,289 B2

device." Ex. 1001, 2:11–15, 2:26–33. Figure 1, reproduced below, is a
block diagram illustrating an exemplary system. Ex. 1001, 2:40–41.



FIG. 1

As shown in the block diagram of Figure 1, "first device (e.g., a personal
computing device) 20" connects to and "acts as a controller" for "second
device (e.g., a television set 22 with a display 23) that acts as a receiver to
play content selected by a user of the first device and to respond to
commands that originate at the personal computing device." Ex. 1001, 3:1–
7. For example, television set 22 can be commanded "to access a content
provider 30 through the Internet 21, load a specific media player, load the
media player-specific content (e.g., a video) and play the content on the
television display 23." Ex. 1001, 3:18–23.

IPR2022-00794
Patent 8,904,289 B2

Furthermore, personal computing device 20 controls the selection of and playback of content on television set 22 through server system 24, rather than through directly controlling television set 22. Ex. 1001, 3:10–18.

Mobile phone 20 then formats and transmits a message to the server system server system 24. Ex. 1001, 4:27–29.

> The message from the mobile phone 20 contains a transmission code that includes data regarding . . . the secondary display it wants to connect to (e.g., television set 22 with display 23), the location and name of the media player for the selected video the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon.

Ex. 1001, 4:29–35, Fig. 3. That message "is transmitted over the Internet 21 and is received by the server system 24." Ex. 1001, 4:40–42. Server system 24 then "converts the incoming commands from the mobile device 20 into the correct JavaScript (or other programming) code used by the [television set] 22 to control the specific player (block 120)." Ex. 1001, 5:65–6:3. That is, the server "interpret[s] and convert[s] a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player" playing content on the television set 22. Ex. 1001, 5:58–62. Then, server system 24 "copies the converted version of the message to the database 34 associated with the [television set] 22." Ex. 1001, 6:3–6. The "display device 22 receives a message from the server system 24 (block 126) [and] executes the message (block 128)." Ex. 1001, 6:30–32.

### 1. Illustrative Claim

Challenged claim 1 is reproduced below.

1. A method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players, the method comprising:

6

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file wherein the media player is a computer application operable to present content and control presentation of the content, (iv) identify a location of the particular media player, and (v) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device; and

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player,

wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file.

## II.  ANALYSIS

### A.  Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

IPR2022-00794
Patent 8,904,289 B2

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence.[2] *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### B. *Level of Ordinary Skill in the Art*

The level of skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis. *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)).

Petitioner asserts that a "person of skill in the art ('POSA') would have had at least a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems." Pet. 14 (citing Ex. 1005 ¶¶ 42–46). Petitioner further asserts that, "[w]ith more education, for example, postgraduate degrees and/or study, less experience is needed to attain an ordinary level of skill in the art. Similarly, more experience can substitute for formal education." Pet. 14 (citing Ex. 1005 ¶¶ 42–46).

At institution, we found this definition to be consistent with the scope and content of the '289 patent and the asserted prior art, with a modification

---

[2] The parties do not present arguments related to objective evidence of nonobviousness (i.e., secondary considerations) as to any of the challenged claims.

IPR2022-00794
Patent 8,904,289 B2

of omitting "at least" to avoid vagueness as to the amount of educational experience—"a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems." Inst. Dec. 10.

In its Response, Patent Owner contends that an ordinarily skilled artisan would have had

> (1) the equivalent of a four-year, B.S. [(Bachelor of Science)] degree from an accredited institution in computer science, computer engineering or an equivalent field; (2) approximately two years of professional experience with Internet-based video delivery systems; and (3) working proficiency with network architecture, including Internet-hosted server-client systems, and with computer programming.

PO Resp. 13 (citing Ex. 2022 ¶¶ 5–28, 43; Ex. 2023). Patent Owner further contends that "[a]dditional graduate education could substitute for professional experience, while significant experience in the field might substitute for formal education," which "is consistent with the level adopted by Petitioner." PO Resp. 13 (citations omitted).

Petitioner does not address Patent Owner's definition in its Petitioner Reply. Given the differences in the assertions, in the oral hearing, we asked Patent Owner about its concerns with the definition set forth in the Decision to Institute:

> In our Decision to Institute we had set forth a level of skill per person of ordinary skill.
>
> In your response, you came back with something different. And I'm wondering, what, specifically, you have concern about with the definition set forth in the Decision to Institute?

Tr. 78:6–10. Patent Owner responded "I don't think it makes any difference for this panel's determination." Tr. 78:13–14. We agree and determine that

9

IPR2022-00794
Patent 8,904,289 B2

the differences in the level of skill offered by the parties are not so significant as to warrant any changes to the definition set forth in the Decision to Institute.  Therefore, we maintain our determination that an ordinarily skilled artisan would have had "a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems."  *See* Inst. Dec. 10.

We determine this level of skill comports with the qualifications a person would have needed to understand and implement the teachings of the '289 Patent and the prior art of record.  *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (noting that the prior art itself may reflect an appropriate level of skill in the art).

### C.  Claim Construction

We construe claim terms according to the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc).  37 C.F.R. § 42.100(b) (2021).  Under *Phillips*, claim terms are afforded "their ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312.  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips*, 415 F.3d at 1313.  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  An inventor may rebut that presumption by providing a definition of the term in the specification "with reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  In the absence of such a definition, limitations are not to be read from the

IPR2022-00794
Patent 8,904,289 B2

specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Petitioner asserts that we "need not construe any claims" to resolve this controversy and that it "adopts" Patent Owner's "proposed plain and ordinary meaning for all terms [from] the parallel district court action." Pet. 14–15 (citing Ex. 1005 ¶ 47; Ex. 1014). Patent Owner proposes constructions for the terms "media player" and "programming code." PO Resp. 14–21. We address "media player" below.

### 1. *media player*

Patent Owner contends that, based on the "intrinsic record . . . an ordinary artisan would have understood the ordinary and customary meaning of 'media player' in the '289 patent refers to application software and does not encompass hardware devices." PO Resp. 14 (citing Ex. 2022 ¶¶ 92–93).

Petitioner asserts that it "has not alleged any hardware device is a 'media player'" and thus, "the Board need not resolve whether 'hardware devices' are encompassed by 'media player.'" Pet. Reply 1. Rather, Petitioner states the media players relied upon in the Petition are all application software. Pet. Reply 1–2. Petitioner specifically states, "Petitioner has identified three 'media players' in the prior art. Two of these—Muthukumarasamy's 'Video Player[s]' and Hayward's 'media players' (Petition, 24–27)—are application software. The third 'media player' is likewise not a hardware device." Pet. Reply 2 (alteration in original). Thus, the parties agree that the term "media player" refers to software and not to a hardware device, and we apply this interpretation in our patentability analysis.

11

IPR2022-00794
Patent 8,904,289 B2

### 2. Additional Terms

In light of the record and our findings, reasonings, and conclusions discussed below, we determine that no other terms or phrases in the claims require express construction. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Asserted Obviousness over Muthukumarasamy

Petitioner contends that Muthukumarasamy renders claims 1, 2, and 6–8 obvious. Pet. 15–16, 20–72.

### 1. Muthukumarasamy (Ex. 1008)

Muthukumarasamy is a U.S. patent application publication titled "Device-Based Control System," and published September 23, 2010. Ex. 1008, codes (43), (54). Muthukumarasamy describes a "Device-Based Control System (DBCS) . . . that enables consumers, through the use of an internet-enabled device (IED)," e.g., a smartphone, "to navigate through media or entertainment content, control media components or equipment to watch and/or listen to media content." Ex. 1008 ¶ 26. Figure 1, reproduced

12

IPR2022-00794
Patent 8,904,289 B2

below, is "a block diagram of the Device-Based Control System (DBCS)."
Ex. 1008 ¶ 44, Fig. 1.



FIG.1

As shown in the block diagram of the DBCS of Figure 1, DBCS includes
IED 4, zHub 2, zNode 3, and entertainment systems such as a television set.
Ex. 1008 ¶ 44, Fig. 1. A user interacts with IED 4 to select or control
content playback hosted on internet server 1. Ex. 1008 ¶¶ 44–45. For
example, IED 4 executes a media management application that presents
media choices from "plurality of disparate media sources" for the user to
select. Ex. 1008 ¶ 48.

"When the IED sends a [content selecting or controlling] command,
the zHub receives the command from the IED and resolves the command
into a specific instruction directed at a specific zNode in the house."
Ex. 1008 ¶ 57. For example, "when a user selects content that is on channel
324 to be displayed on the living room TV, the zHub translates the
command into a specific RF signal directed at the zNode in the living room."
Ex. 1008 ¶ 57. In particular, zHub 2 "receives signals or commands from
the IED 4 via a local or premise network (e.g., router, WiFi, etc.) and

13

IPR2022-00794
Patent 8,904,289 B2

translates [those] received commands to RF signals;" zNode 3 in turn receives the translated RF signals and translates those RF signals "to a protocol (e.g. Infrared) interpretable by the media components." Ex. 1008 ¶ 44. For example, "the infrared codes needed to control the media components" are referenced for such translation. Ex. 1008 ¶ 66. Then, those translated signals are received by media components, e.g., a television set, to control the media component, "e.g., volume selection, channel selection, pause/play, etc." Ex. 1008 ¶ 50.

Additionally, in one DBCS embodiment, a remote-controlled internet browser software (RCIBS or ZRCIBS) provides "a remote controllable internet browser optimized for internet-media consumption." Ex. 1008 ¶ 83. Figure 18, reproduced below, is a "block diagram . . . of a home network." Ex. 1008 ¶ 83.



FIG.18

14

IPR2022-00794
Patent 8,904,289 B2

As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS connected to a WiFi or Wired Network Connection. Ex. 1008 ¶ 83, Fig. 18. The RCIBS sends and receives commands and responses, respectively, to a Zelfy application running on a user's phone, and transmits audio and video to a TV and speakers. Ex. 1008 ¶ 83, Fig. 18. In particular, Figure 18 further shows "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user." Ex. 1008 ¶ 83, Fig. 18. Additionally, the "IED transmits commands to the RCIBS and receives responses from the RCIBS: the commands are received and executed by RCIBS." Ex. 1008 ¶ 83, Fig. 18. For example, RCIBS provides video output to a television. *See* Ex. 1008, Fig. 18. Other commands from the IED include: "Play video at given URL," causing the RCIBS to "play the video present at [a] given URL" and "Play video with given video-id (as specified by 3rd party using 3rd party APIs and Video Players," causing the RCIBS to "load[] the 3rd Party Video Player specified and plays the video with given video[-]id." Ex. 1008, Fig. 19.

### 2. *Independent claim 1*

Petitioner contends Muthukumarasamy renders independent claim 1 obvious. Pet. 20–61. Patent Owner argues that Petitioner's contentions fail for the following limitation of claim 1:

> receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, . . . (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file wherein the media player is a computer application operable to present content and control

15

IPR2022-00794
Patent 8,904,289 B2

presentation of the content, (iv) identify a location of the particular media player.

PO Resp. 1–2. In particular, Patent Owner contends,

Petitioner relies on Muthukumarasamy's descriptions of two distinct processes, which use different components of Muthukumarasamy's system to present different types of content: the "RCIBS" for internet content and the "zHub and zNode" for non-internet content. Neither of these processes satisfies all the limitations of the challenged claims, and Petitioner fails to offer any rationale for combining features of these two processes . . . .

PO Resp. 1. For the reasons explained below, we agree with Patent Owner.

Petitioner relies on Muthukumarasamy to teach this limitation.

Pet. 28–41 (citing Ex. 1005 ¶¶ 74–100; Ex. 1008 ¶¶ 26, 36, 44–45, 47–48, 50, 57, 64, 68–70, 77, 83–85, 88, 116–117, 134, 149, Figs. 1, 14, 15/1, 15/2, 15/3, 19). Petitioner offers an annotated version of Muthukumarasamy's Figure 1, reproduced below, to show the alleged components of claim 1:



FIG.1

IPR2022-00794
Patent 8,904,289 B2

Pet. 30. Muthukumarasamy's Figure 1 is "a block diagram of the Device-Based Control System (DBCS)" (Ex. 1008 ¶ 44), and in the annotated version above, Petitioner identifies the internet-enabled device (IED) in green as the claimed "personal computing device," the internet server, zHub, and zNode in orange as the claimed "server system," and the devices in red labeled "Entertainment Systems" as the claimed "content presentation device." Pet. 29–30.

Petitioner asserts, "Muthukumarasamy's internet server (part of the server system) receives a message from the IED, which is separate from both the internet server and the media device (content presentation device)." Pet. 28 (citing Ex. 1005 ¶ 74); *see also* Pet. 28 (asserting that "the 'zHub receives the command from the IED'") (quoting Ex. 1008 ¶ 44). Petitioner contends, "Muthukumarasamy discloses signals specifying media content to be acted on by a particular media player at a certain location." Pet. 35. More specifically, Petitioner argues that "Muthukumarasamy teaches that the signals identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content [and] identify a location of the particular media player for two reasons." Pet. 37 (alteration in original; emphasis omitted).

First, Petitioner argues, "Muthukumarasamy discloses a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media.'" Pet. 37 (quoting Ex. 1008 ¶ 47); *see also* Pet. 37–38 (identifying Netflix and Amazon Video on Demand as examples of streamed internet content). Based on that disclosure, Petitioner argues a person having ordinary skill in the art "would have understood each

17

IPR2022-00794
Patent 8,904,289 B2

request for particular content to identify a media player associated with the particular source of the content, as well as its location, such as an address or website of the media player, or at least information that may be used to locate the particular media player." Pet. 37–38 (citing Ex. 1005 ¶¶ 94–95; Ex. 1014,[3] 2).

Second, Petitioner contends, "Muthukumarasamy teaches that the IED sends commands to play, through the RCIBS, media content 'as specified by 3rd Party using 3rd party APIs and Video Players," which cause the RCIBS to "load[] the 3rd Party Video Player specified and play[] the video with given video[-]id.'" Pet. 38 (citing Ex. 1008 ¶ 45, Fig. 19) (third alteration in original). As such, Petitioner argues a person having ordinary skill in the art "would have understood Muthukumarasamy teaches that the command sent from the IED specifies the video (*a file to be acted upon*), and the Video Player to play the video (*a particular media player for playing content from the file*)." Pet. 39 (citing Ex. 1005 ¶ 97).

Patent Owner argues Petitioner fails to demonstrate obviousness because of its reliance on two separate processes described in Muthukumarasamy, neither of which teaches the limitation identified above, without explanation as to why an ordinarily skilled artisan would have found it obvious to combine the processes. PO Resp. 32–33. In particular, Patent Owner argues Petitioner relies on Muthukumarasamy's ZHub/zNode process and RCIBS process, "using parts of each process for different limitations of the claimed methods." PO Resp. 32–33 (citing Pet. 24, 59–60). But, Patent

---

[3] Petitioner cites Exhibit 1015, but the cited material appears in Exhibit 1014.

IPR2022-00794
Patent 8,904,289 B2

Owner argues, neither process discloses all the limitations of the independent claims.  PO Resp. 33.

More specifically, Patent Owner contends Muthukumarasamy describes two cases:  the IED sending commands to (1) "the RCIBS over a local WiFi network . . . to access and present online media content" and (2) "the zHub . . . to control media devices that require infrared signals of the type used in conventional remote controls for TV sets."  PO Resp. 35 (citing Ex. 1008 ¶¶ 45, 56–60, 66–67, 83, Fig. 1; Ex. 2022 ¶ 127).  According to Patent Owner, only one of the RCIBS process and the zHub/zNode process "would be used in presenting any particular content."  PO Resp. 35 (citing Ex. 2022 ¶ 127).  However, according to Patent Owner, these two cases do not overlap because Muthukumarasamy does not disclose that the IED sends commands to the RCIBS using the zHub and/or zNode or that the zHub/zNode process is used to access or present online media content or any internet content.  PO Resp. 35–36 (citing Ex. 2022 ¶ 127).

According to Patent Owner, "Petitioner identifies Muthukumarasamy's internet server (1), zHub (2), and zNode (3), collectively, as the *server system*"; "IED (4), which includes a 'DBCS application or software' as the *personal computing device*"; "the 'Entertainment Systems' and 'Zelfy WiFi to HDMI Plug' (5) as part of the recited *content presentation device*"; and "'remote-controlled internet browser software (RCIBS)' as part of the recited *content presentation device*."  PO Resp. 34–35 (citing Ex. 1008 ¶¶ 44–45, 83; Pet. 21–25, 29–30; Ex. 1005 ¶¶ 63–65, 68, 77–79; Ex. 2021, 121:20–122:8; Ex. 2022 ¶ 126).  Patent Owner argues that Petitioner's contention that "Muthukumarasamy discloses that its content presentation device <u>loads any one of a plurality of different media players using the RCIBS</u> because it discloses loading one of

19

**<u>Appx61</u>**

IPR2022-00794
Patent 8,904,289 B2

a plurality of video players" (Pet. 24; emphasis added by Patent Owner)
shows that Petitioner "relies on a particular media player allegedly loaded in
the RCIBS during the RCIBS process." PO Resp. 36. Patent Owner argues,
however, that Petitioner "does not contend that a particular media player is
loaded in the content presentation device or obtained over a network during
the zHub/zNode process." PO Resp. 36 (citing Pet. 24; Ex. 2022 ¶ 129).
Rather, according to Patent Owner, Petitioner relies on "the zHub/zNode
process for *using the particular media player* to execute the *programming
code* with respect to the file" and "*receiving, in the server system, a message
from a personal computing device*" while relying on the RCIBS process for
"*messages identify a particular media player,*" without asserting
Muthukumarasamy's system would have been modified or why an ordinarily
skilled artisan would have made such a modification. PO Resp. 40 (citing
Pet. 28–30, 37–39, 54–57, 59–60).

Patent Owner additionally argues that the RCIBS process does not
"*receiv(e) one or more messages from the personal computing device*" in the
components Petitioner identifies as the "*server system.*" PO Resp. 38–39
(citing Ex. 2022 ¶¶ 137–138). In particular, Patent Owner contends that
Petitioner sets out that Muthukumarasamy's RCIBS is part of the content
presentation device. PO Resp. 39 (citing Pet. 23–24; Ex. 1005 ¶ 68). Patent
Owner further contends that "Petitioner identifies Muthukumarasamy's IED
as the *personal computing device* of the claims and Muthukumarasamy's
internet server, zHub, and zNodes, collectively, as the *server system.*" PO
Resp. 39 (citing Pet. 28). Patent Owner then asserts that "[a]ny messages
from the IED to the RCIBS, including those in Figure 19, would not use the
internet server, zHub, or zNodes because they are transmitted directly to the

20

IPR2022-00794
Patent 8,904,289 B2

RCIBS . . . via the user's home network." PO Resp. 39 (citing Ex. 2022
¶¶ 114–118).

Patent Owner annotates Muthukumarasamy's Figure 1, shown below,
to illustrate that "none of the messages in step R1 are *received* <u>in the alleged</u>
<u>server system</u> of Petitioner's mapping." PO Resp. 39–40 (citing Ex. 2022
¶ 135).



FIG.1

Figure 1 of Muthukumarasamy as annotated illustrates that step R1 is
communication between the entertainment system and IED (Zelfy mobile);
step R2 is communication between the entertainment system and the server
system; and step R3 is communication between the server system and
entertainment system. PO Resp. 39–40 (citing Ex. 1008, Fig. 1). According
to Patent Owner, "[t]he 'commands' listed in Figure 19 of
Muthukumarasamy are the only disclosed 'messages' involved in the RCIBS
process [and] Petitioner never alleges that any other messages related to the
operation of the RCIBS are *received in the server system*." PO Resp. 40

21

IPR2022-00794
Patent 8,904,289 B2

(citing Ex. 2022 ¶ 136; Pet. 28–35, 38–39, 47–48, 62–63). Therefore, according to Patent Owner, "[b]ecause these *messages* are *received* in the alleged *content presentation device* from the alleged *personal computing device*, Petitioner fails to show the RCIBS process satisfies the limitations of the claims." PO Resp. 40 (citing Ex. 2022 ¶ 136).

Patent Owner next argues that Petitioner also asserts "that Muthukumarasamy generally discloses 'stream[ing] internet content over WiFi' into a browser-based media player." PO Resp. 41 (alteration in original; citing Pet. 38; Ex. 1008 ¶ 45). However, according to Patent Owner, "this disclosure is just a reference to the RCIBS, which 'is remote controllable internet browser software optimized for internet-media consumption.'" PO Resp. 41 (citing Ex. 1008 ¶ 83; Ex. 2022 ¶ 118). Patent Owner asserts that Petitioner admits that Muthukumarasamy's disclosure "regarding 'internet content' is provided by the RCIBS, using the commands in Figure 19." PO Resp. 41 (citing Pet. 38). Patent Owner then contends, "Muthukumarasamy does not disclose any mechanism for streaming internet content besides the RCIBS." PO Resp. 41 (citing Ex. 2022 ¶¶ 111, 137). Therefore, Patent Owner contends, Petitioner has failed to show Muthukumarasamy discloses

> receiving, in a server system, one or more messages from a personal computing device . . . wherein the one or more messages . . . identify a particular media player for playing content from the specified file wherein the media player is a computer application operable to present content and control presentation of the content [and] identify a location of the particular media player,

as recited in claim 1. PO Resp. 41.

IPR2022-00794
Patent 8,904,289 B2

We agree with Patent Owner that Petitioner has not shown that Muthukumarasamy teaches this subject matter.  Initially, we note that Petitioner annotates Figure 1 of Muthukumarasamy to identify the elements of claim 1.  Pet. 29–30.  Petitioner contends, "Figure 1, annotated below, shows that the IED [highlighted in green] (*personal computing device*) is separate from the internet server, zHub, and zNode [highlighted in orange] ([collectively,]*server system*), and the 'media device' 'Entertainment Systems' [highlighted in red] (*content presentation device*)."  Pet. 29.



FIG.1

Pet. 30 (reproducing Ex. 1008, Fig. 1 (annotated); Pet. 19–20)).  Petitioner further contends that Muthukumarasamy's DBCS allows a user to use an IED "to select and control media played on different devices and from different media sources including cable and streamed internet content, such

23

IPR2022-00794
Patent 8,904,289 B2

as Netflix or Amazon Video On Demand, onto a content presentation device, such as a media device configured with RCIBS." Pet. 21 (citing Ex. 1008 ¶¶ 26–27, 31, 45, 83, 134). Petitioner also argues that "the RCIBS, running on the content presentation device, 'loads the 3rd Party Video Player specified and plays the video.'" Pet. 24 (quoting Ex. 1008, Fig. 19). Figure 18 of Muthukumarasamy, annotated by Petitioner and reproduced below, is "a block diagram of a home network comprising the IED along with a computer hosting the RCIBS under an embodiment." Ex. 1008 ¶ 24, Fig. 18.



FIG.18

Pet. 25 (reproducing Ex. 1008, Fig. 18 (annotated)). Figure 18 of Muthukumarasamy, shows an IED (i.e., "User's Phone/Device") sending commands to a ZRCIBS (also referred to as an "RCIBS" (*see* Ex. 1008 ¶¶ 24, 83, Fig. 18) hosted on a computer that provides output to a content

24

IPR2022-00794
Patent 8,904,289 B2

presentation device. In the annotated figure above, Petitioner includes the ZRCIBS of Figure 18 in a red box, red being the color Petitioner uses to designate the "content presentation device." Pet. 24–25.

Thus, Petitioner expressly identifies the RCIBS as part of the content presentation device. Petitioner's contention that "the Petition maps the RCIBS as part of the claimed 'server system' (not part of the 'content presentation device')" (*see* Pet. Reply 18) is incorrect, as made plain by the discussion above. More specifically, in its Reply, Petitioner contends that the "Petition states repeatedly that the RCIBS is part of the DBCS, which the Petition maps to the 'server system,'" such that "messages sent from the IED to the RCIBS are sent to the 'server system.'" Pet. Reply 22. This contention fails because Muthukumarasamy's DBCS includes the server as well as other components depicted in Figure 1, such as the software on IED 4 ("personal computing device"). Ex. 1008 ¶¶ 44–45, Fig. 1. Under Petitioner's Reply theory that the DBCS is the claimed "server system," Muthukumarasamy's disclosures of messages from the IED (part of the DBCS) to other components of the DBCS would simply disclose messages *within* a "server system," rather than messages from a "personal computing device" to a "server system." When asked in the Oral Hearing for citations in the Petition that would illustrate that the RCIBS is part of the server and not the content presentation device (Tr. 17:4–13), Petitioner did not identify any persuasive disclosure. Tr. 38:11–12 (asserting that Muthukumarasamy is "not taking a position necessarily on where the RCIBS is located"), 87:21–88:15 (asserting that "it is indifferent to the obviousness of these claims whether the RCIBS is on the server on not").

Petitioner contends,

25

IPR2022-00794
Patent 8,904,289 B2

> Muthukumarasamy teaches that the IED sends commands to play, through the RCIBS, media content "as specified by 3rd Party using 3rd party APIs and Video Players." In response, the RCIBS "loads the 3rd Party Video Player specified and plays the video with given video[-]id." Muthukumarasamy also discloses sending a command of "Play video at given URL" and transmitting the command through an RCIBS and loading the URL and the associated video in response.

Pet. 38–39 (alteration in original; citing Ex. 1008 ¶ 45, Fig. 19). As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS connected to a WiFi or Wired Network Connection. Ex. 1008 ¶ 83, Fig. 18. Muthukumarasamy describes that the RCIBS communicates with a Zelfy application running on a user's phone and transmits audio and video to a TV and speakers. Ex. 1008 ¶ 83, Fig. 18. In particular, Figure 18 further shows that the "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user." Ex. 1008 ¶ 83, Fig. 18.

Figure 18 does not disclose any communication between the personal computing device (Zelfy Application running on User's Phone/Device) and components identified by Petitioner as the server system. Ex. 1008 ¶ 83, Fig. 18. Because messages to the RCIBS do not go through the identified "server system," Petitioner has not shown that the RCIBS disclosures teach "receiving, in a server system, one or more messages from a personal computing device," as recited in claim 1.

Petitioner further argues, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process, the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do." Pet. Reply 11 (citing PO Resp. 35). Petitioner points to the commands transmitted for internet content from "Sky," arguing that "one

IPR2022-00794
Patent 8,904,289 B2

embodiment of which is a 'zSky software agent . . . installed on a media PC'" is a description consistent with the RCIBS. Pet. Reply 11–12 (alteration in original; citing Ex. 1008 ¶ 45, Fig. 5). Paragraph 45 discloses the following:

> The DBCS comprises a zHDStick that streams internet content over WiFi to High Definition television (HDTV). The DBCS comprises a zSky software agent that helps manage online media viewing on TV; the zSky agent can be hosted (e.g., preinstalled) on the zHDStick, or can be independently installed on a media PC, but the embodiment is not so limited.

Ex. 1008 ¶ 45. This disclosure does not provide any detail or description as to what the ZSky agent does besides "help manage online media" and does not refer to the process disclosed in Figure 18. *See* Ex. 1008. Petitioner argues that "[t]he RCIBS is consistent only with the zSky software agent when installed on a media PC because Muthukumarasamy states, '[t]he RCIBS is deployed on a computer that has video, audio, and internet capabilities and is connected to the home network of the user.'"

Pet. Reply 11 n.2 (citing Ex. 1008 ¶ 83). Petitioner then argues that

> Muthukumarasamy envisions controlling, *e.g.*, "Play/Pause" of internet content being presented on a media device through Sky. Because control of Sky internet content flows from the IED through the zNode/zHub to the media device . . . Muthukumarasamy discloses this very "overlapping use-case."

Pet. Reply 11–12 (quoting PO Resp. 35). Petitioner, however, does not direct us to any disclosure in Muthukumarasamy showing that commands to play content using "Sky" flow through the zNode and the zHub. Muthukumarasamy does not disclose that such a path would be used, and it is not clear why it would when zSky is internet connected.

Petitioner additionally argues, "while the RCIBS itself is software, it is hosted on a hardware device (*e.g.*, computer)" and communication

27

IPR2022-00794
Patent 8,904,289 B2

between the IED and the RCBIS, via computer, is over a "home network" and "the only connection labeled '*Home* WiFi' in Figure 1 is that from the IED to the zHub." Pet. Reply 15–16. Thus, Petitioner argues, "[t]his suggests that, when presenting internet content via the RCIBS, that command flows through the zHub." Pet. Reply 16 (citing Ex. 1008 ¶ 56).

We do not find this argument persuasive because Muthukumarasamy's Figure 1 shows several "WiFi" paths that do not go through the zHub, including the path between IED 4 and Zelfy WiFi to HDMI Plug 5 labeled "Commands over Wifi" and the paths between the Database and each of Zelfy WiFi to HDMI Plug 5 and IED 4 labeled "Webservices over WiFi." In Muthukumarasamy, Figure 18 illustrates "a block diagram 1800 of a home network comprising a computer hosting the RCIBS and the IED (Ex. 1008 ¶ 83), and it shows "Commands" and "Responses" communicating directly between the user's device and the RCIBS. Muthukumarasamy indicates that the "Wireless Router" in Figure 1 provides the WiFi network by defining "Router" as "an Internet switch that is coupled or connected to an internet cable or digital subscriber link (DSL) modem and enables a home network that is shared by one or more internet protocol (IP)-based devices (e.g., personal computer (PC), WiFi devices, etc.) in the home." Ex. 1008 ¶ 37. Thus, based on Figure 18 and the description in the Muthukumarasamy, devices that are WiFi connected would communicate via the Router and bypass the "server system" identified by Petitioner.

Petitioner also argues that "[n]othing in Muthukumarasamy suggests the presentation of internet content on a media device—even a media device employing Muthukumarasamy's RCIBS—is 'separate' or 'distinct' from the zHubs/zNodes." Pet. Reply 4. Petitioner's contentions rely on its

28

IPR2022-00794
Patent 8,904,289 B2

characterization of Muthukumarasamy as disclosing "a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media.'" Pet. 37 (citing Ex. 1008 ¶ 47). Petitioner cites various disclosures showing that Muthukumarasamy provides internet and non-internet content from disparate sources in a device-agnostic environment (Pet. Reply 5–10 (citing Ex. 1008 ¶¶ 5, 26, 27, 31, 36, 44, 45, 47, 50–52, 57, 58, 61–62, 64, 68–70, 84, 134, Figs. 15/1–15/3, 16). Based on these disclosures, Petitioner contends that "Muthukumarasamy's RCIBS, zHub, and zNode work together to provide the 'device-agnostic and source-agnostic entertainment experience.'" Pet. Reply 16.

Petitioner additionally contends, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process (POR, 35), the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do." Pet. Reply 11. Petitioner cites "Volume Up" as an example of a command that would be transmitted to a TV via the zHub/zNode process regardless of "whether the content is non-internet content from 'DVR/Blue-ray/ [and] VCR' or internet content from 'Sky.'" Pet. Reply 11 (alteration in original).

We are not persuaded. Even if the zHub and the zNode would be used to control the volume on the TV on which the streamed content is displayed, this device cooperation does not show the particular messaging recited in the claim. More specifically, even under Petitioner's scenario that the "Volume Up" command flows from the IED ("personal computing device") through the zHub/zNode ("server system") to the TV ("content presentation device"), this command does not "identify a particular media player for playing content from the file." Petitioner has not shown any

29

IPR2022-00794
Patent 8,904,289 B2

messages in Muthukumarasamy that "identify a particular media player for playing content from the specified file" and flow from the IED through the zHub/zNode to the content presentation device. Thus, Petitioner's assertions about devices working together fall short of proving by preponderant evidence that Muthukumarasamy discloses the particular messaging contents and path recited in claim 1.

As noted above, Petitioner argues that "Muthukumarasamy teaches that the signals identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content [and] identify a location of the particular media player for two reasons." Pet. 37 (alteration in original; emphasis omitted). For the reasons explained above, Petitioner has not shown that the RCIBS disclosures teach the claimed subject matter. Petitioner's other contention is that "Muthukumarasamy discloses a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media.'" Pet. 37 (citing Ex. 1008 ¶¶ 47–48). Thus, according to Petitioner, a person of ordinary skill in the art "would have understood each request for particular content to identify a media player associated with the particular source of the content, as well as its location, such as an address or website of the media player, or at least information that may be used to locate the particular media player." Pet. 37–38 (citing Ex. 1005 ¶¶ 94–95; Ex. 1015, 2)).

In its Reply, Petitioner argues that "Muthukumarasamy discloses that the zHub/zNode process is used to present internet content. In addition to the commands to control internet content presented through Sky[,]

IPR2022-00794
Patent 8,904,289 B2

Muthukumarasamy contemplates using an 'Apple TV device' as a media device." Pet. Reply 12–13 (citing Ex. 1008 ¶ 36).

Petitioner also contends that "distinguish[ing] hardware device from software applications fails, as even hardware devices involve software applications." Pet. Reply 19. Petitioner then argues, "as Patent Owner's expert recognizes, many different types of content, including cable, DVR, and VOD, 'would all be provided through [the] set-top box.'" Pet. Reply 19 (alteration in original; citing Ex. 2022 ¶ 153).

Petitioner's arguments fail to show by preponderant evidence that messages identifying a particular media player, which the parties agree is software, would go from the IED through the zHub and zNode to the content presentation device. For example, Petitioner identifies Muthukumarasamy's disclosure of "disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media.'" Pet. 37 (quoting Ex. 1008 ¶ 47). Even if we accepted that the identification of "internet media" may entail the identification of a software media player, Petitioner's contentions fall short for not showing the required path through the zHub and zNode, as discussed above. For other sources of media, Petitioner fails to show that these entail identifying a software media player. For example, cable and video on demand may be provided by a TV set-top box, and Muthukumarasamy discloses that, "when a user selects content that is on channel 324 to be displayed on the living room TV, the zHub translates the command into a specific RF signal directed at the zNode in the living room." Ex. 1008 ¶ 57. Petitioner, however, does not present evidence that the messages that go through the zHub and zNode to turn on channel 324 "identify a particular [software] media player," as required of claim 1.

31

Petitioner argues that a set-top box presents different types of content and that "[t]o facilitate presentation of these different sources of content, the set-top box would need software applications for each content source."  Pet. Reply 19.  Petitioner, however, does not direct us to evidence that any set-top box in Muthukumarasamy operates as such.  Tr. 31:18–33:2.  On the other hand, Patent Owner's declarant, Dr. Almeroth, testifies regarding tuning to a particular channel that, "[e]ven if the 'command' in this example identifies a particular underline hardware device, that is not a *media player*" and that "the alleged *messages* do not identify any software application that might qualify as a *media player*."  Ex. 2022 ¶ 152 (citing Ex. 1008 ¶¶ 57, 68–69, Fig. 15/6).  Thus, the evidence of record does not show that messages to select content via the zHub and zNode identify a software media player.

Petitioner notes that Patent Owner "has recently accused several set-top box devices of infringing" a related patent, "stating 'media player[s]' are 'loaded' at set-top boxes to present content, including 'live TV and DVR content.'"  Pet. Reply 20 n.5 (alteration in original).  Petitioner has not, however, proffered any persuasive reasoning explaining why Patent Owner's allegations in a 2023 complaint have any bearing on the question of what would have been obvious to a person of ordinary skill in the art at the time of the invention in 2011.

As to Petitioner's AppleTV assertions, Muthukumarasamy mentions that an "AppleTV device" can be used (Pet. Reply 9–10 (citing Ex. 1008 ¶¶ 36, 45)), but Petitioner does not show that messaging to the AppleTV would go through the zHub and zNode, as opposed simply to over a WiFi connection similar to the RCIBS.  Rather, Petitioner contends the following: "Users '[u]sing the IED interface, . . . select[] the content and start[] enjoying the content' on a separate media device (claimed content

presentation device) such as a 'TV, DVD player, [and] Apple TV device.'"
Pet. 22 (alterations in original; quoting Ex. 1008 ¶¶ 36, 77). This allegation
simply shows that a user selects content, which is then played in a manner
transparent to the user on the content presentation device.

For claim 2, which recites "loading the particular media player in the
content presentation device prior to executing the programming code with
respect to the file," Petitioner asserts, "Muthukumarasamy teaches that a
media device loads an appropriate media player depending on the media
type and source." Pet. 61 (citing 1005 ¶ 131); *see also* Pet. 20–28
(addressing preamble's recitation of "a content presentation device that loads
any one of a plurality of different media players" (citing Ex. 1005 ¶¶ 62–73).
Petitioner's declarant, Dr. Bederson, states "Muthukumarasamy . . .
disclose[s] loading any one of a plurality of different media players on the
content presentation device." Ex. 1005 ¶ 62. Dr. Bederson later repeats that
"Muthukumarasamy teaches that a media device loads an appropriate media
player depending on the media type and course," referring to the previous
statements. Ex. 1005 ¶ 131. Neither Petitioner nor Dr. Bederson provide
sufficient evidence or argument to support that Muthukumarasamy teaches
obtaining or loading a media player in the zHub/zNode process. Petitioner
contends,

> Muthukumarasamy "controls delivery of selected media content
> and selects and controls the media devices that deliver the
> selected media content according to a media type of the selected
> media content." Because Muthukumarasamy teaches that the
> media device displays media content from various disparate
> sources depending on the media type and media source, a [person
> of ordinary skill in the art] would have understood the media
> device loads an appropriate media player depending on the media
> type and source.

IPR2022-00794
Patent 8,904,289 B2

Pet. 23–24 (citing Ex. 1008 ¶ 47; Ex. 1005 ¶¶ 66–67). Petitioner, however, proffers insufficient evidence or argument that the content choices described in paragraph 47 of Muthukumarasamy would have led an ordinarily skilled artisan to understand a media player is obtained and loaded in the content presentation device. Rather, Dr. Bederson makes conclusory statements without providing evidence to support the assertions (Ex. 1005 ¶¶ 66–67).

Accordingly, we determine Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claim 1. Therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claim 1 would have been obvious over Muthukumarasamy.

### 3. Independent Claim 6

Petitioner contends independent claim 6 would have been obvious over Muthukumarasamy, referring to its arguments for claim 1 for similar recitations. *See* Pet. 62–71.

Claim 6 recites, in part,

> receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, . . . (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content.

For this subject matter, Petitioner refers to its contentions for similarly-recited subject matter in claim 1 (Pet. 62–63), and for the reasons set forth with respect to claim 1, we determine Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claim 6. Therefore, based on the record before us, we conclude Petitioner has not established by

IPR2022-00794
Patent 8,904,289 B2

a preponderance of evidence that the subject matter of claim 6 would have been obvious over Muthukumarasamy.

### 4. Dependent claims 2, 7, and 8

Petitioner contends that claims 2, 7, and 8 would have been obvious over Muthukumarasamy. Pet. 61–62 (citing Ex. 1005 ¶¶ 131–132), 71 (citing Ex. 1005 ¶ 150). For the reasons explained above, we find Petitioner has not shown the subject matter of independent claims 1 and 6 would have been obvious over Muthukumarasamy, and, therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of dependent claims 2, 7, and 8 would have been obvious over Muthukumarasamy.

### 5. Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a preponderance of the evidence that claims 1, 2, and 6–8 would have been obvious over Muthukumarasamy.

### E. Asserted Obviousness over Muthukumarasamy and Hayward

Petitioner contends that claims 1, 2, and 6–8 would have been obvious over the combination of Muthukumarasamy and Hayward. Pet. 15–72.

### 1. Hayward (Ex. 1009)

Hayward is a U.S. patent titled "Method of Sizing an Embedded Media Player Page" and issued December 23, 2014. Ex. 1009, codes (45), (54). Hayward describes a "method of displaying video data using an embedded media player page" in which a "media player is launched within the embedded media player page." Ex. 1009, code (57). Hayward explains that a user, accessing a web page, "enter[s] search criteria for a media file, such as a streaming audio or video file." Ex. 1009, 4:25–35. After the

35

IPR2022-00794
Patent 8,904,289 B2

search is complete, "media files that satisfy the search request" are returned
and displayed to the user who "may then decide to view the video data
contained within a video file listed in the search results displayed to the user
by clicking a link to one of the video files." Ex. 1009, 5:6–12, 5:17–23.
"When the user 'clicks' on a link to a selected video file, a script file, such
as a JavaScript file, transmitted to the client . . . instructs the client to request
the embedded media player page from the customer system." Ex. 1009,
5:24–29.

> The requested
>
> [e]mbedded media player page includes a reference to a
> functional media player object (such as a RealPlayer plug in). A
> reference is a tag (as a file locator as a universal resource
> indicator, URI, URL, or a file/object accessed through a directory
> structure) that refers to file, media object, or executable computer
> code stored in a memory structure.

Ex. 1009, 5:38–44. The "media player object generally is resident on the
client, although the reference tag could trigger a download of a media player
applet to control the output of a media file." Ex. 1009, 5:44–47. "The
embedded media player page includes video display area 202" for video
playback. Ex. 1009, 5:61–66. In particular, the "media player is called as an
object by the embedded media player page when launched (i.e., operated or
run) within the embedded media player page" and plays the selected video.
Ex. 1009, 6:35–42.

### 2.  *Claims 1, 2, and 6–8*

Petitioner contends that claim 1 would have been obvious over the
combination of Muthukumarasamy and Hayward, relying additionally on
Hayward to address certain subject matter. *See* Pet. 16–20, 25–28, 41–45,
50–52, 57–58, 60–61. Petitioner contends the combination of

36

IPR2022-00794
Patent 8,904,289 B2

Muthukumarasamy and Hayward renders independent claim 6 obvious for the reasons set forth with respect to claim 1 and for the additional elements, for reasons set forth in the Petition. Pet. 62–71.

Patent Owner contends that Hayward does not cure the deficiencies of Muthukumarasamy because Muthukumarasamy's "disclosed processes that use the RCIBS do not involve the components alleged to be part of a *server system*" as previously argued. PO Resp. 43 (citing Ex. 2022 ¶ 146). Nor, according to Patent Owner, does Petitioner identify "any other way of combining Hayward's embedded media player pages with Muthukumarasamy." PO Resp. 43 (citing Ex. 2022 ¶ 146; Pet. 14–18, 22–25, 36–40, 44–47, 51–54, 56–60). Patent Owner further argues that Petitioner has not asserted the proposed combination would change that "the RCIBS is controlled by commands from the IED that are received by the RCIBS (identified as part of the *content presentation device*) and not the alleged *server system*." PO Resp. 43. Thus, Patent Owner argues that, because "the RCIBS would continue to be part of the alleged *content presentation device* . . . the identified messaging would still not satisfy the limitation of *receiving, <u>in the server system</u>, one or more messages <u>from a personal computing device</u>*." PO Resp. 43–44.

We determine that Hayward does not cure the deficiencies of Muthukumarasamy discussed above. In particular, Petitioner has not explained how Hayward teaches receiving the one or more messages in a system server. Rather, Petitioner relies on Hayward to teach "identify a particular media player for playing content from the file," and "identify a location of the particular media player." Pet. 41–45. More specifically, Petitioner contends that a person of ordinary skill in the art "would have been motivated by and found it obvious from Hayward to implement the

37

IPR2022-00794
Patent 8,904,289 B2

DBCS (e.g., the RCIBS) to facilitate control of internet content presented at the content presentation device using any number of media players through embedded media player pages, as described in Hayward." Pet. 65.

However, to the extent Petitioner's assertions rely on "implement[ing] the DBCS (*e.g., the RCIBS*) to facilitate presentation of internet content at the content presentation device" (Pet. Reply 22), we determine Petitioner has not shown the combined process of Muthukumarasamy and Hayward would include the required messages being received by the server (e.g., zHub/zNode), as opposed to directly by the RCIBS as discussed above. Additionally, Petitioner has not shown, for the zHub/zNode process, that Hayward cures the deficiencies of Muthukumarasamy as set forth above.

Accordingly, Petitioner has not shown that the combination of Muthukumarasamy and Hayward teaches "receiving, in a server system, one or more messages from a personal computing device . . . wherein the one or more messages, . . . identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content," as recited in claim 1 and commensurately recited in independent claim 6.

Additionally, because claim 2 depends from claim 1 and claims 7 and 8 depend from claim 6, we conclude that Petitioner has not established by a preponderance of evidence that the subject matter of claims 2, 7, and 8 would have been obvious over the combination of Muthukumarasamy and Hayward.

Thus, for the reasons explained above, we find Petitioner has not established by a preponderance of evidence that the subject matter of claims 1, 2, and 6–8 would have been obvious over the combination of Muthukumarasamy and Hayward.

IPR2022-00794
Patent 8,904,289 B2

### 3. Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a preponderance of the evidence that claims 1, 2, and 6–8 would have been obvious over the combination of Muthukumarasamy and Hayward.

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has failed to prove, by a preponderance of the evidence, that claims 1, 2, and 6–8 of the '289 patent are unpatentable, as summarized in the table below.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 6–8 | 103 | Muthukumarasamy | | 1, 2, 6–8 |
| 1, 2, 6–8 | 103 | Muthukumarasamy, Hayward | | 1, 2, 6–8 |
| **Overall Outcome** | | | | 1, 2, 6–8 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, and 6–8 of the '289 patent have not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

39

IPR2022-00794
Patent 8,904,289 B2

FOR PETITIONER:

Erika Arner
Kara Specht
Neal Larson
Gracie Mills
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Erika.arner@finnegan.com
Kara.specht@finnegn.com
Neal.larson@finnegan.com
Gracie.mills@finnegan.com


FOR PATENT OWNER:

Sharon A. Israel
Kyle E. Friesen
SHOOK, HARDY & BACON L.L.P.
sisrael@shb.com
kfriesen@shb.com

Trials@uspto.gov                                    Paper 35
571-272-7822                        Date: September 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GOOGLE LLC,
Petitioner,

v.

TOUCHSTREAM TECHNOLOGIES, INC.,
Patent Owner.

IPR2022-00795
Patent 8,356,251 B2

Before DEBRA K. STEPHENS, DANIEL J. GALLIGAN, and
AMBER L. HAGY, *Administrative Patent Judges.*

STEPHENS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00795
Patent 8,356,251 B2

# I.   INTRODUCTION

## A.   Background and Summary

In this *inter partes* review, Google LLC ("Petitioner") challenges claims 1, 2, and 5–9 of U.S. Patent 8,356,251 B2 (Ex. 1001 ("'251 Patent")), assigned to Touchstream Technologies, Inc. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, we determine that Petitioner has failed to prove by a preponderance of the evidence that claims 1, 2, and 5–9 of the '251 Patent are unpatentable (*see* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.")).

## B.   Procedural History

Petitioner filed a petition for *inter partes* review (Paper 1 ("Pet." or "Petition")) challenging claims 1–5, 8, 11, 12, 14, 15, 27, and 28 of the '251 Patent.

Petitioner relies upon the following prior art references:

| Reference | Exhibit No. |
|---|---|
| Muthukumarasamy et al., US 2010/0241699 A1, published Sept. 23, 2010 ("Muthukumarasamy") | 1008 |
| Hayward, US 8,918,812 B2, issued Dec. 23, 2014 ("Hayward") | 1009 |

2

IPR2022-00795
Patent 8,356,251 B2

(Pet. 2). Petitioner challenges the claims on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 5–9 | 103 | Muthukumarasamy |
| 1, 2, 5–9 | 103 | Muthukumarasamy, Hayward |

(Pet. 2–3). Patent Owner timely filed a Preliminary Response (Paper 6 ("Prelim. Resp.")). With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 7 ("Pet. Reply to POPR")), and Patent Owner filed a Sur-reply to Petitioner's Preliminary Reply (Paper 9 ("PO Sur-reply to Pet. Reply")). We instituted trial on the asserted grounds of unpatentability (Paper 10 ("Inst. Dec." or "Institution Decision")).

After institution, Patent Owner filed a Request for Rehearing and review by the Precedential Opinion Panel (Paper 12). The Precedential Opinion Panel denied review (Paper 19, 2). We denied rehearing (Paper 20, 3).

During the trial, Patent Owner filed a Response (Paper 18 ("PO Resp.")), Petitioner filed a Reply (Paper 22 ("Pet. Reply" or "Petitioner Reply")), and Patent Owner filed a Sur-reply (Paper 25 ("PO Sur-reply" or "Patent Owner Sur-reply"). An oral hearing was held on June 13, 2023, a transcript of which appears in the record (Paper 34 ("Tr.")).

Petitioner relies on testimony from Dr. Benjamin B. Bederson (Ex. 1005). Patent Owner relies on testimony from Dr. Kevin C. Almeroth (Ex. 2022). Patent Owner entered into the record a transcript of the deposition of Dr. Bederson (Ex. 2021). No deposition of Dr. Almeroth was entered into the record (*see* Tr. 103:22–24 (Patent Owner's counsel noting that "Petitioner did not cross-examine Dr. Almeroth")).

3

IPR2022-00795
Patent 8,356,251 B2

## C. Real Parties in Interest

Patent Owner identifies itself as the real-party-in-interest (Paper 5, 1).

Petitioner identifies itself as the real-party-in-interest (Pet. 79).[1]

## D. Related Matters

Petitioner and Patent Owner indicate the '251 Patent was asserted in the following district court proceeding: *Touchstream Techs, Inc. v. Google, LLC*, No. 6-21-cv-00569 (W.D. Tex.) (Pet. 79; Paper 5, 1). Petitioner further indicates that the '251 Patent was asserted in the following district court proceeding: *Touchstream Techs., Inc v. Vizbee, Inc.*, No. 1-17-cv-06247 (S.D.N.Y.) (Pet. 79; Paper 30, 1). Patent Owner additionally identifies the following cases:

> *Touchstream Technologies, Inc. v. Altice USA, Inc.*, No. 2:23-cv-00060-JRG (E.D. Tex., Marshall Division);
>
> *Touchstream Technologies, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2:23-cv-00062 (E.D. Tex., Marshall Division); and
>
> *Touchstream Technologies, Inc. v. Charter Commc'ns, Inc.*, No. 2:23-cv-00059 (E.D. Tex., Marshall Division)

(Paper 30, 1).

We are concurrently issuing final written decisions in IPR2022-00793, involving related U.S. Patent 8,782,528 B2, and IPR2022-00794, involving related U.S. Patent 8,904,289 B2.

---

[1] Petitioner states that Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., and that XXVI Holdings Inc. and Alphabet Inc. are not real parties-in-interest to this proceeding (Pet. 79 n.4).

4

IPR2022-00795
Patent 8,356,251 B2

### E. The '251 Patent (Ex. 1001)

The '251 Patent, titled "Play Control of Content on a Display Device," issued January 15, 2013 (Ex. 1001, codes (45), (54)). The '251 Patent describes a system that "allow[s] a personal computing device," e.g., a mobile phone, "to be used to select different content to be played on a remote display," e.g., a television set, and "allow[s] the user to control how the content is displayed on the display device using the personal computing device" (Ex. 1001, 2:11–15, 2:27–33). Figure 1, reproduced below, is a block diagram illustrating an exemplary system (Ex. 1001, 2:41–42).



FIG. 1

As shown in the block diagram of Figure 1, "a first device (e.g., a personal computing device) 20" connects to and "acts as a controller" for "a second device (e.g., a television set 22 with a display 23) [and the second device]

5

IPR2022-00795
Patent 8,356,251 B2

acts as a receiver to play content selected by a user of the first device and [the second device] to respond to commands that originate at the personal computing device" (Ex. 1001, 3:1–7). For example, television set 22 can be commanded "to access a content provider 30 through the Internet 21, load a specific media player, load the media player-specific content (e.g., a video) and play the content on the television display 23" (Ex. 1001, 3:18–23).

Furthermore, personal computing device 20 controls the selection of and playback of content on television set 22 through server system 24, rather than through directly controlling television set 22 (Ex. 1001, 3:10–18). In particular,

> [w]hen a user makes a selection using the personal computing device 20 for particular content to be displayed on the television display 23, a signal is sent through the Internet (or other network) 21 to the server system 24. A corresponding command signal then is passed along [from server system 24] to the connected television set 22 which acts on a transmission code contained within the signal and performs specified commands

(Ex. 1001; *see* Ex. 1001, 3:36–41 ("user-initiated play commands," e.g., play pause, stop, rewind, fast forward, "are passed from the user's personal computing device 20 through the server system 24, to the television set 22")). More specifically, personal computing device 20 sends a signal for controlling media playback to server system 24; server system 24, in turn, sends a signal to television set 22, which correspondingly displays the controlled media (Ex. 1001, 3:18–36).

The signal from personal computing device 20 (which selects content or controls playback) is formatted and transmitted by personal computing device 20 in a message sent to server system 24 (Ex. 1001, 4:27–29). That

> The message from the mobile phone 20 contains a transmission code that includes data regarding . . . the secondary display it

6

IPR2022-00795
Patent 8,356,251 B2

> wants to connect to (e.g., television set 22 with display 23), the
> location and name of the media player for the selected video the
> command (e.g., play, pause, rewind, etc.), and the video file to
> be acted upon

(Ex. 1001, 4:29–35, Fig. 3). That message "is transmitted over the Internet 21 and is received by the server system 24" (Ex. 1001, 4:40–42). Server system 24 then "converts the incoming commands from the mobile device 20 into the correct JavaScript (or other programming) code used by the [television set] 22 to control the specific player (block 120)" (Ex. 1001, 5:67–6:3). That is, the server "interpret[s] and convert[s] a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player" playing content on the television set 22 (Ex. 1001, 5:58–62). Then, server system 24 "copies the converted version of the message to the database 34 associated with the [television set] 22" (Ex. 1001, 6:3–6). Television set 22 then receives the server's converter message (Ex. 1001, 6:23–29) and then "executes the message" (Ex. 1001, 6:30–33), e.g., "load[s] and unload[s] different video players" (Ex. 1001, 6:34–48).

### *1. Illustrative Claim*

Challenged claim 1, the sole challenged independent claim, is reproduced below.

> 1. A machine-implemented method of controlling presentation
> of video content on a display device that loads any one of a
> plurality of different media players, the method comprising:
>
>> assigning, by a server system, a synchronization code to the
>> display device;
>>
>> receiving, in the server system, a message from a personal
>> computing device that is separate from the server system and
>> separate from the display device, wherein the message
>> includes the synchronization code;

7

IPR2022-00795
Patent 8,356,251 B2

    storing, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code;

    receiving, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player,

    converting, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player; and

    storing, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command

(Ex. 1001, 11:22–60 (as corrected by the Certificate of Correction)).

## II.  ANALYSIS

### A.  *Principles of Law*

    A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

IPR2022-00795
Patent 8,356,251 B2

subject matter pertains (*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence[2] (*Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966)).

### B.   *Level of Ordinary Skill in the Art*

The level of skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis (*Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)).

Petitioner asserts a "person of skill in the art ('POSA') would have had at least a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (Pet. 13 (citing Ex. 1005 ¶ 47)). Petitioner further asserts "[w]ith more education, for example, postgraduate degrees and/or study, less experience is needed to attain an ordinary level of skill in the art. Similarly, more experience can substitute for formal education" (Pet. 13 (citing Ex. 1005 ¶¶ 45–49)).

---

[2]  The parties do not present arguments related to objective evidence of nonobviousness (i.e., secondary considerations) as to any of the challenged claims.

9

IPR2022-00795
Patent 8,356,251 B2

At institution, we found this definition to be consistent with the scope and content of the '251 Patent and the asserted prior art, with a modification of omitting "at least" to avoid vagueness as to the amount of educational experience—"a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (Inst. Dec. 10).

In its Response, Patent Owner contends an ordinarily skilled artisan would have had

> (1) the equivalent of a four-year, B.S. [(Bachelor of Science)] degree from an accredited institution in computer science, computer engineering or an equivalent field; (2) approximately two years of professional experience with Internet-based video delivery systems; and (3) working proficiency with network architecture, including Internet-hosted server-client systems, and with computer programming

(PO Resp. 12–13 (citing Ex. 2022 ¶¶ 43, 45–80)). Patent Owner further contends, "[a]dditional graduate education could substitute for professional experience, while significant experience in the field might substitute for formal education," which "is consistent with the level adopted by Petitioner" (PO Resp. 13 (citing Ex. 2023; Pet. 13)).

Petitioner does not address Patent Owner's definition in its Petitioner Reply (*see* Paper 22). Given the differences in the assertions, in the Oral Hearing, we asked Patent Owner about its concerns with the definition set forth in the Decision to Institute:

> In our Decision to Institute we had set forth a level of skill per person of ordinary skill.

IPR2022-00795
Patent 8,356,251 B2

> In your response, you came back with something different. And
> I'm wondering, what, specifically, you have concern about with
> the definition set forth in the Decision to Institute?

(Tr. 78:6–10). Patent Owner responded: "I don't think it makes any difference for this panel's determination" (Tr. 78:13–14). We agree and determine that the differences in the level of skill offered by the Parties are not so significant as to warrant any changes to the definition set forth in the Decision to Institute. Therefore, we maintain our determination that an ordinarily skilled artisan would have had "a bachelor's degree in electrical engineering or computer science (or equivalent experience) and two years of experience designing or implementing interactive systems with networked media or media playback systems" (*see* Inst. Dec. 10).

We determine this level of skill comports with the qualifications a person would have needed to understand and implement the teachings of the '251 Patent and the prior art of record (*cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (noting that the prior art itself may reflect an appropriate level of skill in the art)).

## C.   Claim Construction

We construe claim terms according to the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc) (37 C.F.R. § 42.100(b) (2021)). Under *Phillips*, claim terms are afforded "their ordinary and customary meaning" (*Phillips*, 415 F.3d at 1312). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" (*Phillips*, 415 F.3d at 1313). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the

11

IPR2022-00795
Patent 8,356,251 B2

context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" (*Phillips*, 415 F.3d at 1313).  An inventor may rebut that presumption by providing a definition of the term in the specification "with reasonable clarity, deliberateness, and precision" (*In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).  In the absence of such a definition, limitations are not to be read from the specification into the claims (*In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993)).

Petitioner asserts that we "need not construe any claims" to resolve this controversy and that it "adopts" Patent Owner's "proposed plain and ordinary meaning for all terms [from] the parallel district court action" (Pet. 12–13 (citing Ex. 1005 ¶ 50; Ex. 1014)).  Patent Owner proposes constructions for the terms "media player" and "programming code" (PO Resp. 13–20).  We address the term "media player" below.

### 1.   Media player

Patent Owner contends, based on the "intrinsic record . . . an ordinary artisan would have understood the ordinary and customary meaning of 'media player' in the '251 Patent refers to application software and does not encompass hardware devices" (PO Resp. 13 (citing Ex. 2022 ¶¶ 81–92, 95)).

Petitioner asserts that it "has not alleged any hardware device is a 'media player'" and thus, "the Board need not resolve whether 'hardware devices' are encompassed by 'media player'" (Pet. Reply 1).  Rather, Petitioner states the media players relied upon in the Petition are all software (Pet. Reply 1–2).  Petitioner specifically states, "Petitioner has identified three 'media players' in the prior art.  Two of these—Muthukumarasamy's

12

IPR2022-00795
Patent 8,356,251 B2

'Video Player[s]' and Hayward's 'media players' (Petition, 23–26)—are
application software. The third 'media player' is likewise not a hardware
device" (Pet. Reply 1–2). Thus, the parties agree that the term "media
player" refers to software and not to a hardware device, and we apply this
interpretation in our patentability analysis.

### 2. Additional Terms

In light of the record and our findings, reasonings, and conclusions
discussed below, we determine that no other terms or phrases in the claims
require express construction (*see Realtime Data, LLC v. Iancu*, 912 F.3d
1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those
terms . . . that are in controversy, and only to the extent necessary to resolve
the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200
F.3d 795, 803 (Fed. Cir. 1999)))).

### D. Asserted Obviousness over Muthukumarasamy

Petitioner contends claims 1, 2, and 5–9 would have been obvious
over Muthukumarasamy (Pet. 14–15, 20–74 (citing Ex. 1005 ¶¶ 65–72, 86–
93, 95–99, 104–110, 113–119, 122–125, 130–134, 137–144, 147–150, 153–
162; Ex. 1008 ¶¶ 20, 25–27, 31, 36, 38, 44–45, 47–51, 56–58, 64, 68–70, 77,
83–85, 88, 114, 116–117, 134, 149, Figs. 1, 2, 5, 6, 12, 14–15, 18–19)).

### 1. Muthukumarasamy (Ex. 1008)

Muthukumarasamy is a U.S. patent application publication titled
"Device-Based Control System," and published September 23, 2010
(Ex. 1008, codes (43), (54)). Muthukumarasamy describes a "Device-Based

13

IPR2022-00795
Patent 8,356,251 B2

Control System (DBCS) . . . that enables consumers, through the use of an internet-enabled device (IED)," e.g., a smartphone, "to navigate through media or entertainment content, control media components or equipment to watch and/or listen to media content" (Ex. 1008 ¶ 26). Figure 1, reproduced below, is "a block diagram of the Device-Based Control System (DBCS)" (Ex. 1008 ¶ 44).



FIG.1

As shown in the block diagram of the DBCS of Figure 1, DBCS includes IED 4, zHub 2, zNode 3, and entertainment systems such as a television set (Ex. 1008 ¶ 44). A user interacts with IED 4 to select or control content playback hosted on internet server 1 (Ex. 1008 ¶¶ 44–45). For example, IED 4 executes a media management application that presents media choices from "plurality of disparate media sources" for the user to select (Ex. 1008 ¶ 48).

"When the IED sends a [content selecting or controlling] command, the zHub receives the command from the IED and resolves the command into a specific instruction directed at a specific zNode in the house" (Ex.

14

IPR2022-00795
Patent 8,356,251 B2

1008 ¶ 57). For example, "when a user selects content that is on channel 324 to be displayed on the living room TV, the zHub translates the command into a specific RF signal directed at the zNode in the living room" (Ex. 1008 ¶ 57). In particular, zHub 2 "receives signals or commands from the IED 4 via a local or premise network (e.g., router, WiFi, etc.) and translates [those] received commands to RF signals;" zNode 3 in turn receives the translated RF signals and translates those RF signals "to a protocol (e.g., Infrared) interpretable by the media components" (Ex. 1008 ¶ 44). For example, "the infrared codes needed to control the media components" are referenced for such translation (Ex. 1008 ¶ 66). Then, those translated signals are received by media components, e.g., a television set, to control the media component, "e.g., volume selection, channel selection, pause/play, etc." (Ex. 1008 ¶ 50).

Additionally, in one DBCS embodiment, a remote-controlled internet browser software (RCIBS or ZRCIBS) provides "a remote controllable internet browser optimized for internet-media consumption" (Ex. 1008

15

IPR2022-00795
Patent 8,356,251 B2

¶ 83). Figure 18, reproduced below, is a "block diagram . . . of a home network" (Ex. 1008 ¶ 83).



# FIG.18

As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS and the IED (Ex. 1008 ¶ 83, Fig. 18). The RCIBS sends and receives commands and responses, respectively, to a Zelfy application running on a user's phone, and transmits audio and video to a TV and speakers (Ex. 1008 ¶ 83, Fig. 18). In particular, Figure 18 further shows "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user" (Ex. 1008 ¶ 83, Fig. 18). Additionally, the "IED transmits commands to the RCIBS and receives responses from the RCIBS: the commands are received and executed by RCIBS" (Ex. 1008 ¶ 83, Fig. 18). For example, RCIBS provides video output to a television (*see* Ex. 1008, Fig. 18). Other

16

IPR2022-00795
Patent 8,356,251 B2

commands from the IED include: "Play video at given URL," causing the RCIBS to "play the video present at [a] given URL" and "Play video with given video-id (as specified by 3rd party using 3rd party APIs and Video Players," causing the RCIBS to "load[] the 3rd Party Video Player specified and plays the video with given video[-]id)" (Ex. 1008, Fig. 19).

### 2. *Independent Claim 1*

Petitioner contends independent claim 1 would have been obvious over Muthukumarasamy (Pet. 14–15, 20–63). Patent Owner argues that Petitioner's contentions fail for the following limitation of claim 1:

> receiving, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content

(PO Resp. 1–2). In particular, Patent Owner contends,

> Petitioner relies on Muthukumarasamy's descriptions of two distinct processes, which use different components of Muthukumarasamy's system to present different types of content: the "RCIBS" for internet content and the "zHub and zNode" for non-internet content. Neither of these processes satisfies all the limitations of the challenged claims, and Petitioner fails to offer any rationale for combining features of these two processes . . .

(PO Resp. 1). For the reasons explained below, we agree with Patent Owner.

Petitioner relies on Muthukumarasamy to teach this limitation (Pet. 34–38 (citing Ex. 1005 ¶¶ 92–99; Ex. 1008 ¶¶ 44–45, 47–48, 50, 57, 64, 70, 77, 84–85, 88, 116–117, 134, 149, Figs. 2, 19)). Petitioner offers an

17

IPR2022-00795
Patent 8,356,251 B2

annotated version of Muthukumarasamy's Figure 1, reproduced below, to
show the alleged components of claim 1:



FIG.1

(Pet. 22). Muthukumarasamy's Figure 1 is "a block diagram of the Device-
Based Control System (DBCS)" (Ex. 1008 ¶ 44), and in the annotated
version above, Petitioner identifies the internet-enabled device (IED) in
green as the claimed "personal computing device," the internet server, zHub,
and zNode in orange as the claimed "server system," and the devices in red
labeled "Entertainment Systems" as the claimed "display device" (Pet. 21
(citing Ex. 1005 ¶ 68)).

Petitioner asserts the internet server, a zHub, and a zNode "work
together as a *server system* to receive messages and commands from an
internet-enabled device, such as a smartphone," and relay corresponding
commands to control a media device (display device), such as a TV" (Pet.
27). In particular, Petitioner asserts, "Muthukumarasamy's internet server

18

IPR2022-00795
Patent 8,356,251 B2

receives a message from the IED, which is separate from both the internet server and the media device (playback device)" (Pet. 31; *see also* Pet. 27 (asserting that "the 'zHub receives the command from the IED'")(quoting Ex. 1008 ¶ 57)). Petitioner contends, "Muthukumarasamy discloses signals specifying media content to be acted on by a particular video player" (Pet. 35). More specifically, Petitioner argues that "Muthukumarasamy teaches that the signals identify[] a particular media player for playing the video content for two reasons" (Pet. 37 (alteration in original; emphasis omitted)).

First, Petitioner argues, "Muthukumarasamy discloses a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media'" (Pet. 37 (quoting Ex. 1008 ¶ 47); *see also* Pet. 21 (identifying Netflix and Amazon Video On Demand as examples of streamed internet content)). Based on that disclosure, Petitioner argues a person having ordinary skill in the art "would have understood each request for particular content to identify a media player associated with the particular source of the content" (Pet. 37 (citing Ex. 1005 ¶ 98)).

Second, Petitioner contends, Muthukumarasamy's "IED sends commands to play, through [its] RCIBS, media content 'as specified by 3rd party using 3rd party APIs and Video Players,'" which cause the RCIBS to "load[] the 3rd Party Video Player specified and play[] the video with given video[-]id" (Pet. 38 (citing Ex. 1008 ¶ 45, Fig. 19) (fourth alteration in original)). As such, Petitioner argues a person having ordinary skill in the art "would have understood Muthukumarasamy to teach that the command sent from the IED specifies both the video (***a video file to be acted upon***)

19

IPR2022-00795
Patent 8,356,251 B2

and the Video Player to be loaded to play the video (*a particular media player for playing the content*)" (Pet. 38 (citing Ex. 1005 ¶ 99)).

Patent Owner argues Petitioner fails to demonstrate obviousness because of its reliance on two separate processes described in Muthukumarasamy, neither of which teaches the limitation identified above, without explanation as to why an ordinarily skilled artisan would have found it obvious to combine the processes (PO Resp. 31). In particular, Patent Owner argues Petitioner relies on Muthukumarasamy's ZHub/zNode process and RCIBS process, "using parts of each process for different limitations of the claimed methods" (PO Resp. 32 (citing Pet. 23, 51)). But, Patent Owner argues, neither process discloses all the limitations of the independent claims (PO Resp. 32).

More specifically, Patent Owner contends Muthukumarasamy describes two cases: the IED sending commands to (1) "the RCIBS over a local WiFi network . . . to access and present online media content" and (2) "the zHub . . . to control media devices that require infrared signals of the type used in conventional remote controls for TV sets" (PO Resp. 34 (citing Ex. 1008 ¶¶ 45, 56–60, 66–67, 83, Fig. 1; Ex. 2022 ¶¶ 127–128)). According to Patent Owner, only one of the RCIBS process and the zHub/zNode process "would be used in presenting any particular content" (PO Resp. 34 (citing Ex. 2022 ¶ 127)). However, according to Patent Owner, these two cases do not overlap because Muthukumarasamy does not disclose that the IED sends commands to the RCIBS using the zHub and/or zNode or that the zHub/zNode process is used to access or present online media content or any internet content (PO Resp. 35 (citing Ex. 2022 ¶ 127)).

IPR2022-00795
Patent 8,356,251 B2

According to Patent Owner, "Petitioner identifies Muthukumarasamy's internet server (1), zHub (2), and zNode (3), collectively, as the *server system*"; "IED (4), which includes a 'DBCS application or software' as the *personal computing device*"; "the 'Entertainment Systems' and 'Zelfy WiFi to HDMI Plug' (5) as part of the recited *display device*"; and "'remote-controlled internet browser software (RCIBS)' as part of the recited *display device*" (PO Resp. 33–34 (citing Ex. 1008 ¶¶ 44–45, 83; Pet. 20–24, 27; Ex. 1005 ¶¶ 68–69, 71, 86–88; Ex. 2021, 121:20–122:8; Ex. 2022 ¶¶ 116–118)). Patent Owner argues Petitioner's contention that "Muthukumarasamy discloses that its display device <u>loads any one of a plurality of different media players using the RCIBS</u> because it discloses loading one of a plurality of video players" (PO Resp. 35 (emphasis added by Patent Owner; quoting Pet. 23)) shows that Petitioner "relies on a *particular media player* allegedly loaded in the RCIBS during the RCIBS process" (PO Resp. 35–36). Patent Owner argues, however, that Petitioner "does not contend that any *particular media player* is loaded during the zHub/zNode process" (PO Resp. 36). Rather, according to Patent Owner, Petitioner relies on "the zHub/zNode process for *receiving, in the server system, one or more signals from the personal computing device*" while relying on the RCIBS process for "*messages identify a particular media player*", without asserting Muthukumarasamy's system would have been modified or why an ordinarily skilled artisan would have made such a modification (PO Resp. 36–37 (citing Pet. 34–35, 37–38))).

Patent Owner additionally argues the RCIBS process does not "*receiv[e] one or more signals from the personal computing device* in the components identified by Petitioner as the *server system*" (PO Resp. 38

IPR2022-00795
Patent 8,356,251 B2

(citing Ex. 1022 ¶¶ 135–138)). In particular, Patent Owner contends Petitioner sets out that Muthukumarasamy's RCIBS is part of the display device (PO Resp. 38 (citing Pet. 21–23; Ex. 1005 ¶ 71)). Patent Owner further contends "Petitioner identifies Muthukumarasamy's IED as the *personal computing device* of the claims and Muthukumarasamy's internet server, zHub, and zNodes, collectively, as the *server system*" (PO Resp. 38 (citing Pet. 27)). Patent Owner then asserts "[a]ny messages from the IED to the RCIBS, including those in Figure 19, would not use the internet server, zHub, or zNodes because they are transmitted directly to the RCIBS via the user's home network" (PO Resp. 38–39 (citing Ex. 2022 ¶¶ 114–118)).

Patent Owner annotates Muthukumarasamy's Figure 1, shown below, to illustrate that "none of the messages in step R1 are *received* in the alleged *server system* of Petitioner's mapping" (PO Resp. 39 (citing Ex. 2022 ¶ 135; Pet. 7)).



FIG.1

22

IPR2022-00795
Patent 8,356,251 B2

Figure 1 of Muthukumarasamy, as further annotated by Patent Owner, illustrates step R1 is communication between the entertainment system and IED (Zelfy mobile); step R2 is communication between the entertainment system and the server system; and step R3 is communication between the server system and entertainment system (PO Resp. 39 (citing Ex. 1008, Fig. 1)). According to Patent Owner, "[t]he 'commands' listed in Figure 19 of Muthukumarasamy are the only disclosed 'signals' involved in the RCIBS process" and "Petitioner never alleges that any other messages related to the operation of the RCIBS are *received in the server system*" (PO Resp. 39 (citing Pet. 10, 38, 44–46). Therefore, according to Patent Owner, "[b]ecause these *signals* are *received* in the alleged [*display*] *device* from the alleged *personal computing device*, Petitioner fails to show the RCIBS process satisfies the limitations of the claims" (PO Resp. 39–40 (citing Ex. 2022 ¶ 136)).

Patent Owner next argues Petitioner also asserts "that Muthukumarasamy generally discloses 'stream[ing] internet content over WiFi' into a browser-based media player" (PO Resp. 40 (alteration in original; citing Pet. 38; Ex. 1008 ¶ 45)). However, according to Patent Owner, "this disclosure is just a reference to the RCIBS, which 'is remote controllable internet browser software optimized for internet-media consumption'" (PO Resp. 40 (citing Ex. 1008 ¶ 83; Ex. 2022 ¶ 118)). Patent Owner asserts Petitioner admits Muthukumarasamy's disclosure "regarding 'internet content' is provided by the RCIBS, using the commands in Figure 19" (PO Resp. 40 (citing Pet. 38)). Patent Owner then contends, "Muthukumarasamy does not disclose any mechanism for streaming internet content besides the RCIBS" (PO Resp. 40 (citing Ex. 2022 ¶¶ 117, 137)).

IPR2022-00795
Patent 8,356,251 B2

Therefore, Patent Owner contends, Petitioner has failed to show Muthukumarasamy discloses

> receiving, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content,

as recited in claim 1 (PO Resp. 41; Ex. 1001, 11:35–42).

We agree with Patent Owner that Petitioner has not shown that Muthukumarasamy teaches this subject matter. Initially, we note Petitioner annotates Figure 1 of Muthukumarasamy to identify the elements of claim 1 (Pet. 32). Petitioner contends, "Figure 1, annotated below, shows that the IED [highlighted in green] (*personal computing device*) is separate from the internet server, zHub, and zNode [highlighted in orange] ([collectively,] *server system*), and the 'media device' 'Entertainment Systems' [highlighted in red] (*display device*)".



FIG.1

IPR2022-00795
Patent 8,356,251 B2

(Pet. 32–33 (reproducing Ex. 1008, Fig. 1 (annotated); Pet. 21–22)).

Petitioner further contends,

> Muthukumarasamy's DBCS allows a user to the IED to select
> and control media played on different devices and from different
> media sources, including cable and streamed internet content
> (e.g., Netflix), onto a display device, such as a media device
> configured with RCIBS

(Pet. 20–21 (citing Ex. 1008 ¶¶ 26, 27, 31, 45, 83, 134)).  Petitioner also
argues, "the RCIBS, running on the display device, 'loads the 3rd Party
Video Player specified and plays the video'" (Pet. 23 (quoting Ex. 1008
¶¶ 25, 83, Fig. 19)).  Figure 18 of Muthukumarasamy, annotated by
Petitioner and reproduced below, is "a block diagram of a home network
comprising the IED along with a computer hosting the RCIBS under an

25

IPR2022-00795
Patent 8,356,251 B2

embodiment" (Pet. 24; Ex. 1008 ¶ 24, Fig. 18).



FIG.18

(Pet. 24 (reproducing Ex. 1008, Fig. 18 (annotated)). Figure 18 of Muthukumarasamy, shows an IED (i.e., "User's Phone/Device") sending commands to a ZRCIBS (also referred to as an "RCIBS" (*see* Ex. 1008 ¶¶ 24, 83, Fig. 18) hosted on a computer that provides output to a display device. In the annotated figure above, Petitioner includes the ZRCIBS of Figure 18 in a red box, red being the color Petitioner uses to designate the "display device" (Pet. 24).

Thus, Petitioner expressly identifies the RCIBS as part of the display device. Petitioner's contention that "the Petition maps the RCIBS as part of the claimed 'server system' (not part of the 'display device')" (*see* Pet. Reply 18) is incorrect, as made plain by the discussion above. More specifically, in its Reply, Petitioner contends that the "Petition states

26

repeatedly that the RCIBS is part of the DBCS, which the Petition maps to the 'server system,'" such that "signals sent from the IED to the RCIBS are sent to the 'server system'" (Pet. Reply 22 (citing Pet. 38)).  This contention fails because Muthukumarasamy's DBCS includes the server as well as other components depicted in Figure 1, such as the software on IED 4 ("personal computing device") (Ex. 1008 ¶¶ 44–45, Fig. 1).  Under Petitioner's Reply theory that the DBCS is the claimed "server system," Muthukumarasamy's disclosures of messages from the IED (part of the DBCS) to other components of the DBCS would simply disclose messages *within* a "server system," rather than messages from a "personal computing device" to a "server system."  When asked in the Oral Hearing for citations in the Petition that would illustrate the RCIBS is part of the server and not the display device (Tr. 17:4–13), Petitioner did not identify any persuasive disclosure (Tr. 38:11–12 (asserting that Muthukumarasamy is "not taking a position necessarily on where the RCIBS is located"), 87:21–88:15 ("it is indifferent to the obviousness of these claims whether the RCIBS is on the server on not")).

Petitioner contends,

> Muthukumarasamy's IED sends commands to play, through the RCIBS, media content "as specified by 3rd party using 3rd party APIs and Video Players."  In response, the RCIBS "loads the 3rd Party Video Player specified and plays the video with given video[-]id"

(Pet. 38 (alteration in original; quoting Ex. 1008 ¶ 45)).  As shown in the block diagram of Figure 18, the home network comprises a computer hosting the RCIBS connected to a WiFi or Wired Network Connection (Ex. 1008 ¶ 83, Fig. 18).  Muthukumarasamy describes that the RCIBS communicates with a Zelfy application running on a user's phone and

IPR2022-00795
Patent 8,356,251 B2

transmits audio and video to a TV and speakers (Ex. 1008 ¶ 83, Fig. 18). In particular, Figure 18 further shows "RCIBS is deployed on a computer that has video, audio and internet capabilities and is connected to the home network of the user" (Ex. 1008 ¶ 83, Fig. 18).

Figure 18 does not disclose any communication between the personal computing device (Zelfy Application running on User's Phone/Device) and components identified by Petitioner as the server system (Ex. 1008 ¶ 83, Fig. 18). Because signals to the RCIBS do not go through the identified "server system," Petitioner has not shown that the RCIBS disclosures teach "receiving, in the server system, one or more signals from the personal computing device," as recited in claim 1.

Petitioner further argues, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process (POR, 34), the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do" (Pet. Reply 11 (citing PO Resp. 34)). Petitioner points to the commands transmitted for internet content from "Sky," arguing "one embodiment of which is a 'zSky software agent . . . installed on a media PC'" is a description consistent with the RCIBS (Pet. Reply 11 (citing Ex. 1008 ¶ 45)). Paragraph 45 of Muthukumarasamy discloses the following:

> The DBCS comprises a zHDStick that streams internet content over WiFi to High Definition television (HDTV). The DBCS comprises a zSky software agent that helps manage online media viewing on TV; the zSky agent can be hosted (e.g., preinstalled) on the zHDStick, or can be independently installed on a media PC, but the embodiment is not so limited

(Ex. 1008 ¶ 45). This disclosure does not provide any detail or description as to what the ZSky agent does besides "help manage online media" and does not refer to the process disclosed in Figure 18 (*see* Ex. 1008).

28

IPR2022-00795
Patent 8,356,251 B2

Petitioner argues "[t]he RCIBS is consistent only with the zSky software agent when installed on a media PC because Muthukumarasamy states, '[t]he RCIBS is deployed on a computer that has video, audio, and internet capabilities and is connected to the home network of the user'"

(Pet. Reply 11 n.2 (Ex. 1008 ¶ 83)). Petitioner then argues,

> Muthukumarasamy envisions controlling, *e.g.*, "Play/Pause" of internet content being presented on a media device through Sky. Because control of the Sky internet content flows from the IED through the zNode and zHub to the media device . . . Muthukumarasamy discloses this very "overlapping use-case"

(Pet. Reply 11–12). Petitioner, however, does not direct us to any disclosure in Muthukumarasamy showing that commands to play content using "Sky" flow through the zNode and the zHub. Muthukumarasamy does not disclose that such a path would be used, and it is not clear why it would when zSky is internet connected.

Petitioner additionally argues, "while the RCIBS itself is software, it is hosted on a hardware device (e.g., computer)" and communication between the IED and the RCBIS, via computer, is over a "home network" and "the only connection labeled '*Home* WiFi'" in Figure 1 is that from the IED to the zHub (Pet. Reply 15–16 (citing Ex. 1008 ¶ 83; PO Resp. 24)). Thus, Petitioner argues, "[t]his suggests that, when presenting internet content via the RCIBS, that command flows through the zHub" (Pet. Reply 16 (citing Ex. 1008 ¶ 56)).

We do not find this argument persuasive because Muthukumarasamy's Figure 1 shows several "WiFi" paths that do not go through the zHub, including the path between IED 4 and Zelfy WiFi to HDMI Plug 5 labeled "Commands over Wifi" and the paths between the Database and each of Zelfy WiFi to HDMI Plug 5 and IED 4 labeled

29

IPR2022-00795
Patent 8,356,251 B2

"Webservices over WiFi." In Muthukumarasamy, Figure 18 illustrates "a block diagram 1800 of a home network comprising a computer hosting the RCIBS and the IED (Ex. 1008 ¶ 83), and it shows "Commands" and "Responses" communicating directly between the user's device and the RCIBS. Muthukumarasamy indicates that the "Wireless Router" in Figure 1 provides the WiFi network by defining "Router" as "an Internet switch that is coupled or connected to an internet cable or digital subscriber link (DSL) modem and enables a home network that is shared by one or more internet protocol (IP)-based devices (e.g., personal computer (PC), WiFi devices, etc.) in the home" (Ex. 1008 ¶ 37). Thus, based on Figure 18 and the description in the Muthukumarasamy, devices that are WiFi connected would communicate via the Router and bypass the "server system" identified by Petitioner.

Petitioner also argues that "[n]othing in Muthukumarasamy suggests the presentation of internet content on a media device——even a media device employing Muthukumarasamy's RCIBS——is 'separate' or 'distinct' from the zHubs/zNodes" (Pet. Reply 4). Petitioner's contentions rely on its characterization of Muthukumarasamy as disclosing a "source-agnostic system [that] allows selection and presentation of content from disparate sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media'" (Pet. 37 (citing Ex. 1008 ¶¶ 47–48)). Petitioner cites various disclosures showing that Muthukumaramy provides internet and non-internet content from disparate sources in a device-agnostic environment (Pet. Reply 5–10 (citing Ex. 1008 ¶¶ 5, 26, 27, 31, 36, 44, 45, 47, 48, 50–52, 57, 58, 61–62, 64, 68–70, 84, 134, Figs. 5, 6, 16)). Based on these disclosures, Petitioner contends, "Muthukumarasamy's RCIBS, zHub,

IPR2022-00795
Patent 8,356,251 B2

and zNode work together to provide the 'device-agnostic and source-agnostic entertainment experience'" (Pet. Reply 16).

Petitioner additionally contends, "[e]ven if the RCIBS *itself* does not communicate with the IED through the zHub/zNode process (POR, 38), the computer, the display device (TV), and audio device (Speakers) working with the RCIBS do" (Pet. Reply 11). Petitioner cites "Volume Up" as an example of a command that would be transmitted to a TV via the zHub/zNode process regardless of "whether the content is non-internet content from 'DVR/Blue-ray/ [and] VCR' or internet content from 'Sky'" (Pet. Reply 11 (alteration in original)).

We are not persuaded. Even if the zHub and the zNode would be used to control the volume on the TV on which the streamed content is displayed, this device cooperation does not show the particular messaging recited in the claim. More specifically, even under Petitioner's scenario that the "Volume Up" command flows from the IED ("personal computing device") through the zHub/zNode ("server system") to the TV ("display device"), this command does not "identify[] a particular media player for playing the video content." Petitioner has not shown any signals in Muthukumarasamy that "identify[] a particular media player for playing the video content" and flow from the IED through the zHub/zNode to the display device. Thus, Petitioner's assertions about devices working together fall short of proving by preponderant evidence that Muthukumarasamy discloses the particular signal contents and path recited in claim 1.

As noted above, Petitioner argues that "Muthukumarasamy teaches that the signals identify[] a particular media player for playing the video content for two reasons" (Pet. 34 (alteration in original; emphasis omitted)).

31

For the reasons explained above, Petitioner has not shown that the RCIBS disclosures teach the claimed subject matter.

Petitioner's other contention is that "Muthukumarasamy discloses a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including 'subscription media, cable, DVR, VOD and internet media'" and "Muthukumarasamy 'controls delivery of selected media content and selects and controls the media devices that deliver the selected media content according to a media type of the selected media content'" (Pet. 37 (quoting Ex. 1008 ¶¶ 47–48)). Thus, according to Petitioner, "a [person of ordinary skill in the art] would have understood each request for particular content to identify a media player associated with the particular source of the content" (Pet. 37 (citing Ex. 1005 ¶ 98)).

In its Reply, Petitioner argues "Muthukumarasamy discloses that the zHub/zNode process is used to present internet content. In addition to the commands to control internet content presented through Sky[,] Muthukumarasamy contemplates using an 'Apple TV device' as a media device" (Pet. Reply 12–13 (Ex. 1008 ¶ 36)).

Petitioner also contends that "distinguish[ing] hardware device[s] from software applications fails, as even hardware devices involve software applications" (Pet. Reply 19). Petitioner then argues, "as Patent Owner's expert recognizes, many different types of content, including cable, DVR, and VOD, 'would all be provided through [the] set-top box'" (Pet. Reply 19 (alteration in original; quoting Ex. 2022 ¶ 152)).

Petitioner's arguments fail to show by preponderant evidence that messages identifying a particular media player, which the parties agree is software, would go from the IED through the zHub and zNode to the display

IPR2022-00795
Patent 8,356,251 B2

device.  For example, Petitioner identifies Muthukumarasamy's disclosure of "disparate media sources, including 'subscription media, broadcast media, cable, DVR, VOD and internet media'" (Pet. 37 (quoting Ex. 1008 ¶ 47)). Even if we accepted the identification of "internet media" may entail the identification of a software media player, Petitioner's contentions fall short for not showing the required path through the zHub and zNode, as discussed above.  For other sources of media, Petitioner fails to show any of these entails identifying a software media player.  For example, cable and video on demand may be provided by a TV set-top box, and Muthukumarasamy discloses that, "when a user selects content that is on channel 324 to be displayed on the living room TV, the zHub translates the command into a specific RF signal directed at the zNode in the living room" (Ex. 1008 ¶ 57). Petitioner, however, does not present evidence that the signals that go through the zHub and zNode to turn on channel 324 "identify[] a particular [software] media player," as required of claim 1.

Petitioner argues that a set-top box presents different types of content and that "[t]o facilitate presentation of these different sources of content, the set-top box would need software applications for each content source" (Pet. Reply 19).  Petitioner, however, does not direct us to evidence that any set-top box in Muthukumarasamy operates as such (Tr. 31:18–33:2).  On the other hand, Patent Owner's declarant, Dr. Almeroth, testifies regarding tuning to a particular channel that, "[e]ven if the 'command' in this example identifies a particular hardware device, that is not a *media player*" and that "the alleged *messages* do not identify any software application that might qualify as a *media player*" (Ex. 2022 ¶ 151 (citing Ex. 1008 ¶¶ 57, 68–69, Fig. 15/6) (emphasis omitted)).  Thus, the evidence of record does not show

IPR2022-00795
Patent 8,356,251 B2

that signals to select content via the zHub and zNode identify a software media player.

Petitioner notes that Patent Owner "has recently accused several set-top box devices of infringing the '251 patent, stating 'media player[s]' are 'loaded' at set-top boxes to present content, including 'live TV and DVR content'" (Pet. Reply 20 n.5 (alteration in original; citing Ex. 1018 ¶¶ 35, 55; Ex. 1019 ¶¶ 32, 38; Ex. 1020 ¶¶ 31, 37). Petitioner has not, however, proffered any persuasive reasoning explaining why Patent Owner's allegations in a 2023 complaint have any bearing on the question of what would have been obvious to a person of ordinary skill in the art at the time of the invention in 2011.

As to Petitioner's AppleTV assertions, Muthukumarasamy mentions that an "AppleTV" device can be used (Pet. Reply 9–10 (citing Ex. 1008 ¶¶ 36, 45)), but Petitioner does not show signals to the AppleTV would go through the zHub and zNode, as opposed simply to over a WiFi connection similar to the RCIBS. Rather, Petitioner contends the following: "Users '[u]sing the IED interface, . . . select[] the content and start[] enjoying the content' on a separate 'media device' (claimed display device) . . . such as a 'TV, DVD player, [and] Apple TV device'" (Pet. 19 (quoting Ex. 1008 ¶¶ 36, 77)). This allegation simply shows that a user selects content, which is then played in a manner transparent to the user on the display device.

Petitioner contends, "[b]ecause Muthukumarasamy teaches that the media device displays media content from various disparate sources depending on the media type and media source, a POSA would have understood the media device to load an appropriate media player depending on the media type and source" (Pet. 22–23 (citing 1005 ¶¶ 69–70); Pet. 20

34

(addressing preamble's recitation of "a display device that loads any[]one of a plurality of different media players" (citing Ex. 1005 ¶ 65)). Petitioner's declarant, Dr. Bederson, states "Muthukumarasamy . . . disclose(s) loading any one of a plurality of different media players on the content device" (Ex. 1005 ¶¶ 65–70). Neither Petitioner nor Dr. Bederson provide sufficient evidence or argument to support that Muthukumarasamy teaches obtaining or loading a media player in the zHub/zNode process. Petitioner contends,

> Muthukumarasamy discloses a source-agnostic system that aggregates content choices from a multitude of disparate media sources, including "subscription media, broadcast media, cable, DVR, VOD and internet media." Muthukumarasamy "controls delivery of selected media content and selects and controls the media devices that deliver the selected media content according to a media type of the selected media content." Because Muthukumarasamy teaches that the media device displays media content from various disparate sources depending on the media type and media source, a [person of ordinary skill in the art] would have understood the media device to load an appropriate media player depending on the media type and source

(Pet. 22–23 (citing Ex. 1008 ¶¶ 47–48; Ex. 1005 ¶¶ 69–71)). Petitioner, however, proffers insufficient evidence or argument that the content choices described in paragraph 47 of Muthukumarasamy would have led an ordinarily skilled artisan to understand a media player is obtained and loaded in the content presentation device. Rather, Dr. Bederson makes conclusory statements without providing evidence to support the assertions (Ex. 1005 ¶¶ 69–71).

Accordingly, we determine Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claim 1. Therefore, based on the record before us, we conclude Petitioner has not established by

a preponderance of evidence that the subject matter of claim 1 would have been obvious over Muthukumarasamy.

### 3.   Dependent claims 2 and 5–9

Petitioner contends claims 2 and 5–9 would have been obvious over Muthukumarasamy (Pet. 64–74 (citing Ex. 1001, 5:62–6:3; Ex. 1005 ¶¶ 138–144, 147–162; Ex. 1008 ¶¶ 31, 44, 45, 48, 50, 56, 68, 83, 134, Figs. 5, 14, 19)).

For the reasons set forth *supra*, we determine Petitioner has failed to show Muthukumarasamy teaches independent claim 1 from which these claims depend.  As such, Petitioner has failed to show Muthukumarasamy teaches the limitations recited in claims 2 and 5–9.  Therefore, based on the record before us, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claims 2 and 5–9 would have been obvious over Muthukumarasamy .

### 4.   Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a preponderance of the evidence claims 1, 2, and 5–9 would have been obvious over Muthukumarasamy.

### E.   Asserted Obviousness over Muthukumarasamy and Hayward

Petitioner contends claims 1, 2, and 5–9 would have been obvious over the combination of Muthukumarasamy and Hayward (Pet. 15–74).

36

IPR2022-00795
Patent 8,356,251 B2

### *1. Hayward (Ex. 1009)*

Hayward is a U.S. patent titled "Method of Sizing an Embedded Media Player Page," and issued December 23, 2014 (Ex. 1009, codes (45), (54)).  Hayward describes a "method of displaying video data using an embedded media player page" in which a "media player is launched within the embedded media player page" (Ex. 1009, code (57)).  Hayward explains that a user, accessing a web page, "enter[s] search criteria for a media file, such as a streaming audio or video file" (Ex. 1009, 4:25–35).  After the search is complete, "media files that satisfy the search request" are returned and displayed to the user who "may then decide to view the video data contained within a video file listed in the search results displayed to the user by clicking a link to one of the video files" (Ex. 1009, 5:6–12, 5:17–23).  "When the user 'clicks' on a link to a selected video file, a script file, such as a JavaScript file, transmitted to the client . . . instructs the client to request the embedded media player page from the customer system" (Ex. 1009, 5:23–29).

> The requested
>
> [e]mbedded media player page includes a reference to a functional media player object (such as a RealPlayer plug in). A reference is a tag (as a file locator as a universal resource indicator, URI, URL, or a file/object accessed through a directory structure) that refers to file, media object, or executable computer code stored in a memory structure

(Ex. 1009, 5:38–44).  The "media player object generally is resident on the client, although the reference tag could trigger a download of a media player applet to control the output of a media file" (Ex. 1009, 5:44–47).  "The embedded media player page includes video display area 202" for video playback (Ex. 1009, 5:61–66).  In particular, the "media player is . . . an

37

IPR2022-00795
Patent 8,356,251 B2

object by the embedded media player page when launched (i.e., operated or run) within the embedded media player page" and plays the selected video (Ex. 1009, 6:35–42).

### 2. Claims 1, 2, and 5–9

Petitioner contends independent claim 1 would have been obvious over the combination of Muthukumarasamy and Hayward (Pet. 20–63 (citing Ex. 1001, 1:44–50, 2:16–26, 5:2–7, 5:54–6:17; Ex. 1005 ¶¶ 65–109, 111–136; Ex. 1008 ¶¶ 20, 25–27, 31, 36, 44, 45, 47–51, 57–58, 64, 68–70, 77, 83–85, 114, 116, 117, 134, 149, Figs. 1, 5, 6, 14, 15/1, 15/2, 15/3, 19; Ex. 1009, code (57), 1:11–13, 1:26–30, 2:9–12, 3:53–63, 4:9–19, 5:21–29, 5:38–6:4, 8:39–41, Figs. 1A, 2)).

Patent Owner contends Hayward does not cure the deficiencies of Muthukumarasamy because Muthukumarasamy's "disclosed processes that use the RCIBS do not involve the components alleged to be part of a *server* system" as previously argued (PO Resp. 42). Nor, according to Patent Owner, does Petitioner identify "any other way of combining Hayward's embedded media player pages with Muthukumarasamy" (PO Resp. 42 (citing Ex. 2022 ¶ 145; Pet. 15–20, 24–27, 38–41, 46–48, 51–52, 56–58, 62–63)). Patent Owner further argues Petitioner has not asserted the proposed combination would change that "the RCIBS is controlled by commands from the IED that are received by the RCIBS (identified as part of the *display device*) and not the alleged *server system*" (PO Resp. 42 (citing Ex. 2022 ¶ 143)). Thus, Patent Owner argues because "the RCIBS would continue to be part of the alleged *display device* . . . the identified signaling would still not satisfy the limitation of 'receiving, in the server system, one

38

IPR2022-00795
Patent 8,356,251 B2

or more signals from the personal computing device,'" as recited in claim 1 (PO Resp. 42 (emphasis omitted)).

We determine that Hayward does not cure the deficiencies of Muthukumarasamy discussed *supra*. In particular, Petitioner has not explained how Hayward teaches receiving the one or more signals in a system server. Rather, Petitioner relies on Hayward to teach "identify a particular media player for playing the video content" (Pet. 38–41). More specifically, Petitioner contends "a [person of ordinary skill in the art] would have been motivated by and found it obvious from Hayward to implement the DBCS (e.g., the RCIBS) to facilitate presentation of internet content at the display device using any number of media players through embedded media player pages, as described in Hayward" (Pet. 15, 40 (citing Ex. 1005 ¶¶ 60, 102)).

However, to the extent Petitioner's assertions rely on "implement[ing] the DBCS (e.g., the RCIBS) to facilitate presentation of internet content at the display device . . ." (Pet. Reply 22 (emphasis omitted)), we determine Petitioner has not shown the combined process of Muthukumarasamy and Hayward would include the required signals being received by the server (e.g., zHub/zNode), as opposed to directly by the RCIBS as discussed above. Additionally, Petitioner has not shown, for the zHub/zNode process, that Hayward cures the deficiencies of Muthukumarasamy as set forth above.

Additionally, because claims 2 and 5–9 depend from claim 1, we conclude Petitioner has not established by a preponderance of evidence that the subject matter of claims 2 and 5–9 would have been obvious over the combination of Muthukumarasamy and Hayward.

IPR2022-00795
Patent 8,356,251 B2

Thus, for the reasons explained *supra*, we find Petitioner has not established by a preponderance of evidence that the subject matter of claims 1, 2, and 5–9 would have been obvious over the combination of Muthukumarasamy and Hayward.

### 3.   Conclusion

Based on the record before us, we determine Petitioner's proffered arguments, evidence, and supporting testimony fail to establish by a preponderance of the evidence that claims 1, 2, and 5–9 would have been obvious over Muthukumarasamy and Hayward.

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner failed to prove, by a preponderance of the evidence, that claims 1, 2, and 5–9 of the '251 Patent are unpatentable, as summarized in the table below.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5–9 | 103 | Muthukumarasamy | | 1, 2, 5–9 |
| 1, 2, 5–9 | 103 | Muthukumarasamy, Hayward | | 1, 2, 5–9 |
| **Overall Outcome** | | | | 1, 2, 5–9 |

## IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, and 5–9 of the '251 Patent have not been shown to be unpatentable; and

IPR2022-00795
Patent 8,356,251 B2

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00795
Patent 8,356,251 B2

FOR PETITIONER:

Erika Arner
Kara Specht
Neal Larson
Gracie Mills
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Erika.arner@finnegan.com
Kara.specht@finnegn.com
Neal.larson@finnegan.com
Gracie.mills@finnegan.com


FOR PATENT OWNER:

Sharon A. Israel
Kyle E. Friesen
SHOOK, HARDY & BACON L.L.P.
sisrael@shb.com
kfriesen@shb.com



US008782528B2

(12) **United States Patent**

Strober

(10) Patent No.: **US 8,782,528 B2**
(45) Date of Patent: **Jul. 15, 2014**

(54) **PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE**

(71) Applicant: **Touchstream Technologies, Inc.,** Valhalla, NY (US)

(72) Inventor: **David Strober**, Rye, NY (US)

(73) Assignee: **Touchstream Technologies, Inc.,** New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/736,590**

(22) Filed: **Jan. 8, 2013**

(65) **Prior Publication Data**

US 2013/0124759 A1     May 16, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/245,001, filed on Sep. 26, 2011, now Pat. No. 8,356,251, which is a continuation of application No. 13/157,821, filed on Jun. 10, 2011.

(60) Provisional application No. 61/477,998, filed on Apr. 21, 2011.

(51) **Int. Cl.**
*G06F 3/00* (2006.01)

(52) **U.S. Cl.**
USPC ........... **715/740**; 715/734; 715/738; 715/751; 715/764; 715/835

(58) **Field of Classification Search**
USPC .................. 715/740, 738, 734, 751, 764, 835
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,855,842 A | * | 8/1989 | Hayes et al. .................. 386/206 |
| 7,058,356 B2 | | 6/2006 | Slotznick |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101534449 | 9/2009 |
| CN | 101577650 | 11/2009 |
| CN | 101778198 | 7/2010 |
| CN | 101815073 | 8/2010 |

OTHER PUBLICATIONS

anyremote.sourceforge 2013.*
Bing search q=control+television+phone&go=Submit Feb. 6, 2014.*

(Continued)

*Primary Examiner* — Boris Pesin
*Assistant Examiner* — John Heffington
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57) **ABSTRACT**

A system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

**30 Claims, 9 Drawing Sheets**



GOOGLE EXHIBIT 1001

**US 8,782,528 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,088,823 B2 * | 8/2006 | Fetkovich | 380/255 |
| 7,330,875 B1 * | 2/2008 | Parasnis et al. | 709/204 |
| 7,424,718 B2 * | 9/2008 | Dutton | 719/318 |
| 7,433,922 B2 * | 10/2008 | Engstrom | 709/205 |
| 7,440,972 B2 * | 10/2008 | Oetzel | 386/252 |
| 7,453,454 B2 * | 11/2008 | Allen et al. | 345/418 |
| 7,466,823 B2 * | 12/2008 | Vestergaard et al. | 380/227 |
| 7,769,827 B2 * | 8/2010 | Girouard et al. | 709/219 |
| 7,774,708 B2 * | 8/2010 | Bell et al. | 715/738 |
| 7,814,144 B2 * | 10/2010 | Koyama et al. | 709/203 |
| 7,835,505 B2 | 11/2010 | Toyama et al. | |
| 7,849,485 B2 | 12/2010 | Paik et al. | |
| 8,086,679 B2 * | 12/2011 | Nobori et al. | 709/206 |
| 8,171,507 B2 * | 5/2012 | Hironaka et al. | 725/12 |
| 8,433,812 B2 * | 4/2013 | Mahajan et al. | 709/231 |
| 2002/0075332 A1 * | 6/2002 | Geilfuss et al. | 345/859 |
| 2002/0120666 A1 * | 8/2002 | Landsman et al. | 709/200 |
| 2002/0129102 A1 * | 9/2002 | Landsman et al. | 709/203 |
| 2002/0133518 A1 * | 9/2002 | Landsman et al. | 707/513 |
| 2002/0146122 A1 * | 10/2002 | Vestergaard et al. | 380/231 |
| 2002/0198778 A1 * | 12/2002 | Landsman et al. | 705/14 |
| 2003/0004804 A1 * | 1/2003 | Landsman et al. | 705/14 |
| 2003/0005000 A1 * | 1/2003 | Landsman et al. | 707/513 |
| 2003/0018885 A1 * | 1/2003 | Landsman et al. | 713/2 |
| 2003/0023488 A1 * | 1/2003 | Landsman et al. | 705/14 |
| 2003/0028565 A1 * | 2/2003 | Landsman et al. | 707/513 |
| 2003/0112258 A1 * | 6/2003 | Dietz et al. | 345/700 |
| 2003/0131251 A1 * | 7/2003 | Fetkovich | 713/193 |
| 2003/0142127 A1 * | 7/2003 | Markel | 345/738 |
| 2003/0182663 A1 * | 9/2003 | Gudorf et al. | 725/110 |
| 2003/0193520 A1 * | 10/2003 | Oetzel | 345/723 |
| 2004/0008972 A1 * | 1/2004 | Haken | 386/83 |
| 2004/0088728 A1 * | 5/2004 | Shimizu | 725/89 |
| 2004/0268224 A1 * | 12/2004 | Balkus et al. | 715/500.1 |
| 2004/0268451 A1 * | 12/2004 | Robbin et al. | 999/999.999 |
| 2005/0034151 A1 | 2/2005 | Abramson | |
| 2005/0144305 A1 * | 6/2005 | Fegan et al. | 709/231 |
| 2006/0062544 A1 * | 3/2006 | Southwood et al. | 386/46 |
| 2006/0083194 A1 | 4/2006 | Dhrimaj et al. | |
| 2006/0098624 A1 * | 5/2006 | Morgan et al. | 370/352 |
| 2006/0101098 A1 * | 5/2006 | Morgan et al. | 707/204 |
| 2006/0200832 A1 * | 9/2006 | Dutton | 719/318 |
| 2006/0203758 A1 * | 9/2006 | Tee et al. | |
| 2006/0263038 A1 * | 11/2006 | Gilley | 386/52 |
| 2006/0265657 A1 * | 11/2006 | Gilley | 715/730 |
| 2007/0050054 A1 * | 3/2007 | Sambandam Guruparan et al. | 700/65 |
| 2007/0055986 A1 * | 3/2007 | Gilley et al. | 725/34 |
| 2007/0083540 A1 * | 4/2007 | Gundla et al. | 707/101 |
| 2007/0094408 A1 * | 4/2007 | Gundla et al. | 709/231 |
| 2007/0112785 A1 * | 5/2007 | Murphy et al. | 707/10 |
| 2007/0136778 A1 * | 6/2007 | Birger et al. | 725/117 |
| 2007/0160963 A1 * | 6/2007 | Lee et al. | 726/27 |
| 2007/0202923 A1 * | 8/2007 | Jung et al. | |
| 2007/0288715 A1 * | 12/2007 | Boswell et al. | |
| 2007/0294621 A1 * | 12/2007 | Hansen et al. | 715/716 |
| 2008/0048439 A1 * | 1/2008 | Liu et al. | 386/46 |
| 2008/0028037 A1 * | 1/2008 | Moyer et al. | 709/217 |
| 2008/0034394 A1 * | 2/2008 | Jacobs et al. | 725/98 |
| 2008/0077526 A1 | 3/2008 | Arumugam | |
| 2008/0104267 A1 * | 5/2008 | Dawson | 709/231 |
| 2008/0126943 A1 * | 5/2008 | Parasnis et al. | 715/730 |
| 2008/0140849 A1 * | 6/2008 | Collazo | 709/229 |
| 2008/0155600 A1 * | 6/2008 | Klappert et al. | |
| 2008/0162670 A1 * | 7/2008 | Chapweske et al. | 709/219 |
| 2008/0187279 A1 * | 8/2008 | Gilley et al. | 386/52 |
| 2008/0189617 A1 * | 8/2008 | Covell et al. | 715/738 |
| 2008/0267369 A1 * | 10/2008 | Parlamas et al. | 379/93.01 |
| 2008/0270881 A1 * | 10/2008 | Meyer et al. | 715/202 |
| 2008/0301737 A1 * | 12/2008 | Hjelmeland Almas et al. | 725/61 |
| 2009/0049373 A1 * | 2/2009 | Sharma et al. | 715/234 |
| 2009/0094331 A1 * | 4/2009 | Nobori et al. | 709/205 |
| 2009/0164641 A1 * | 6/2009 | Rogers et al. | 709/227 |
| 2009/0228919 A1 * | 6/2009 | Zott et al. | |

| | | | | |
|---|---|---|---|---|
| 2009/0254827 A1 * | 10/2009 | Gonze et al. | 715/716 |
| 2009/0259944 A1 * | 10/2009 | Wu | 715/738 |
| 2009/0282470 A1 * | 11/2009 | Yang et al. | 726/12 |
| 2010/0027974 A1 | 2/2010 | Ansari | |
| 2010/0094728 A1 * | 4/2010 | Denning et al. | 705/27 |
| 2010/0137028 A1 | 6/2010 | Farris et al. | |
| 2010/0138746 A1 * | 6/2010 | Zarom | 715/720 |
| 2010/0174993 A1 * | 7/2010 | Pennington et al. | 715/738 |
| 2010/0198860 A1 * | 8/2010 | Burnett et al. | 707/769 |
| 2010/0205628 A1 | 8/2010 | Davis et al. | |
| 2010/0208136 A1 * | 8/2010 | Castano | 348/553 |
| 2010/0257569 A1 * | 10/2010 | O'Hanlon | 725/110 |
| 2010/0265939 A1 * | 10/2010 | Parlamas et al. | 370/352 |
| 2010/0281042 A1 * | 11/2010 | Windes et al. | 707/756 |
| 2010/0283586 A1 * | 11/2010 | Ikeda et al. | 340/10.42 |
| 2010/0313135 A1 * | 12/2010 | Johnson et al. | 715/738 |
| 2010/0325552 A1 * | 12/2010 | Sloo et al. | 715/738 |
| 2011/0007901 A1 * | 1/2011 | Ikeda et al. | 380/270 |
| 2011/0014972 A1 * | 1/2011 | Herrmann et al. | 463/25 |
| 2011/0030020 A1 | 2/2011 | Halttunen | |
| 2011/0032870 A1 * | 2/2011 | Kumar | 370/328 |
| 2011/0035692 A1 * | 2/2011 | Sandone et al. | 715/769 |
| 2011/0060998 A1 * | 3/2011 | Schwartz et al. | 715/738 |
| 2011/0090908 A1 * | 4/2011 | Patel et al. | 370/352 |
| 2011/0107227 A1 * | 5/2011 | Rempell et al. | 715/738 |
| 2011/0125594 A1 * | 5/2011 | Brown et al. | 705/14.73 |
| 2011/0137729 A1 * | 6/2011 | Weisman et al. | 705/14.58 |
| 2011/0138354 A1 * | 6/2011 | Hertenstein et al. | 717/115 |
| 2011/0156879 A1 * | 6/2011 | Matsushita et al. | 340/10.1 |
| 2011/0161396 A1 * | 6/2011 | Filbrich et al. | 709/203 |
| 2011/0202466 A1 * | 8/2011 | Carter | 705/67 |
| 2011/0214148 A1 * | 9/2011 | Gossweiler et al. | 725/46 |
| 2011/0228768 A1 * | 9/2011 | Gelter et al. | 370/389 |
| 2011/0231265 A1 * | 9/2011 | Brown et al. | 705/14.73 |
| 2011/0231565 A1 * | 9/2011 | Gelter et al. | 709/231 |
| 2011/0231566 A1 * | 9/2011 | Gelter et al. | 709/231 |
| 2011/0267981 A1 * | 11/2011 | Davies | 370/255 |
| 2011/0289419 A1 * | 11/2011 | Yu et al. | 715/738 |
| 2011/0296454 A1 * | 12/2011 | Xiong et al. | 725/30 |
| 2011/0296465 A1 | 12/2011 | Krishnan et al. | |
| 2012/0072846 A1 * | 3/2012 | Curtis | 715/738 |
| 2012/0110074 A1 * | 5/2012 | Getchius | 709/204 |
| 2012/0110464 A1 * | 5/2012 | Chen et al. | 715/738 |
| 2012/0166560 A1 * | 6/2012 | Nobori et al. | 709/206 |
| 2012/0182994 A1 * | 7/2012 | Dec et al. | 370/392 |
| 2012/0185887 A1 * | 7/2012 | Newell | 725/12 |
| 2012/0239218 A1 * | 9/2012 | Forbes, Jr. | 700/295 |
| 2012/0254931 A1 * | 10/2012 | Oztaskent et al. | 725/112 |
| 2013/0014142 A1 * | 1/2013 | Newell | 725/12 |

OTHER PUBLICATIONS

Bing search q=control+television+server+phone&qs Feb. 6, 2014.*
Boxee-smartphone-remote-control Dec. 11, 2011.*
File guru mobile_phone_television_remote_control 2013.*
Mashable smart phone tv remote control apps Nov. 28, 2012.*
Hachman, M., "Snapstick's Media Streaming App/Box: Hands On," www.pcmag.com/article/2/0,2817,2375455,00.asp, 2 pages, (Jan. 8, 2011).
Dolcourt, J., CES: Snapstick takes on Apple TV, Google TV, http://news.cnet.com/8301-17938_105-20025100-1.html, 3 pages, (Dec. 9, 2010).
Shaivitz, M., "The Web to Your TV, With a Flick of a Wrist?" Slapstick Says Yes," http://techcocktail.com/the-web-to-our-tv-with-a-flick-of-a-wrist-slapstick-says-yes-2010-12, 2 pages, (Dec. 10, 2010).
Snapstick—Home, "Snapstick," http://www.snapstick.com/, 2 pages, printed on Mar. 2, 2011.
Paul, I., Hands On: YouTube Leanback, PCWORLD, http://www.pcworld.com/article/200769/hands_on_youtube_leanback.html, 3 pages, (Jul. 9, 2010).
Using AirPlay, Article HT4437, http://support.apple.com/kb/HT4437, 3 pages, (Apr. 18, 2011).
Cheng, J., "Stream AirPlay video to regular TV? Apple might make it happen," http://arstechnica.com/apple/news/2011/03/stream-air-play-video-to-a-regular-tv-apple-migh . . . , 1 page, printed on Jun. 7, 2011.

US 8,782,528 B2

Page 3

(56)                    **References Cited**

OTHER PUBLICATIONS

"Using the Play To feature to stream media," http://windows. microsoft.com/en-US/windows7/using-the-play-to-feature-to-stream-media, 3 pages, printed on Jun. 7, 2011.
"YouTube—Leanback," http://www.youtube.com/t/leanback, 1 page, printed on Jun. 7, 2011.
"Yahoo!7 TV Guide for iPhone, iPod touch and iPad on the iTunes App Store," http://itunes.apple.com/au/app/yahoo-7-tv-guide/id42471992?mt=8, 2 pages, printed on Jun. 7, 2011.
Hu, C., et al., "Mobile Media Content Sharing in UPnP-Based Home Network Environment," Journal of Information Science and Engineering 24, 1753-1769. (2008).
Fallahkhair, S., et al., "Dual Device User interface Design for Ubiquitous Language Learning: Mobile Phone and Interactive Television (iTV)," Proceedings of the 2005 IEEE Int'l Workshop on Wireless an Mobile Technologies in Education, 8 pages, 2005.
Ask Search Internet Search, session identifier random, printed on Nov. 19, 2011.
Webopedia computer dictionary, session cookie, printed on Nov. 19, 2011.
Webopedia computer dictionary, web identifier, printed on Nov. 19, 2011.
Webopedia computer dictionary, user session, printed on Nov. 19, 2011.
www.vbulletin.com, Best way to generate Random, Unique ID's, printed on Nov. 19, 2011.
www.vbulletin.com, Best way to generate Random, Unique ID's, Internet Archive Wayback Machine, Jan. 16, 2009.

* cited by examiner



FIG. 1

Case: 24-1207        Document: 18        Page: 212        Filed: 04/11/2024



FIG. 2

| Transmission Code | | | | |
|---|---|---|---|---|
| UserID | TargetID | MediaPlayerID | Command | Data |

FIG. 3

| Single Connection Look-up Table | |
|---|---|
| Display Device | User - Smartphone |
| 2 | A |
| 1 | C |
| 3 | D |
| 4 | B |

FIG. 4

26

| Universal API Adapter | | |
|---|---|---|
| Universal Command | MediaPlayerID | Specific Player Command |
| New Video | YouTube | yt_loadVideo |
| | Ted.com | getVideo |
| | Vimeo | loadNewVideo |
| Pause | YouTube | yt_pauseVideo |
| | Ted.com | pauseVideo |
| | Vimeo | pause |

FIG. 5



FIG. 6



FIG. 7A

| Sync-code Look-up Table | | |
|---|---|---|
| IP Address | Cookie | Sync-code |
| 169.343.231.234 | erjg988dhuj | 435-05-342 |

FIG. 7B



FIG. 8

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13

Case: 24-1207     Document: 18     Page: 218     Filed: 04/11/2024



**FIG. 14C**

HEADER

MENU|CHANNELS|PLAYLIST|SEARCH

AD SPACE

FOOTER

**FIG. 14B**

CONTROL PANEL    GUEST

DISPLAY 1|DISPLAY 2|DISPLAY 3|DISPLAY 4

my laptop

living-room PC

friend's laptop

*Enter the Sync-code below or choose from one of your devices listed above*

SEND

**FIG. 14A**

HEADER

MENU|CHANNELS|PLAYLIST|SEARCH

SPLASH PAGE

FOOTER

Appx135

Case: 24-1207     Document: 18     Page: 219     Filed: 04/11/2024



**Group Connection Look-up Table**

| Display Device | Group | User - Smartphone |
|---|---|---|
| 2 | X | A", C*, D |
| 1,3 | Y | B"*, E |

" = Group Moderator,
* = Control of Display Device

FIG. 15

FIG. 14E

FIG. 14D

Appx136

US 8,782,528 B2

1

# PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE

## BACKGROUND

This disclosure relates to play control of content on a display device. Such display devices include, for example, television displays used by consumers in their home for viewing videos and other media that are either provided from the Web or previously stored. In particular, the disclosure relates to the creation, storage, manipulation and access of media playlists used in conjunction with display devices and control of the display devices.

Web media often is played on computers rather than television displays. Although it is known to connect a computer to a television set in order to watch Web media, it is difficult to control such a system within the typical scenario for television watching where the viewer is positioned some distance from the television. Furthermore, although a wireless device can enable the user to control the television from a distance, it can be difficult to view a web browser display on the television set and may interfere with normal television program viewing by other persons.

Given the desire to watch various World Wide Web media on a family's primary television set, and to control this operation from the comfort of one's couch, there is a need to operate a television set or other display remotely from a personal computing device, such as a mobile phone. It also is desirable to allow a user to perform a general Web search to locate and capture Web media, and to control a television or other display remotely using the personal computing device.

## SUMMARY

Various aspects of the invention are set forth in the claims.

For example, according to one aspect, a system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

In some implementations, the display device is operable, in response to receiving the second message, to obtain the first media player from the content provider only if the first media player is not already loaded in the display device.

In some implementations, the personal computing device is operable to transmit a message according to a specified format over the network to the server system. The message can include a command for controlling playing of the content on the display device. The server system is operable, in response to receiving the message, to convert the command into a corresponding command recognizable by the media player if the command received from the personal computing device is not recognizable by the media player. The server system is operable to provide to the display device a message

2

that includes the corresponding command, and the display device is operable, in response to receiving the message from the server system, to execute the command.

In some implementations, the personal computing device is, for example, a mobile phone, and the display device is a television set. Other personal computing devices or display devices can be used in other implementations. The network can include, for example, the Internet.

In some implementations, the server system stores a look-up table that includes a synchronization code uniquely associated with the display device. A message from the personal computing device can include the synchronization code, and in response to receiving the message from personal computing device, the server system can use the synchronization code and the look-up table to identify the display device on which the content is to be played. The synchronization code can be different from an IP address associated with the display device and/or a media access control address associated with the display device.

In various implementations, the system can facilitate allowing a personal computing device to be used to select different content to be played on a remote display even if different media players are required to present the different content. The system also can allow the user to control how the content is displayed on the display device using the personal computing device. For example, user-initiated play commands can be passed from the user's personal computing device, through the server system, to the display device.

Other aspects, features and advantages will be apparent from the following detailed description, the accompanying drawings, and the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating an example of a system according to the invention.

FIG. **2** illustrates various details of the flow of information and signals according to some implementations.

FIG. **3** illustrates an example of a transmission code incorporated into a message from a personal computing device.

FIG. **4** illustrates an example of a look-up table that forms part of a server system.

FIG. **5** illustrates an example of entries in a universal API adapter.

FIG. **6** is a flow chart showing steps for display device to load a video player and video.

FIG. **7**A illustrates an example of a display device including a synchronization code.

FIG. **7**B illustrates an example of a synchronization code look-up table.

FIGS. **8-13** illustrate examples of various scenarios in which the invention can be used.

FIGS. **14**A through **14**E illustrate examples of display screens that may appear on a user's personal computing device in accordance with the invention.

FIG. **15** illustrates further information that can be stored in the look-up table in the server system.

## DETAILED DESCRIPTION

As shown in FIG. **1**, a system **10** facilitates synchronizing a connection between two or more devices **20, 22** connected to the Internet **21** or other computer network. The connection is designed to be made by a first device (e.g., a personal computing device) **20** that acts as a controller and a second device (e.g., a television set **22** with a display **23**) that acts as a receiver to play content selected by a user of the first device

US 8,782,528 B2

3

and to respond to commands that originate at the personal computing device. The personal computing device **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The television set **22** is operable to link back to a server system **24** from which the television set receives commands. When a user makes a selection using the personal computing device **20** for particular content to be displayed on the television display **23**, a signal is sent through the Internet (or other network) **21** to the server system **24**. A corresponding command signal then is passed along to the connected television set **22**, which acts on a transmission code contained within the signal and performs specified commands. For example, in some scenarios, the command instructs the television set **22** to access a content provider **30** through the Internet **21**, load a specific media player, load the media player-specific content (e.g., a video) and play the content on the television display **23**. The user can use the personal computing device **20** to control how the content is played on the television display **23**. The user may subsequently visit the same or another Web site using the personal computing device **20** to select different content (e.g., a second video) to be played on the television display **23**. In that case, another signal would be sent through the server system **24** to the television set **22**. A transmission code associated with this command signal instructs the television set **22** to load a new media player (if needed) over the Internet and to load the specified video file to be played on the display **23**. Thus, the system **10** allows a personal computing device **20** to be used to select different content to be played on a remote display **23** even if different media players are required for the different content. The user also can control how the content is displayed (e.g., play, pause, stop, rewind, fast forward, etc.) on the display **23** using the personal computing device **20**. The user-initiated play commands are passed from the user's personal computing device **20**, through the server system **24**, to the television set **22**.

Although the following detailed discussion describes videos as an example of the type of content to be played on the display **23**, the system **10** can be used for other types of content as well. Thus, depending on the implementation, the content may include one or more of the following: video, audio, interactive video game, streaming media, multimedia, images, slides (e.g., a PowerPoint presentation) or other types of dynamic content. Furthermore, in the following discussion, it is assumed that the personal computing device **20** is a mobile phone that includes a display, an internal microprocessor or other processing circuitry, a keypad, keyboard, touchscreen, mouse, trackball, or other device to receive user selections and other input, and a transceiver to establish communications to the Internet **21** or other communications networks. More generally, however, the personal computing device **20** can be any type of handheld or other Internet-enabled personal computing device, including mobile computers, e-books, kiosks, tablets, smart phones, media players, and motion and touch sensory interfaces. In some cases, input from the user can be received in forms other than tactile input (e.g., acoustic or speech).

FIG. **2** illustrates further details of the flow of information and signals according to some implementations. The personal computing device (e.g., mobile phone) **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The user operates the mobile phone **20** so as to start the application or access the web site (block **100**). In some implementations, a logo appears on the mobile phone's display. By selecting the logo, the user causes a menu to expand and present various options. The options can include, for example: (i) add new

4

content to a playlist, (ii) play a listed item on a secondary device, (iii) play a listed item on the mobile phone **20**. If the user selects to add new content to the playlist, the user is presented with a screen that allows him to enter user-defined search parameters or o select predefined search parameters to request video data. The search parameters are sent from the mobile phone **20** as part of a request for video data that satisfy the search parameters (block **102**). The request is transmitted via the Internet **21** and through the server system **24** to the appropriate content provider web site. In response, the content provider **30** provides metadata (e.g., titles, links to the videos) for one or more video files that satisfy the search parameters (block **104**). The metadata can be provided to the mobile phone **20**, for example, in the form of an XML data file. Upon receiving the data file, the mobile phone **20** displays a list of one or more videos based on the information received from the content provider **30** (block **106**).

If desired, the user can take one of several actions, including selecting one of the videos from the displayed list to be played on the television display **23** or initiating a command with respect to a video that already has been loaded to the television set **22** (block **108**). The mobile phone **20** then formats and transmits a message to the server system **24** (block **110**). The message from the mobile phone **20** contains a transmission code that includes data regarding the user information (e.g., user identification or account number), the secondary display it wants to connect to (e.g., television set **22** with display **23**), the location and name of the media player for the selected video, the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon. An example of the format of a transmission code from the mobile phone **20** to the server system **24** is illustrated in FIG. **3**. Different formats and/or different information may be appropriate for other implementations.

The message from the mobile phone **20** is transmitted over the Internet **21** and is received by the server system **24** (block **112**). Based on information in the message from the mobile phone **20**, the server system **24** verifies that the user has an account (block **114**), and the contents of the message, as well as the date and time of receipt of the message, are added to a personal computing device database **32** (block **116**) which forms part of a switchboard **28**. In general, all messages from a particular user's personal computing device **20** are stored in the database **32** corresponding to an account for the particular user. Thus, the database **32** stores a record of all messages received from a user's personal computing device **20**, as well as the user's identification, an indication of the target device **22**, an identification of the media player that is required for the selected video, and an identification of the selected video.

The switchboard **28** also includes a look-up table **34** that stores a correspondence between a particular personal computing device (such as mobile phone **20**) and target devices (e.g., the television set **22**) to which the user command is directed. An example of the look-up table **28** is illustrated in FIG. **4**. In this example, it is assumed that, at most, a single connection is established at any given time between a particular mobile phone and a display device. However, as explained below, other scenarios are also possible to establish group connections (e.g., multiple mobile phones connected to the same display device). The server system **24** performs a target verification (block **118**), which includes checking whether a connection to a particular display device already is established for the mobile phone **20** and, if so, checking the identification of the display device. During the target verification, if the look-up table indicates that there is no connection established between the mobile phone **20** and a particular display device, then the server system **24** sends a message to

US 8,782,528 B2

5

6

the mobile phone **20** to prompt the user to identify the device on which the video is to be displayed.

A user can identify the device on which the video is to be displayed in one of several ways, depending on the implementation. In some implementations, the user can select the display device from a list of devices displayed on the mobile phone **20**. The list can include a field populated with names or identifications of display devices that previously have been initialized for connection. Alternatively, the user can select the display device by entering a synchronization code uniquely associated with the particular display device. As illustrated in FIG. **7A**, the synchronization code **48** can be displayed, for example, on a splash page of the display device as text on the screen or as an image such as a QR code and can be entered into the mobile phone **20**, for example, manually by the user or by scanning the code into the mobile phone. The code can be scanned, for example, using optical scanning or RFID techniques. Preferably, the synchronization code is different from the IP address associated with the device **22**. The IP address also can be different from the media access control (MAC) address associated with the device **22**. For example, in some implementations, the synchronization code is generated randomly and assigned to the display device **22** each time it connects to the server system **24**. Thus, a particular display device **22** may have an IP address, a MAC address, a web or browser cookie, and a synchronization code ("sync code") assigned to it at any given time. This information can be stored, for example, in a look-up table in the server system **24**. An example of entries in such a look-up table are illustrated in FIG. **7B**.

Once the synchronization code is entered into, or captured by, the mobile phone **20**, it is sent from the mobile phone **20** to the server system **24**, which stores the information in the look-up table **36** so as to establish a connection between the mobile phone **20** and the display device **22** through the server system **24**.

Once a connection is established between the mobile phone **20** and the display device **22**, signals sent from the mobile device **20** to its associated database **32** are copied to a database **34** associated with the target device (e.g., television set **24**) based on the correspondence between the mobile device and the target device listed in the look-up table **36** (block **122**). Thus, the database **32** entries associated with a particular display device (e.g., television set **24**) provide a record of the messages received for that display device, as well as an indication of the identification of the device that sent each message, an indication of the media player required to play the video, and an indication of the selected video.

In the illustrated implementation, the command in the transmission code (see FIG. **3**) contains a JavaScript reference to control the media player needed to play the selected video. Various types of video players may use different JavaScript commands to control their respective playback. Therefore, in the illustrated implementation, a universal adapter **26** is provided to interpret and convert a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player. Each time a signal is received from the mobile device **20**, the API adapter **26** checks and identifies the specific media player that is being requested. Based on this information, the system loads the appropriate set of protocols or application programming interfaces (APIs) from its library and converts the incoming commands from the mobile device **20** into the correct JavaScript (or other programming) code used by the target device **22** to control the specific player (block **120**). The server system **24** then copies

the converted version of the message to the database **34** associated with the target device **22**, as indicated above in connection with block **122**.

The universal adapter **26** can be implemented, for example, as a look-up table. Examples of entries in such a look-up table are illustrated in FIG. **5**. Thus, for a universal command "New Video," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "yt_loadVideo" for YouTube). Similarly, for a universal command "Pause," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "pauseVideo" for Ted.com). Other universal commands and the corresponding command(s) for one or more media players also can be stored by the universal adapter **26**.

The display device **22** periodically checks the entries in the database **34** to determine if there are any new messages/commands directed to it (block **124**). For example, in some implementations, the display device **22** polls the associated database **34** at some predetermined time interval. In some implementations, instead of the display device **22** periodically checking whether there are any messages for it in the database **34**, the server system **24** can push the messages to the display device **22**. In any event, the system is arranged so that the display device **22** receives the messages intended for it.

When the display device **22** receives a message from the server system **24** (block **126**), the display device executes the message (block **128**). In some cases, the media player required to play the video indicated in the message is not presently loaded in the display device **22**. For example, the received command may be to "play" a particular video. As indicated by FIG. **6**, if the media player needed to play the video is not already loaded in the display device **22**, the display device **22** requests and obtains a copy of the appropriate media player **40** and a copy of the video file **42** from a content provider **30**, loads the media player and then presents the video on the display **23** (FIG. **2**, block **130**). Likewise, as indicated by FIG. **6**, if the appropriate media player already is loaded in the display device, but the particular video is not, then the display device **22** requests and obtains a copy of the video the **42** from the content provider **30** and proceeds to play the video. To allow the display device **22** to switch between different video players (i.e., to load and unload different video players), a software program can be stored on the display device and/or the web site to establish a secure connection back to the server system **24**.

Once the video is playing on the display device **22**, the user of the mobile phone **20** can control the playing of the video by entering appropriate commands (e.g., pause, fast forward, rewind, stop, play, etc.) through the mobile phone. Each command is incorporated into a message including a transmission code (FIG. **3**) as described above. The message is transmitted to the server system **24**, which copies the message into database entries associated with the particular display device **22** (i.e., after performing any conversion of the command by the API adapter **26**). Once the message is retrieved by or sent to the display device **22**, the display device proceeds to execute the command.

The system and methods described here allow a user of a mobile phone or other personal computing device to create a playlist based on videos (or other types of content) from multiple sources and to play back each video using a single interface that can be used to control different media players.

As mentioned above, the system and methods described above also can be used with types of content other than video. In that case, different types of user-initiated commands may be available to control the content displayed on the display **23**.

US 8,782,528 B2

7

For example, for interactive video games, the user-initiated commands can include control commands appropriate for the particular game.

Although the implementation of FIG. 1 illustrates the display device 22 as a television set with a display screen 23, other types of display devices can be used as well (e.g., a laptop or personal computer).

The systems and methods can be used in various scenarios to play back videos (or other content). Examples of several scenarios that can be implemented using the system described above are described in the following paragraphs. For example, a first scenario involves a single user's smartphone connecting to a single display device (FIG. 8). In this scenario, the user turns on, for example, her display device (e.g., personal computer with a display monitor), opens up a browser and accesses a website associated with the server system 24. The user then clicks on a link that launches the software program to establish a secure connection back to the server system 24. The software program opens a splash page (see FIG. 14A), and a sync-code is displayed on the monitor. The user then opens the appropriate application on her smartphone. In the smartphone application, the user accesses a "Connect" screen from which he can select one of several listed display devices (see FIG. 14B). Alternatively, the user can enter the sync-code displayed on the computer monitor (see FIG. 14B). The user then clicks on a SEND button which causes a message including the sync-code to be sent the server system 24. In response, the server system 24 establishes a connection between the user's smartphone and the selected display device through a look-up table as described above with respect to FIG. 4. The user can use a search tool in the smartphone application to find a video. In response to the search, a list of videos satisfying the search appears on the smartphone (see FIG. 14C). When the user selects a value from the list displayed on the smartphone, the information is provided through the server system 24 to the personal computer. In some implementations, a pop-up window may appear on the smartphone listing one or more options for the user to take regarding the selected video. Such options can include, for example, play the video on the selected display device (e.g., the personal computer), play the video on the smartphone, or add the video to the playlist on the smartphone. If the user chooses to have the video played on the display device (e.g., the personal computer), the personal computer obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video on the monitor as described previously. In some implementations, a message is displayed on the user's smartphone indicating that the selected video is playing and providing additional information about the selected video (see FIG. 14D). The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from her smartphone.

A second scenario involves saving a selected video to a playlist on a single user's smartphone, and subsequently playing the video on a display device (FIG. 9). In this scenario, the user opens the appropriate application on his smartphone and searches for videos using the search tool displayed in the application. When a list of videos is displayed on the smartphone in response to the search request, the user selects one or more videos to add to his playlist. At that time, or at a later time, the user can connect to a display device through the server system 24. To do so, the user opens the playlist on his smartphone and selects a video. The information is provided through the server system 24 to the display device, which obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet

8

and begins to play the video. The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from his smartphone.

A third scenario involves multiple users' smartphones and a single display device (FIG. 10). For example, a user may want to share and watch videos with a group of friends watching together on a single display device. In this situation, the user can access the application or web site to set up a group and serve as the moderator for the group. The user then can send out a request to other members of the group, or other users can send a request to the moderator to join the group. Users can search for other users based, for example, on username or from a contact list. The moderator then can select a user in the group to control the display device. FIG. 14E illustrates an example of a screen on the user's smartphone that allows the user to connect with other users to form a group and to select which member of the group controls the display device (e.g., by selecting a member of the group from the list "Me, Guest 1, Guest 2, . . . " near the top of the screen). Alternatively, the moderator can set it up so that control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. Regardless of who has control of the display device 22, each user in the group retains control of his own smartphone. The lookup table 36 in the server system 24 stores the connections established between the personal computing devices of the users in the group and the display device (see FIG. 15).

A fourth scenario involves one user's smartphone and multiple display devices (FIG. 11). In this example, a user opens the application on his smartphone to establish a connection to a first display device and then repeats the process for multiple display devices. A list of devices that the user's smartphone is connected to is displayed on the smartphone. The user can choose to control all devices simultaneously or one at a time. To do so, the user selects from the list the display device(s) he wants to control. The user then can search for videos using his smartphone. In response to the user selecting a particular video, the selected video is played on the selected display device(s).

A fifth scenario involves multiple users' smartphones and multiple connected display devices (FIG. 12). For example, a user may want to share and watch videos with a group of friends, who may be in different locations each of which has a separate display device. Each user establishes a connection from her smartphone to the display device where she is located. One of the users uses the application or web site to establish a group, with the user who establishes the group serving as the group moderator. The user can send out a request to other users to join the group or other users can send a request to the moderator to join the group. In some implementations, users can search for other users based on username or from a contact list. The moderator chooses which member of the group has control of the display device. Alternatively, the moderator can set it up control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. The signal sent from the smartphone of the group member who has control is sent (via the server system 24) to all display devices within the group. Regardless of which group member has control of the display devices, each user retains control of her own smartphone. The look-up table 36 in the server system 24 stores the connections established between the personal computing devices of the users in the group and the display devices (see FIG. 15).

A sixth scenario involves sharing video links and a playlist (FIG. 13). For example, a user within a group can share a

US 8,782,528 B2

9

video playlist and video links via an Instant messaging system built-in to the application. Users also can post video links or a video playlist to third-party web sites (e.g., social networking sites). Other users can view the video link and play-list within the application. When a video from the list is selected, it plays on the selected device.

The system and methods can be used by a wide variety of users in addition to individual viewers. For example, companies that provide on-line video platforms that host videos for other individuals or companies can obtain useful advantages by integrating the platforms with the server system **24**. Programming hooks can be created in the API so that the on-line video platform's media player can communicate with the server system **24**. When media player commands for an on-line video platform are added to the system **24**, the media player's API is placed in an API library and is stored in the API adapter **26**. The on-line video platform can then offer customers the ability to add videos to their own mobile web sites that are enabled to operate with the server system **24**.

The system and methods also can be used by content providers. For example, the content provider may want to deliver its media on-line. The content provider can use an on-line video platform that is enabled to operate with the server system **24**. In some implementations, the content provider is allowed to add links to videos for that web site (i.e., mobile site or an application). The link facilitates synchronization to the secondary device **22** (e.g., a television set) and allows the end-user to load and control the video on the secondary device.

As used in this disclosure, terms such as "first," "second," etc. with respect to the messages are used simply as labels to distinguish the various messages from one another. Such terms do not imply that there cannot be any other messages prior to the first message or that there cannot be other messages between the first and second messages.

Implementations of the subject matter and the operations described in this specification can include digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can include one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially-generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or can be included in, a computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially-generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can include operations performed by a data processing apparatus on data stored on one or more computer-readable storage devices or received from other sources. The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a

10

programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub-programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. Elements of a computer include a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data.

Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto-optical disks, or optical disks. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile, audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non-volatile memory, media and memory devices, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

Although this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation. Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring

US 8,782,528 B2

11

that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results, in certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described herein and the attachments hereto should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, although particular implementations have been described, other implementations are within the scope of the claims.

What is claimed is:

**1**. A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device;

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

loading the particular media player in the content presentation device; and

using the particular media player to execute the programming code with respect to the file.

**2**. The method of claim **1** wherein the file stores audio content.

**3**. The method of claim **1** wherein the file stores video content.

**4**. The method of claim **1** wherein the file stores multimedia content.

**5**. The method of claim **1** wherein the file stores images.

**6**. The method of claim **1** wherein the file stores slides.

**7**. The method of claim **1** wherein the file stores elements of interactive content.

**8**. The method of claim **1** including loading, by the server system, a set of protocols or application programming interfaces from a library based on the identity of the particular media player.

**9**. The method of claim **1** wherein obtaining programming code corresponding to the action control command includes accessing a look-up table.

**10**. The method of claim **9** wherein the look-up table stores a plurality of specific commands, each of which represents,

12

respectively, a command for a different media player and each of which corresponds to the action control command.

**11**. The method of claim **1** wherein the action control command represents an instruction to play the content, to stop playing the content or to pause playing the content.

**12**. The method of claim **1** wherein the synchronization code is uniquely associated with the content presentation device on which the content is to be played.

**13**. The method of claim **12** wherein assigning a synchronization code includes assigning a randomly generated code to the content presentation device each time the content presentation device connects to the server system.

**14**. The method of claim **1** including:

receiving, in the server system, a further message from the personal computing device, the further message including a second action control command;

identifying second programming code corresponding to the second action control command, wherein the second programming code is for controlling presentation of the content by the content presentation device using the particular media player; and

using the particular media player to execute the second programming code with respect to the file.

**15**. The method of claim **1** including:

receiving, in the server system, a further message from the personal computing device, the further message specifying a second file to be acted upon, identifying a second media player for playing second content from the second file, identifying a location of the second media player, and including a second action control command for presentation of the second content on the content presentation device by the second media player;

identifying second programming code corresponding to the second action control command, wherein the second programming code is for controlling presentation of the second content by the content presentation device using the second media player;

obtaining, by the content presentation device, the second media player, wherein the second media player is obtained over a network from a second content provider;

loading the second media player in the content presentation device; and

using the second media player to execute the second programming code corresponding to the second action control command with respect to the second file.

**16**. A system for controlling playing of content on a content presentation device that loads anyone of a plurality of different media players, the system comprising:

a server system including at least one processor;

a database storing a relationship between a personal computing device and the content presentation device based on a synchronization code assigned by the server system to the content presentation device and received by the server system in a message generated by the personal computing device, wherein the personal computing device is separate from the server system and separate from the display device; and

wherein the server system is configured to receive one or more messages generated by the personal computing device, the one or more messages, taken together, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for controlling playing of the content on the content presentation device by the particular media player;

US 8,782,528 B2

13

one or more computer-readable media storing instructions that when executed by the server system, cause the server system to identify programming code corresponding to the action control command, wherein the programming code is for controlling presentation by the particular media player of the content by the content presentation device;

the server system being further configured to store information for transmission to or retrieval by the content presentation device, wherein the information specifies the file to be acted upon, identifies the particular media player for playing the content, and includes the corresponding programming code to control playing of the content on the content presentation device by the particular media player in accordance with the action control command,

wherein the content presentation device obtains the particular media player over a network from a content provider and loads the particular media player in the content presentation device if the particular media player is not already loaded in the content presentation device, and

wherein the content presentation device uses the particular media player to execute the programming code with respect to the file.

**17**. The system of claim **16** wherein the file stores audio content.

**18**. The system of claim **16** wherein the file stores video content.

**19**. The system of claim **16** wherein the file stores multimedia content.

**20**. The system of claim **16** wherein the file stores images.

**21**. The system of claim **16** wherein the file stores slides.

**22**. The system of claim **16** wherein the file stores elements of interactive content.

**23**. The system of claim **16** including:

a library storing protocols or application programming interfaces,

wherein the server system is configured to load a set of protocols or application programming interfaces from the library based on the identity of the particular media player.

**24**. The system of claim **16** including:

a look-up table storing a plurality of specific commands, each of which represents, respectively, a command for a different media player and each of which corresponds to the action control command,

wherein the server system is configured to obtain the programming code corresponding to the action control command by accessing the look-up table.

**25**. The system of claim **16** wherein the synchronization code is uniquely associated with the content presentation device on which the content is to be played.

**26**. The system of claim **25** wherein the server system is configured to assign as the synchronization code a randomly generated code each time the content presentation device connects to the server system.

**27**. A method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:

receiving, in a server system, a first message from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the first message includes information based on a synchronization code assigned to the content presentation device;

using the information based on the synchronization code that is received in the server system to store a record

14

establishing an association between the personal computing device and the content presentation device;

receiving, in the server system, a second message from the personal computing device, the second message specifying a file to be acted upon, identifying a particular media player for playing content from the file, identifying a location of the particular media player, and including an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

loading the particular media player in the content presentation device; and

using the particular media player to execute the programming code with respect to the file.

**28**. A machine-implemented method of controlling presentation of content on a content presentation device that loads anyone of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages generated by a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, collectively, include information based on a unique identification associated with the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information that is based on the unique identification associated with the content presentation device and that is received in the server system to store a record establishing an association between the personal computing device and the content presentation device;

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation by the particular media player of the content by the content presentation device;

obtaining, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider;

loading the particular media player in the content presentation device; and

using the particular media player to execute the programming code with respect to the file.

**29**. The method of claim **28** wherein obtaining programming code corresponding to the action control command includes accessing a look-up table.

**30**. The method of claim **29** wherein the look-up table stores a plurality of specific commands, each of which represents, respectively, a command for a different media player and each of which corresponds to the action control command.

* * * * *



US008904289B2

(12) **United States Patent**      (10) **Patent No.:**     **US 8,904,289 B2**
Strober                                                   (45) **Date of Patent:**      *Dec. 2, 2014

(54) **PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE**

(75) Inventor:  **David Strober**, Rye, NY (US)

(73) Assignee:  **Touchstream Technologies, Inc.**, New York, NY (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 254 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/157,821**

(22) Filed:  **Jun. 10, 2011**

(65)                 **Prior Publication Data**

US 2012/0272147 A1      Oct. 25, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/477,998, filed on Apr. 21, 2011.

(51) **Int. Cl.**
   *G06F 3/00*        (2006.01)
   *H04L 29/06*       (2006.01)
   *G06F 3/01*        (2006.01)
   *H04N 21/40*       (2011.01)

(52) **U.S. Cl.**
   CPC   *H04L 65/60* (2013.01); *G06F 3/01* (2013.01);
                            *H04N 21/40* (2013.01)
   USPC ........... **715/740**; 715/718; 715/736; 715/738;
                            715/756; 715/835

(58) **Field of Classification Search**
   CPC .................................................. G06F 3/0487
   USPC .......... 715/716, 718, 736, 738, 740, 756, 835
   See application file for complete search history.

(56)                  **References Cited**

U.S. PATENT DOCUMENTS

   5,613,137 A * 3/1997 Bertram et al. ................... 710/1
   5,875,311 A * 2/1999 Bertram et al. ............... 710/305
                        (Continued)

FOREIGN PATENT DOCUMENTS

   CN       101534449      9/2009
   CN       101577650      11/2009
                        (Continued)

OTHER PUBLICATIONS

Bing search q=mobile+server+television+control&q Jun. 26, 2014.*

(Continued)

*Primary Examiner* — Boris Pesin
*Assistant Examiner* — John Heffington
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57)                  **ABSTRACT**

A system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

**18 Claims, 9 Drawing Sheets**



GOOGLE EXHIBIT 1001

Appx144

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| 6,181,713 | B1 * | 1/2001 | Patki et al. .................... 370/474 |
| 6,252,889 | B1 * | 6/2001 | Patki et al. .................... 370/474 |
| 6,756,965 | B2 * | 6/2004 | Combs et al. .................. 345/156 |
| 6,978,424 | B2 * | 12/2005 | Safadi .......................... 715/765 |
| 7,058,356 | B2 | 6/2006 | Slotznick |
| 7,114,173 | B2 * | 9/2006 | Urdang et al. ................ 725/88 |
| 7,330,875 | B1 * | 2/2008 | Parasnis et al. ............. 709/204 |
| 7,424,718 | B2 * | 9/2008 | Dutton .......................... 719/318 |
| 7,433,922 | B2 * | 10/2008 | Engstrom ...................... 709/205 |
| 7,440,972 | B2 * | 10/2008 | Oetzel .......................... 386/252 |
| 7,453,454 | B2 * | 11/2008 | Allen et al. .................. 345/418 |
| 7,509,588 | B2 * | 3/2009 | Van Os et al. ............... 715/835 |
| 7,614,070 | B2 * | 11/2009 | Urdang et al. ................ 725/90 |
| 7,689,931 | B2 * | 3/2010 | Koga et al. .................... 715/812 |
| 7,769,827 | B2 * | 8/2010 | Girouard et al. ............ 709/219 |
| 7,774,708 | B2 * | 8/2010 | Bell et al. ..................... 715/738 |
| 7,814,144 | B2 * | 10/2010 | Koyama et al. ............... 709/203 |
| 7,835,505 | B2 | 11/2010 | Toyama et al. |
| 7,849,485 | B2 | 12/2010 | Paik et al. |
| 7,878,904 | B2 * | 2/2011 | Maehiro ......................... 463/37 |
| 7,949,606 | B1 * | 5/2011 | Sweet ............................ 705/52 |
| 7,956,846 | B2 * | 6/2011 | Ording et al. ................ 345/173 |
| 8,086,679 | B2 * | 12/2011 | Nobori et al. ................ 709/206 |
| 8,171,507 | B2 * | 5/2012 | Hironaka et al. ............. 725/12 |
| 8,230,360 | B2 * | 7/2012 | Ma et al. ....................... 715/810 |
| 8,250,608 | B2 * | 8/2012 | Hayes et al. .................. 725/51 |
| 8,255,968 | B2 * | 8/2012 | Louie et al. ................... 725/133 |
| 8,316,308 | B2 * | 11/2012 | Sherman et al. .............. 715/744 |
| 8,344,870 | B2 * | 1/2013 | Evans et al. .................. 340/461 |
| 8,373,660 | B2 * | 2/2013 | Pallakoff ...................... 345/163 |
| 8,418,084 | B1 * | 4/2013 | Tischer .......................... 715/863 |
| 8,572,488 | B2 * | 10/2013 | Phillips et al. ............... 715/716 |
| 8,659,553 | B1 * | 2/2014 | Chan et al. .................... 345/169 |
| 8,738,536 | B2 * | 5/2014 | Strom et al. ................... 705/59 |
| 8,738,737 | B2 * | 5/2014 | Baldini et al. ................ 708/219 |
| 8,739,074 | B2 * | 5/2014 | Kinoshita ...................... 715/864 |
| 8,743,284 | B2 * | 6/2014 | Russell et al. ................ 348/515 |
| 8,744,434 | B2 * | 6/2014 | Funderburk et al. ......... 455/431 |
| 8,745,228 | B2 * | 6/2014 | Beckert et al. ............... 709/226 |
| 8,745,388 | B2 * | 6/2014 | Kanungo ........................ 713/168 |
| 8,751,159 | B2 * | 6/2014 | Hall .............................. 701/467 |
| 8,751,520 | B1 * | 6/2014 | Bhattacharjee et al. ...... 707/767 |
| 8,751,793 | B2 * | 6/2014 | Ginter et al. ................. 713/156 |
| 8,752,016 | B2 * | 6/2014 | Hernandez Porras |
| | | | et al. ............................ 717/122 |
| 8,755,919 | B2 * | 6/2014 | Pyle ............................... 700/94 |
| 8,756,333 | B2 * | 6/2014 | Jannink et al. ............... 709/231 |
| 8,756,505 | B2 * | 6/2014 | Gonze et al. .................. 715/721 |
| 8,761,351 | B1 * | 6/2014 | Daly et al. ...................... 379/45 |
| 8,761,792 | B2 * | 6/2014 | Sennett et al. ................ 455/454 |
| 8,762,240 | B2 * | 6/2014 | Sogo et al. .................... 705/35 |
| 8,762,548 | B1 * | 6/2014 | Kessel et al. ................. 709/228 |
| 8,763,081 | B2 * | 6/2014 | Bogdanovic et al. .......... 726/3 |
| 2002/0021289 | A1 * | 2/2002 | Combs et al. .................. 345/173 |
| 2002/0034193 | A1 * | 3/2002 | Patki et al. .................... 370/474 |
| 2002/0075332 | A1 * | 6/2002 | Geilfuss et al. .............. 345/859 |
| 2002/0083147 | A1 * | 6/2002 | Ripperger ...................... 709/213 |
| 2002/0120666 | A1 * | 8/2002 | Landsman et al. ............ 709/200 |
| 2002/0129102 | A1 * | 9/2002 | Landsman et al. ............ 709/203 |
| 2002/0133518 | A1 * | 9/2002 | Landsman et al. ............ 707/513 |
| 2002/0146122 | A1 * | 10/2002 | Vestergaard et al. |
| 2002/0198778 | A1 * | 12/2002 | Landsman et al. ............ 705/14 |
| 2003/0004804 | A1 * | 1/2003 | Landsman et al. ............ 705/14 |
| 2003/0005000 | A1 * | 1/2003 | Landsman et al. ............ 707/513 |
| 2003/0018885 | A1 * | 1/2003 | Landsman et al. ............... 713/2 |
| 2003/0023488 | A1 * | 1/2003 | Landsman et al. ............ 705/14 |
| 2003/0028565 | A1 * | 2/2003 | Landsman et al. ............ 707/513 |
| 2003/0071792 | A1 * | 4/2003 | Safadi .......................... 345/169 |
| 2003/0112258 | A1 * | 6/2003 | Dietz et al. ................... 345/700 |
| 2003/0131251 | A1 | 7/2003 | Fetkovich |
| 2003/0142127 | A1 * | 7/2003 | Markel .......................... 345/738 |
| 2003/0182663 | A1 * | 9/2003 | Gudorf et al. ................ 725/110 |
| 2003/0193520 | A1 * | 10/2003 | Oetzel ........................... 345/723 |
| 2003/0208765 | A1 * | 11/2003 | Urdang et al. ................ 725/90 |
| 2004/0008972 | A1 * | 1/2004 | Haken ............................. 386/83 |

| 2004/0049743 | A1 * | 3/2004 | Bogward ....................... 715/531 |
| 2004/0056837 | A1 * | 3/2004 | Koga et al. .................... 345/156 |
| 2004/0088728 | A1 * | 5/2004 | Shimizu |
| 2004/0268224 | A1 * | 12/2004 | Balkus et al. ............... 715/500.1 |
| 2004/0268451 | A1 * | 12/2004 | Robbin et al. ....... 999/999,999 |
| 2005/0012723 | A1 * | 1/2005 | Pallakoff ...................... 345/173 |
| 2005/0034151 | A1 | 2/2005 | Abramson |
| 2005/0055716 | A1 * | 3/2005 | Louie et al. .................... 725/58 |
| 2005/0144305 | A1 * | 6/2005 | Fegan et al. .................. 709/231 |
| 2005/0149970 | A1 * | 7/2005 | Fairhurst et al. ............ 725/47 |
| 2005/0192096 | A1 * | 9/2005 | Maehiro ......................... 463/37 |
| 2006/0062544 | A1 | 3/2006 | Southwood et al. |
| 2006/0083194 | A1 | 4/2006 | Dhrimaj et al. |
| 2006/0098624 | A1 * | 5/2006 | Morgan et al. ............... 370/352 |
| 2006/0101098 | A1 * | 5/2006 | Morgan et al. ............... 707/204 |
| 2006/0200832 | A1 * | 9/2006 | Dutton .......................... 719/318 |
| 2006/0203758 | A1 | 9/2006 | Tee et al. |
| 2006/0263038 | A1 * | 11/2006 | Gilley ............................ 386/52 |
| 2006/0265657 | A1 * | 11/2006 | Gilley ............................ 715/730 |
| 2007/0050054 | A1 * | 3/2007 | Sambandam Guruparan |
| | | | et al. .............................. 700/65 |
| 2007/0052868 | A1 * | 3/2007 | Chou et al. .................... 348/734 |
| 2007/0055986 | A1 * | 3/2007 | Gilley et al. ................... 725/34 |
| 2007/0083540 | A1 * | 4/2007 | Gundla et al. ................ 707/101 |
| 2007/0089147 | A1 * | 4/2007 | Urdang et al. ................ 725/90 |
| 2007/0094408 | A1 * | 4/2007 | Gundla et al. ................ 709/231 |
| 2007/0112785 | A1 * | 5/2007 | Murphy et al. ................ 707/10 |
| 2007/0136778 | A1 * | 6/2007 | Birger et al. ................. 725/117 |
| 2007/0150963 | A1 * | 6/2007 | Lee et al. |
| 2007/0152978 | A1 * | 7/2007 | Kocienda et al. ............ 345/173 |
| 2007/0152980 | A1 * | 7/2007 | Kocienda et al. ............ 345/173 |
| 2007/0156855 | A1 * | 7/2007 | Johnson ......................... 709/219 |
| 2007/0157089 | A1 * | 7/2007 | Van Os et al. ............... 715/702 |
| 2007/0202923 | A1 | 8/2007 | Jung et al. |
| 2007/0288715 | A1 * | 12/2007 | Boswell et al. |
| 2008/0084394 | A1 * | 1/2008 | Liu et al. ...................... 386/46 |
| 2008/0280037 | A1 * | 1/2008 | Moyer et al. .................. 709/217 |
| 2008/0034394 | A1 * | 2/2008 | Jacobs et al. .................. 725/98 |
| 2008/0040758 | A1 * | 2/2008 | Beetcher et al. .............. 725/81 |
| 2008/0077526 | A1 | 3/2008 | Arumugam |
| 2008/0104267 | A1 * | 5/2008 | Dawson .......................... 709/231 |
| 2008/0126943 | A1 * | 5/2008 | Parasnis et al. ............. 715/730 |
| 2008/0140849 | A1 * | 6/2008 | Collazo ......................... 709/229 |
| 2008/0155600 | A1 | 6/2008 | Klappert et al. |
| 2008/0178198 | A1 * | 7/2008 | Gauba ............................ 719/320 |
| 2008/0187279 | A1 * | 8/2008 | Gilley et al. .................... 386/52 |
| 2008/0189617 | A1 * | 8/2008 | Covell et al. ................. 715/738 |
| 2008/0216001 | A1 * | 9/2008 | Ording et al. ................ 715/763 |
| 2008/0250190 | A1 * | 10/2008 | Johnson ......................... 711/103 |
| 2008/0267369 | A1 * | 10/2008 | Parlamas et al. ........ 379/93.01 |
| 2008/0270881 | A1 * | 10/2008 | Meyer et al. .................. 715/202 |
| 2008/0301737 | A1 * | 12/2008 | Hjelmeland Almas et al. 725/61 |
| 2008/0307315 | A1 * | 12/2008 | Sherman et al. .............. 715/744 |
| 2009/0049373 | A1 * | 2/2009 | Sharma et al. ................ 715/234 |
| 2009/0077467 | A1 * | 3/2009 | Adappa et al. ................ 715/719 |
| 2009/0094331 | A1 * | 4/2009 | Nobori et al. ................ 709/205 |
| 2009/0100477 | A1 | 4/2009 | Jeffs |
| 2009/0164641 | A1 * | 6/2009 | Rogers et al. ................ 709/227 |
| 2009/0177989 | A1 * | 7/2009 | Ma et al. ....................... 715/766 |
| 2009/0228919 | A1 | 9/2009 | Zott et al. |
| 2009/0254827 | A1 * | 10/2009 | Gonze et al. .................. 715/716 |
| 2009/0259944 | A1 * | 10/2009 | Wu ................................. 715/738 |
| 2009/0259969 | A1 * | 10/2009 | Pallakoff ...................... 715/808 |
| 2009/0282470 | A1 * | 11/2009 | Yang et al. ...................... 726/12 |
| 2010/0027974 | A1 | 2/2010 | Ansari |
| 2010/0081375 | A1 * | 4/2010 | Rosenblatt et al. ........ 455/41.1 |
| 2010/0094728 | A1 * | 4/2010 | Denning et al. ............... 705/27 |
| 2010/0094900 | A1 | 4/2010 | Hughes |
| 2010/0127847 | A1 * | 5/2010 | Evans et al. .................. 340/461 |
| 2010/0137028 | A1 | 6/2010 | Farris et al. |
| 2010/0138746 | A1 * | 6/2010 | Zarom .......................... 715/720 |
| 2010/0174993 | A1 * | 7/2010 | Pennington et al. ......... 715/738 |
| 2010/0180307 | A1 * | 7/2010 | Hayes et al. .................. 725/51 |
| 2010/0198860 | A1 * | 8/2010 | Burnett et al. ............... 707/769 |
| 2010/0205628 | A1 | 8/2010 | Davis et al. |
| 2010/0223649 | A1 * | 8/2010 | Castano ......................... 348/553 |
| 2010/0266939 | A1 * | 10/2010 | Parlamas et al. ............. 370/352 |
| 2010/0281042 | A1 * | 11/2010 | Windes et al. ................ 707/756 |
| 2010/0283586 | A1 * | 11/2010 | Ikeda et al. ............... 340/10.42 |

US 8,904,289 B2

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| 2010/0313135 | A1* | 12/2010 | Johnson et al. | ............... | 715/738 |
| 2010/0325552 | A1* | 12/2010 | Sloo et al. | ............... | 715/738 |
| 2011/0007901 | A1 | 1/2011 | Ikeda et al. | ............... | 380/270 |
| 2011/0014972 | A1 | 1/2011 | Herrmann et al. | ............... | 463/25 |
| 2011/0030020 | A1 | 2/2011 | Halttunen | | |
| 2011/0032870 | A1* | 2/2011 | Kumar | ............... | 370/328 |
| 2011/0035692 | A1* | 2/2011 | Sandone et al. | ............... | 715/769 |
| 2011/0060998 | A1* | 3/2011 | Schwartz et al. | ............... | 715/738 |
| 2011/0084900 | A1* | 4/2011 | Jacobsen et al. | ............... | 345/156 |
| 2011/0090898 | A1* | 4/2011 | Patel et al. | ............... | 370/352 |
| 2011/0107227 | A1* | 5/2011 | Rempell et al. | ............... | 715/738 |
| 2011/0125594 | A1* | 5/2011 | Brown et al. | ............... | 705/14.73 |
| 2011/0137729 | A1* | 6/2011 | Weisman et al. | ............... | 705/14.58 |
| 2011/0138354 | A1* | 6/2011 | Hertenstein et al. | ............... | 717/115 |
| 2011/0156879 | A1* | 6/2011 | Matsushita et al. | ............... | 340/10.1 |
| 2011/0161396 | A1* | 6/2011 | Filbrich et al. | ............... | 709/203 |
| 2011/0202466 | A1* | 8/2011 | Carter | ............... | 705/67 |
| 2011/0214148 | A1* | 9/2011 | Gossweiler et al. | ............... | 725/46 |
| 2011/0228768 | A1* | 9/2011 | Gelter et al. | ............... | 370/389 |
| 2011/0231265 | A1* | 9/2011 | Brown et al. | ............... | 705/14.73 |
| 2011/0231565 | A1* | 9/2011 | Gelter et al. | ............... | 709/231 |
| 2011/0231566 | A1* | 9/2011 | Gelter et al. | ............... | 709/231 |
| 2011/0239119 | A1* | 9/2011 | Phillips et al. | ............... | 715/731 |
| 2011/0267981 | A1* | 11/2011 | Davies | ............... | 370/255 |
| 2011/0289419 | A1* | 11/2011 | Yu et al. | ............... | 715/738 |
| 2011/0296454 | A1* | 12/2011 | Xiong et al. | ............... | 725/30 |
| 2011/0296465 | A1 | 12/2011 | Krishnan et al. | | |
| 2011/0314386 | A1* | 12/2011 | Jeong et al. | ............... | 715/741 |
| 2012/0072846 | A1* | 3/2012 | Curtis | ............... | 715/738 |
| 2012/0110074 | A1* | 5/2012 | Getchius | ............... | 709/204 |
| 2012/0110464 | A1* | 5/2012 | Chen et al. | ............... | 715/738 |
| 2012/0166560 | A1* | 6/2012 | Nobori et al. | ............... | 709/206 |
| 2012/0182994 | A1* | 7/2012 | Dec et al. | ............... | 370/392 |
| 2012/0185887 | A1* | 7/2012 | Newell | ............... | 725/12 |
| 2012/0239218 | A1* | 9/2012 | Forbes, Jr. | ............... | 700/295 |
| 2012/0254931 | A1* | 10/2012 | Oztaskent et al. | ............... | 725/112 |
| 2012/0272148 | A1 | 10/2012 | Strober | | |
| 2013/0014142 | A1* | 1/2013 | Newell | ............... | 725/12 |
| 2013/0124759 | A1 | 5/2013 | Strober | | |
| 2013/0250181 | A1* | 9/2013 | Zhang et al. | ............... | 348/734 |
| 2014/0033198 | A1* | 1/2014 | Umapathy et al. | ............... | 717/176 |

FOREIGN PATENT DOCUMENTS

| CN | 101778198 | 7/2010 |
| CN | 101815073 | 8/2010 |
| WO | 2008/070050 | 6/2008 |

OTHER PUBLICATIONS

Bing search q=phone+server+television+control&qs Jun. 26, 2014.*
Bing search q=phone+server+television+control+me Jun. 26, 2014.*
Bing search q=mobile+server+television+control+m Jun. 26, 2014.*

Ask Search Internet Search, session identifier random, printed on Nov. 19, 2011.
Webopedia computer dictionary, session cookie, printed on Nov. 19, 2011.
Webopedia computer dictionary, web identifier, printed on Nov. 19, 2011.
Webopedia computer dictionary, user session, printed on Nov. 19, 2011.
www.vbulletin.com, Best way to generate Random, Unique ID's, printed on Nov. 19, 2011.
www.vbulletin.com, Best way to generate Random, Unique ID's, Internet Archive Wayback Machine, Jan. 16, 2009.
Official communication from the USPTO in U.S. Appl. No. 13/245,001, dated Dec. 8, 2011.
U.S. Appl. No. 13/245,001, filed Sep. 26, 2011.
Hachman, M., "Snapstick's Media Streaming App/Box: Hands on," www.pcmag.com/article2/0,2817,2375455.00.asp, 2 pages, (Jan. 8, 2011).
Dolcourt, J., CES: Snapstick takes on Apple TV, Google TV, http://news.cnet.com/8301-17938__105-20025100-1.html, 3 pages, (Dec. 9, 2010).
Shaivitz, M., "The Web to Your TV, With a Flick of a Wrist? Slapstick Says Yes," http://techcocktail.com/the-web-to-our-tv-with-a-flick-of-a-wrist-slapstick-says-yes-2010-12, 2 pages, (Dec. 10, 2010).
Snapstick—Home, "Snapstick," http://www.snapstick.com/, 2 pages, printed on Mar. 2, 2011.
Paul, I., Hands on: YouTube Leanback, PCWORLD, http://www.pcworld.com/article/200769/hands__on__youtube__leanback.html, 3 pages, (Jul. 9, 2010).
Using AirPlay, Article HT4437, http://support.apple.com/kb/HT4437, 3 pages, (Apr. 18, 2011).
Cheng, J., "Stream AirPlay video to regular TV? Apple might make it happen," http://arstechnica.com/apple/news/2011/03/stream-air-play-video-to-a-regular-tv-apple-migh . . . , 1 page, printed on Jun. 7, 2011.
"Using the Play to feature to stream media," http://windows.microsoft.com/en-US/windows7/using-the-play-to-feature-to-stream-media, 3 pages, printed on Jun. 7, 2011.
"YouTube—Leanback," http://www.youtube.com/t/leanback, 1 page, printed on Jun. 7, 2011.
"Yahoo!7 TV Guide for iPhone, iPod touch and iPad on the iTunes App Store," http://itunes.apple.com/au/app/yahoo-7-tv-guide/id42471992?mt=8, 2 pages, printed on Jun. 7, 2011.
Hu, C., et al., "Mobile Media Content Sharing in UPnP-Based Home Network Environment," Journal of Information Science and Engineering 24, 1753-1769. (2008).
Fallahkhair, S., et al., "Dual Device User interface Design for Ubiquitous Language Learning: Mobile Phone and Interactive Television (iTV)," Proceedings of the 2005 IEEE Int'l Workshop on Wireless an Mobile Technologies in Education, 8 pages, 2005.
US Patent and Trademark Office, Official communication in U.S. Appl. No. 13/736,590 (dated Oct. 25, 2013).

* cited by examiner



FIG. 1

Case: 24-1207     Document: 18     Page: 231     Filed: 04/11/2024



FIG. 2

Appx148

| Transmission Code | | | | |
|---|---|---|---|---|
| UserID | TargetID | MediaPlayerID | Command | Data |

FIG. 3

| Single Connection Look-up Table | |
|---|---|
| Display Device | User - Smartphone |
| 2 | A |
| 1 | C |
| 3 | D |
| 4 | B |

FIG. 4

26

| Universal API Adapter | | |
|---|---|---|
| Universal Command | MediaPlayerID | Specific Player Command |
| New Video | YouTube | yt_loadVideo |
| | Ted.com | getVideo |
| | Vimeo | loadNewVideo |
| Pause | YouTube | yt_pauseVideo |
| | Ted.com | pauseVideo |
| | Vimeo | pause |

FIG. 5



FIG. 6



FIG. 7A

| Sync-code Look-up Table | | |
|---|---|---|
| IP Address | Cookie | Sync-code |
| 169.343.231.234 | erjg988dhuj | 435-05-342 |

FIG. 7B



FIG. 8

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14C

FIG. 14B

FIG. 14A

Case: 24-1207    Document: 18    Page: 238    Filed: 04/11/2024



**Group Connection Look-up Table**

| Display Device | Group | User – Smartphone |
|---|---|---|
| 2 | X | A",C*,D |
| 1,3 | Y | B"*,E |

" = Group Moderator, 
* = Control of Display Device

FIG. 15

FIG. 14E

FIG. 14D

Appx155

US 8,904,289 B2

<div style="display:flex; justify-content:space-between;"><span>1</span><span>2</span></div>

# PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION(S)

This application claims the benefit of priority of U.S. Provisional Patent Application No. 61/477,998, filed on Apr. 21, 2011.

## BACKGROUND

This disclosure relates to play control of content on a display device. Such display devices include, for example, television displays used by consumers in their home for viewing videos and other media that are either provided from the Web or previously stored. In particular, the disclosure relates to the creation, storage, manipulation and access of media playlists used in conjunction with display devices and control of the display devices.

Web media often is played on computers rather than television displays. Although it is known to connect a computer to a television set in order to watch Web media, it is difficult to control such a system within the typical scenario for television watching where the viewer is positioned some distance from the television. Furthermore, although a wireless device can enable the user to control the television from a distance, it can be difficult to view a web browser display on the television set and may interfere with normal television program viewing by other persons.

Given the desire to watch various World Wide Web media on a family's primary television set, and to control this operation from the comfort of one's couch, there is a need to operate a television set or other display remotely from a personal computing device, such as a mobile phone. It also is desirable to allow a user to perform a general Web search to locate and capture Web media, and to control a television or other display remotely using the personal computing device.

## SUMMARY

Various aspects of the invention are set forth in the claims.

For example, according to one aspect, a system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

In some implementations, the display device is operable, in response to receiving the second message, to obtain the first media player from the content provider only if the first media player is not already loaded in the display device.

In some implementations, the personal computing device is operable to transmit a message according to a specified format over the network to the server system. The message can include a command for controlling playing of the content on the display device. The server system is operable, in response to receiving the message, to convert the command into a corresponding command recognizable by the media player if the command received from the personal computing device is not recognizable by the media player. The server system is operable to provide to the display device a message that includes the corresponding command, and the display device is operable, in response to receiving the message from the server system, to execute the command.

In some implementations, the personal computing device is, for example, a mobile phone, and the display device is a television set. Other personal computing devices or display devices can be used in other implementations. The network can include, for example, the Internet.

In some implementations, the server system stores a look-up table that includes a synchronization code uniquely associated with the display device. A message from the personal computing device can include the synchronization code, and in response to receiving the message from personal computing device, the server system can use the synchronization code and the look-up table to identify the display device on which the content is to be played. The synchronization code can be different from an IP address associated with the display device and/or a media access control address associated with the display device.

In various implementations, the system can facilitate allowing a personal computing device to be used to select different content to be played on a remote display even if different media players are required to present the different content. The system also can allow the user to control how the content is displayed on the display device using the personal computing device. For example, user-initiated play commands can be passed from the user's personal computing device, through the server system, to the display device.

Other aspects, features and advantages will be apparent from the following detailed description, the accompanying drawings, and the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating an example of a system according to the invention.

FIG. **2** illustrates various details of the flow of information and signals according to some implementations.

FIG. **3** illustrates an example of a transmission code incorporated into a message from a personal computing device.

FIG. **4** illustrates an example of a look-up table that forms part of a server system.

FIG. **5** illustrates an example of entries in a universal API adapter.

FIG. **6** is a flow chart showing steps for display device to load a video player and video.

FIG. **7**A illustrates an example of a display device including a synchronization code.

FIG. **7**B illustrates an example of a synchronization code look-up table.

FIGS. **8-13** illustrate examples of various scenarios in which the invention can be used.

FIGS. **14**A through **14**E illustrate examples of display screens that may appear on a user's personal computing device in accordance with the invention.

FIG. **15** illustrates further information that can be stored in the look-up table in the server system.

## DETAILED DESCRIPTION

As shown in FIG. **1**, a system **10** facilitates synchronizing a connection between two or more devices **20, 22** connected

US 8,904,289 B2

3

to the Internet **21** or other computer network. The connection is designed to be made by a first device (e.g., a personal computing device) **20** that acts as a controller and a second device (e.g., a television set **22** with a display **23**) that acts as a receiver to play content selected by a user of the first device and to respond to commands that originate at the personal computing device. The personal computing device **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The television set **22** is operable to link back to a server system **24** from which the television set receives commands. When a user makes a selection using the personal computing device **20** for particular content to be displayed on the television display **23**, a signal is sent through the Internet (or other network) **21** to the server system **24**. A corresponding command signal then is passed along to the connected television set **22**, which acts on a transmission code contained within the signal and performs specified commands. For example, in some scenarios, the command instructs the television set **22** to access a content provider **30** through the Internet **21**, load a specific media player, load the media player-specific content (e.g., a video) and play the content on the television display **23**. The user can use the personal computing device **20** to control how the content is played on the television display **23**. The user may subsequently visit the same or another Web site using the personal computing device **20** to select different content (e.g., a second video) to be played on the television display **23**. In that case, another signal would be sent through the server system **24** to the television set **22**. A transmission code associated with this command signal instructs the television set **22** to load a new media player (if needed) over the Internet and to load the specified video file to be played on the display **23**. Thus, the system **10** allows a personal computing device **20** to be used to select different content to be played on a remote display **23** even if different media players are required for the different content. The user also can control how the content is displayed (e.g., play, pause, stop, rewind, fast forward, etc.) on the display **23** using the personal computing device **20**. The user-initiated play commands are passed from the user's personal computing device **20**, through the server system **24**, to the television set **22**.

Although the following detailed discussion describes videos as an example of the type of content to be played on the display **23**, the system **10** can be used for other types of content as well. Thus, depending on the implementation, the content may include one or more of the following: video, audio, interactive video game, streaming media, multimedia, images, slides (e.g., a PowerPoint presentation) or other types of dynamic content. Furthermore, in the following discussion, it is assumed that the personal computing device **20** is a mobile phone that includes a display, an internal microprocessor or other processing circuitry, a keypad, keyboard, touchscreen, mouse, trackball, or other device to receive user selections and other input, and a transceiver to establish communications to the Internet **21** or other communications networks. More generally, however, the personal computing device **20** can be any type of handheld or other Internet-enabled personal computing device, including personal computers, e-books, kiosks, tablets, smart phones, media players, and motion and touch sensory interfaces. In some cases, input from the user can be received in forms other than tactile input (e.g., acoustic or speech).

FIG. **2** illustrates further details of the flow of information and signals according to some implementations. The personal computing device (e.g., mobile phone) **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The user

4

operates the mobile phone **20** so as to start the application or access the web site (block **100**). In some implementations, a logo appears on the mobile phone's display. By selecting the logo, the user causes a menu to expand and present various options. The options can include, for example: (i) add new content to a playlist, (ii) play a listed item on a secondary device, (iii) play a listed item on the mobile phone **20**. If the user selects to add new content to the playlist, the user is presented with a screen that allows him to enter user-defined search parameters or o select predefined search parameters to request video data. The search parameters are sent from the mobile phone **20** as part of a request for video data that satisfy the search parameters (block **102**). The request is transmitted via the Internet **21** and through the server system **24** to the appropriate content provider web site. In response, the content provider **30** provides metadata (e.g., titles, links to the videos) for one or more video files that satisfy the search parameters (block **104**). The metadata can be provided to the mobile phone **20**, for example, in the form of an XML data file. Upon receiving the data file, the mobile phone **20** displays a list of one or more videos based on the information received from the content provider **30** (block **106**).

If desired, the user can take one of several actions, including selecting one of the videos from the displayed list to be played on the television display **23** or initiating a command with respect to a video that already has been loaded to the television set **22** (block **108**). The mobile phone **20** then formats and transmits a message to the server system **24** (block **110**). The message from the mobile phone **20** contains a transmission code that includes data regarding the user information (e.g., user identification or account number), the secondary display it wants to connect to (e.g., television set **22** with display **23**), the location and name of the media player for the selected video, the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon. An example of the format of a transmission code from the mobile phone **20** to the server system **24** is illustrated in FIG. **3**. Different formats and/or different information may be appropriate for other implementations.

The message from the mobile phone **20** is transmitted over the Internet **21** and is received by the server system **24** (block **112**). Based on information in the message from the mobile phone **20**, the server system **24** verifies that the user has an account (block **114**), and the contents of the message, as well as the date and time of receipt of the message, are added to a personal computing device database **32** (block **116**) which forms part of a switchboard **28**. In general, all messages from a particular user's personal computing device **20** are stored in the database **32** corresponding to an account for the particular user. Thus, the database **32** stores a record of all messages received from a user's personal computing device **20**, as well as the user's identification, an indication of the target device **22**, an identification of the media player that is required for the selected video, and an identification of the selected video.

The switchboard **28** also includes a look-up table **34** that stores a correspondence between a particular personal computing device (such as mobile phone **20**) and target devices (e.g., the television set **22**) to which the user command is directed. An example of the look-up table **28** is illustrated in FIG. **4**. In this example, it is assumed that, at most, a single connection is established at any given time between a particular mobile phone and a display device. However, as explained below, other scenarios are also possible to establish group connections (e.g., multiple mobile phones connected to the same display device). The server system **24** performs a target verification (block **118**), which includes checking whether a connection to a particular display device already is estab-

US 8,904,289 B2

5

lished for the mobile phone **20** and, if so, checking the identification of the display device. During the target verification, if the look-up table indicates that there is no connection established between the mobile phone **20** and a particular display device, then the server system **24** sends a message to the mobile phone **20** to prompt the user to identify the device on which the video is to be displayed.

A user can identify the device on which the video is to be displayed in one of several ways, depending on the implementation. In some implementations, the user can select the display device from a list of devices displayed on the mobile phone **20**. The list can include a field populated with names or identifications of display devices that previously have been initialized for connection. Alternatively, the user can select the display device by entering a synchronization code uniquely associated with the particular display device. As illustrated in FIG. **7A**, the synchronization code **48** can be displayed, for example, on a splash page of the display device as text on the screen or as an image such as a QR code and can be entered into the mobile phone **20**, for example, manually by the user or by scanning the code into the mobile phone. The code can be scanned, for example, using optical scanning or RFID techniques. Preferably, the synchronization code is different from the IP address associated with the device **22**. The IP address also can be different from the media access control (MAC) address associated with the device **22**. For example, in some implementations, the synchronization code is generated randomly and assigned to the display device **22** each time it connects to the server system **24**. Thus, a particular display device **22** may have an IP address, a MAC address, a web or browser cookie, and a synchronization code ("sync code") assigned to it at any given time. This information can be stored, for example, in a look-up table in the server system **24**. An example of entries in such a look-up table are illustrated in FIG. **7B**.

Once the synchronization code is entered into, or captured by, the mobile phone **20**, it is sent from the mobile phone **20** to the server system **24**, which stores the information in the look-up table **36** so as to establish a connection between the mobile phone **20** and the display device **22** through the server system **24**.

Once a connection is established between the mobile phone **20** and the display device **22**, signals sent from the mobile device **20** to its associated database **32** are copied to a database **34** associated with the target device (e.g., television set **24**) based on the correspondence between the mobile device and the target device listed in the look-up table **36** (block **122**). Thus, the database **32** entries associated with a particular display device (e.g., television set **24**) provide a record of the messages received for that display device, as well as an indication of the identification of the device that sent each message, an indication of the media player required to play the video, and an indication of the selected video.

In the illustrated implementation, the command in the transmission code (see FIG. **3**) contains a JavaScript reference to control the media player needed to play the selected video. Various types of video players may use different JavaScript commands to control their respective playback. Therefore, in the illustrated implementation, a universal adapter **26** is provided to interpret and convert a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player. Each time a signal is received from the mobile device **20**, the API adapter **26** checks and identifies the specific media player that is being requested. Based on this information, the system loads the appropriate set of protocols or application programming interfaces (APIs) from its library and converts the incoming commands from

6

the mobile device **20** into the correct JavaScript (or other programming) code used by the target device **22** to control the specific player (block **120**). The server system **24** then copies the converted version of the message to the database **34** associated with the target device **22**, as indicated above in connection with block **122**.

The universal adapter **26** can be implemented, for example, as a look-up table. Examples of entries in such a look-up table are illustrated in FIG. **5**. Thus, for a universal command "New Video," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "yt_loadVideo" for YouTube). Similarly, for a universal command "Pause," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "pauseVideo" for Ted.com). Other universal commands and the corresponding command(s) for one or more media players also can be stored by the universal adapter **26**.

The display device **22** periodically checks the entries in the database **34** to determine if there are any new messages/ commands directed to it (block **124**). For example, in some implementations, the display device **22** polls the associated database **34** at some predetermined time interval. In some implementations, instead of the display device **22** periodically checking whether there are any messages for it in the database **34**, the server system **24** can push the messages to the display device **22**. In any event, the system is arranged so that the display device **22** receives the messages intended for it.

When the display device **22** receives a message from the server system **24** (block **126**), the display device executes the message (block **128**). In some cases, the media player required to play the video indicated in the message is not presently loaded in the display device **22**. For example, the received command may be to "play" a particular video. As indicated by FIG. **6**, if the media player needed to play the video is not already loaded in the display device **22**, the display device **22** requests and obtains a copy of the appropriate media player **40** and a copy of the video file **42** from a content provider **30**, loads the media player and then presents the video on the display **23** (FIG. **2**, block **130**). Likewise, as indicated by FIG. **6**, if the appropriate media player already is loaded in the display device, but the particular video is not, then the display device **22** requests and obtains a copy of the video file **42** from the content provider **30** and proceeds to play the video. To allow the display device **22** to switch between different video players (i.e., to load and unload different video players), a software program can be stored on the display device and/or the web site to establish a secure connection back to the server system **24**.

Once the video is playing on the display device **22**, the user of the mobile phone **20** can control the playing of the video by entering appropriate commands (e.g., pause, fast forward, rewind, stop, play, etc.) through the mobile phone. Each command is incorporated into a message including a transmission code (FIG. **3**) as described above. The message is transmitted to the server system **24**, which copies the message into database entries associated with the particular display device **22** (i.e., after performing any conversion of the command by the API adapter **26**). Once the message is retrieved by or sent to the display device **22**, the display device proceeds to execute the command.

The system and methods described here allow a user of a mobile phone or other personal computing device to create a playlist based on videos (or other types of content) from multiple sources and to play back each video using a single interface that can be used to control different media players.

US 8,904,289 B2

7

As mentioned above, the system and methods described above also can be used with types of content other than video. In that case, different types of user-initiated commands may be available to control the content displayed on the display 23. For example, for interactive video games, the user-initiated commands can include control commands appropriate for the particular game.

Although the implementation of FIG. 1 illustrates the display device 22 as a television set with a display screen 23, other types of display devices can be used as well (e.g., a laptop or personal computer).

The systems and methods can be used in various scenarios to play back videos (or other content). Examples of several scenarios that can be implemented using the system described above are described in the following paragraphs. For example, a first scenario involves a single user's smartphone connecting to a single display device (FIG. 8). In this scenario, the user turns on, for example, her display device (e.g., personal computer with a display monitor), opens up a browser and accesses a website associated with the server system 24. The user then clicks on a link that launches the software program to establish a secure connection back to the server system 24. The software program opens a splash page (see FIG. 14A), and a sync-code is displayed on the monitor. The user then opens the appropriate application on her smartphone. In the smartphone application, the user accesses a "Connect" screen from which he can select one of several listed display devices (see FIG. 14B). Alternatively, the user can enter the sync-code displayed on the computer monitor (see FIG. 14B). The user then clicks on a SEND button which causes a message including the sync-code to be sent the server system 24. In response, the server system 24 establishes a connection between the user's smartphone and the selected display device through a look-up table as described above with respect to FIG. 4. The user can use a search tool in the smartphone application to find a video. In response to the search, a list of videos satisfying the search appears on the smartphone (see FIG. 14C). When the user selects a video from the list displayed on the smartphone, the information is provided through the server system 24 to the personal computer. In some implementations, a pop-up window may appear on the smartphone listing one or more options for the user to take regarding the selected video. Such options can include, for example, play the video on the selected display device (e.g., the personal computer), play the video on the smartphone, or add the video to the playlist on the smartphone. If the user chooses to have the video played on the display device (e.g., the personal computer), the personal computer obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video on the monitor as described previously. In some implementations, a message is displayed on the user's smartphone indicating that the selected video is playing and providing additional information about the selected video (see FIG. 14D). The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from her smartphone.

A second scenario involves saving a selected video to a playlist on a single user's smartphone, and subsequently playing the video on a display device (FIG. 9). In this scenario, the user opens the appropriate application on his smartphone and searches for videos using the search tool displayed in the application. When a list of videos is displayed on the smartphone in response to the search request, the user selects one or more videos to add to his playlist. At that time, or at a later time, the user can connect to a display device through the server system 24. To do so, the user opens the playlist on his

8

smartphone and selects a video. The information is provided through the server system 24 to the display device, which obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video. The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from his smartphone.

A third scenario involves multiple users' smartphones and a single display device (FIG. 10). For example, a user may want to share and watch videos with a group of friends watching together on a single display device. In this situation, the user can access the application or web site to set up a group and serve as the moderator for the group. The user then can send out a request to other members of the group, or other users can send a request to the moderator to join the group. Users can search for other users based, for example, on username or from a contact list. The moderator then can select a user in the group to control the display device. FIG. 14E illustrates an example of a screen on the user's smartphone that allows the user to connect with other users to form a group and to select which member of the group controls the display device (e.g., by selecting a member of the group from the list "Me, Guest 1, Guest 2, . . ." near the top of the screen). Alternatively, the moderator can set it up so that control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. Regardless of who has control of the display device 22, each user in the group retains control of his own smartphone. The look-up table 36 in the server system 24 stores the connections established between the personal computing devices of the users in the group and the display device (see FIG. 15).

A fourth scenario involves one user's smartphone and multiple display devices (FIG. 11). In this example, a user opens the application on his smartphone to establish a connection to a first display device and then repeats the process for multiple display devices. A list of devices that the user's smartphone is connected to is displayed on the smartphone. The user can choose to control all devices simultaneously or one at a time. To do so, the user selects from the list the display device(s) he wants to control. The user then can search for videos using his smartphone. In response to the user selecting a particular video, the selected video is played on the selected display device(s).

A fifth scenario involves multiple users' smartphones and multiple connected display devices (FIG. 12). For example, a user may want to share and watch videos with a group of friends, who may be in different locations each of which has a separate display device. Each user establishes a connection from her smartphone to the display device where she is located. One of the users uses the application or web site to establish a group, with the user who establishes the group serving as the group moderator. The user can send out a request to other users to join the group or other users can send a request to the moderator to join the group. In some implementations, users can search for other users based on username or from a contact list. The moderator chooses which member of the group has control of the display device. Alternatively, the moderator can set it up so control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. The signal sent from the smartphone of the group member who has control is sent (via the server system 24) to all display devices within the group. Regardless of which group member has control of the display devices, each user retains control of her own smartphone. The look-up table 36 in the server system 24 stores the connections estab-

US 8,904,289 B2

9

lished between the personal computing devices of the users in the group and the display devices (see FIG. **15**).

A sixth scenario involves sharing video links and a playlist (FIG. **13**). For example, a user within a group can share a video playlist and video links via an Instant messaging system built-in to the application. Users also can post video links or a video playlist to third-party web sites (e.g., social networking sites). Other users can view the video link and playlist within the application. When a video from the list is selected, it plays on the selected device.

The system and methods can be used by a wide variety of users in addition to individual viewers. For example, companies that provide on-line video platforms that host videos for other individuals or companies can obtain useful advantages by integrating the platforms with the server system **24**. Programming hooks can be created in the API so that the on-line video platform's media player can communicate with the server system **24**. When media player commands for an online video platform are added to the system **24**, the media player's API is placed in an API library and is stored in the API adapter **26**. The on-line video platform can then offer customers the ability to add videos to their own mobile web sites that are enabled to operate with the server system **24**.

The system and methods also can be used by content providers. For example, the content provider may want to deliver its media on-line. The content provider can use an on-line video platform that is enabled to operate with the server system **24**. In some implementations, the content provider is allowed to add links to videos for that web site (i.e., mobile site or an application). The link facilitates synchronization to the secondary device **22** (e.g., a television set) and allows the end-user to load and control the video on the secondary device.

As used in this disclosure, terms such as "first," "second," etc. with respect to the messages are used simply as labels to distinguish the various messages from one another. Such terms do not imply that there cannot be any other messages prior to the first message or that there cannot be other messages between the first and second messages.

Implementations of the subject matter and the operations described in this specification can include digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can include one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially-generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or can be included in, a computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially-generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can include operations performed by a data processing apparatus on data

10

stored on one or more computer-readable storage devices or received from other sources. The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub-programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. Elements of a computer include a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data.

Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto-optical disks, or optical disks. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile, audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non-volatile memory, media and memory devices, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

Although this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation. Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the

US 8,904,289 B2

11

combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described herein and the attachments hereto should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, although particular implementations have been described, other implementations are within the scope of the claims.

What is claimed is:

1. A method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file wherein the media player is a computer application operable to present content and control presentation of the content, (iv) identify a location of the particular media player, and (v) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device; and

identifying, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player,

wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file.

2. The method of claim 1 further including loading the particular media player in the content presentation device prior to executing the programming code with respect to the file.

3. The method of claim 1 wherein the unique identification code represents a QR code obtained by the personal computing device.

4. The method of claim 1 wherein identifying programming code corresponding to the action control command includes accessing a look-up table.

5. The method of claim 4 wherein the look-up table stores a plurality of specific commands, each of which represents, respectively, a command for a different media player and each of which corresponds to the action control command.

12

6. A method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players, the method comprising:

receiving, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content, and (iv) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player;

using the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device;

loading, by the server system, a set of protocols or application programming interfaces from a library based on the identity of the particular media player; and

identifying, based on the set of protocols or application programming interfaces, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player;

wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file.

7. The method of claim 6 wherein collectively the one or more messages further include information indicating a location of the particular media player.

8. The method of claim 6 further including loading the particular media player in the content presentation device prior to executing the programming code with respect to the file.

9. The method of claim 6 wherein the unique identification code represents a QR code obtained by the personal computing device.

10. A system for controlling playing of content on a content presentation device that loads any one of a plurality of different media players, the system comprising:

a server system including at least one processor;

a database storing a relationship between a personal computing device and the content presentation device based on an identification code assigned by the server system to the content presentation device and received by the server system in a message generated by the personal computing device, wherein the personal computing device is separate from the server system and separate from the display device; and

wherein the server system is configured to receive one or more messages generated by the personal computing device, the one or more messages, taken together, (i) specify a file to be acted upon, (ii) identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content, (iii) identify a location of the particular media player, and (iv) include an action control command for control-

US 8,904,289 B2

13

ling playing of the content on the content presentation device by the particular media player; and

one or more computer-readable media storing instructions that when executed by the server system, cause the server system to identify programming code corresponding to the action control command, wherein the programming code is for controlling presentation by the particular media player of the content by the content presentation device;

the server system being further configured to store information for transmission to or retrieval by the content presentation device, wherein the information specifies the file to be acted upon, identifies the particular media player for playing the content, and includes the corresponding programming code to control playing of the content on the content presentation device by the particular media player in accordance with the action control command,

wherein, based on information received or retrieved from the server system, the content presentation device is operable to use the particular media player to execute the programming code with respect to the file.

**11.** The system of claim **10** wherein the content presentation device is operable to load the particular media player in the content presentation device if the particular media player is not already loaded in the content presentation device.

**12.** The system of claim **10** wherein the content presentation device is operable to load the particular media player prior to executing the programming code with respect to the file.

**13.** The system of claim **10** wherein the unique identification code represents a QR code obtained by the personal computing device.

**14.** The system of claim **10** wherein the server system includes a look-up table that is accessed to identify the programming code corresponding to the action control command.

**15.** The system of claim **14** wherein the look-up table stores a plurality of specific commands, each of which represents, respectively, a command for a different media player and each of which corresponds to the action control command.

**16.** A system for controlling playing of content on a content presentation device that loads any one of a plurality of different media players, wherein each media player is a computer application operable to present content and to control the presentation of content, the system comprising:

a server system including at least one processor;

14

a database storing a relationship between a personal computing device and the content presentation device based on an identification code assigned by the server system to the content presentation device and received by the server system in a message generated by the personal computing device, wherein the personal computing device is separate from the server system and separate from the display device; and

wherein the server system is configured to receive one or more messages generated by the personal computing device, the one or more messages, taken together, (i) specify a file to be acted upon, (ii) identify a particular media player for playing content from the file wherein the media player is a computer application operable to present content and control presentation of the content, and (iii) include an action control command for controlling playing of the content on the content presentation device by the particular media player; and

one or more computer-readable media storing instructions that when executed by the server system, cause the server system to load a set of protocols or application programming interfaces from a library based on the identity of the particular media player, and identify, based on the set of protocols or application programming interfaces, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player,

the server system being further configured to store information for transmission to or retrieval by the content presentation device, wherein the information specifies the file to be acted upon, identifies the particular media player for playing the content, and includes the corresponding programming code to control playing of the content on the content presentation device by the particular media player in accordance with the action control command,

wherein, based on information received or retrieved from the server system, the content presentation device is operable to use the particular media player to execute the programming code with respect to the file.

**17.** The system of claim **16** wherein collectively the one or more messages further include information indicating a location of the particular media player.

**18.** The system of claim **16** wherein the unique identification code represents a QR code.

* * * * *



US008356251B2

(12) **United States Patent**
    Strober

(10) **Patent No.:**    **US 8,356,251 B2**
(45) **Date of Patent:**    **Jan. 15, 2013**

(54) **PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE**

(75) Inventor:    **David Strober**, Rye, NY (US)

(73) Assignee:    **Touchstream Technologies, Inc.,** Valhalla, NY (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 4 days.

(21) Appl. No.: **13/245,001**

(22) Filed:    **Sep. 26, 2011**

(65)    **Prior Publication Data**

    US 2012/0272148 A1    Oct. 25, 2012

    **Related U.S. Application Data**

(63) Continuation of application No. 13/157,821, filed on Jun. 10, 2011.

(60) Provisional application No. 61/477,998, filed on Apr. 21, 2011.

(51) **Int. Cl.**
    *G06F 3/00*    (2006.01)
(52) **U.S. Cl.** ........ **715/740**; 715/716; 715/734; 715/738; 715/751; 715/764; 715/835
(58) **Field of Classification Search** .................. 715/716, 715/738, 734, 740, 751, 764, 835
    See application file for complete search history.

(56)    **References Cited**

    U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,058,356 B2 | 6/2006 | Slotznick | |
| 7,330,875 B1 * | 2/2008 | Parasnis et al. | 709/204 |
| 7,424,718 B2 * | 9/2008 | Dutton | 719/318 |
| 7,433,922 B2 * | 10/2008 | Engstrom | 709/205 |

| | | | |
|---|---|---|---|
| 7,440,972 B2 * | 10/2008 | Oetzel | 386/252 |
| 7,453,454 B2 * | 11/2008 | Allen et al. | 345/418 |
| 7,769,827 B2 * | 8/2010 | Girouard et al. | 709/219 |
| 7,774,708 B2 * | 8/2010 | Bell et al. | 715/738 |
| 7,814,144 B2 * | 10/2010 | Koyama et al. | 709/203 |
| 7,835,505 B2 | 11/2010 | Toyama et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

CN    101534449    9/2009

(Continued)

OTHER PUBLICATIONS

Ask Search Internet Search, session identifier random.*

(Continued)

*Primary Examiner* — Boris Pesin
*Assistant Examiner* — John Heffington
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57)    **ABSTRACT**

A system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

**26 Claims, 9 Drawing Sheets**



**GOOGLE EXHIBIT 1001**

US 8,356,251 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,849,485 | B2 | 12/2010 | Paik et al. |
| 8,086,679 | B2* | 12/2011 | Nobori et al. ................. 709/206 |
| 8,171,507 | B2* | 5/2012 | Hironaka et al. .............. 725/12 |
| 2002/0075332 | A1* | 6/2002 | Geilfuss et al. ............... 345/859 |
| 2002/0120666 | A1* | 8/2002 | Landsman et al. ........... 709/200 |
| 2002/0129102 | A1* | 9/2002 | Landsman et al. ........... 709/203 |
| 2002/0133518 | A1* | 9/2002 | Landsman et al. ........... 707/513 |
| 2002/0198778 | A1* | 12/2002 | Landsman et al. ............ 705/14 |
| 2003/0004804 | A1* | 1/2003 | Landsman et al. ............ 705/14 |
| 2003/0005000 | A1* | 1/2003 | Landsman et al. ........... 707/513 |
| 2003/0018885 | A1* | 1/2003 | Landsman et al. ............ 713/2 |
| 2003/0023488 | A1* | 1/2003 | Landsman et al. ............ 705/14 |
| 2003/0028565 | A1* | 2/2003 | Landsman et al. ........... 707/513 |
| 2003/0142127 | A1* | 7/2003 | Markel ........................ 345/738 |
| 2003/0182663 | A1* | 9/2003 | Gudorf et al. ................ 725/110 |
| 2003/0193520 | A1* | 10/2003 | Oetzel ......................... 345/723 |
| 2004/0008972 | A1* | 1/2004 | Haken ........................... 386/83 |
| 2004/0088728 | A1* | 5/2004 | Shimizu ....................... 725/89 |
| 2004/0268224 | A1* | 12/2004 | Balkus et al. ............. 715/500.1 |
| 2004/0268451 | A1* | 12/2004 | Robbin et al. ....... 999/999.999 |
| 2005/0034151 | A1 | 2/2005 | Abramson |
| 2005/0144305 | A1* | 6/2005 | Fegan et al. ................. 709/231 |
| 2006/0083194 | A1 | 4/2006 | Dhrimaj et al. |
| 2006/0098624 | A1* | 5/2006 | Morgan et al. ............... 370/352 |
| 2006/0101098 | A1* | 5/2006 | Morgan et al. ............... 707/204 |
| 2006/0200832 | A1* | 9/2006 | Dutton ......................... 719/318 |
| 2006/0203758 | A1 | 9/2006 | Tee et al. |
| 2006/0263038 | A1* | 11/2006 | Gilley ............................ 386/52 |
| 2006/0265657 | A1* | 11/2006 | Gilley .......................... 715/730 |
| 2007/0050054 | A1* | 3/2007 | Sambandam Guruparan et al. ......................... 700/65 |
| 2007/0055986 | A1* | 3/2007 | Gilley et al. ................. 725/34 |
| 2007/0083540 | A1* | 4/2007 | Gundla et al. ............... 707/101 |
| 2007/0094408 | A1* | 4/2007 | Gundla et al. ............... 709/231 |
| 2007/0112785 | A1* | 5/2007 | Murphy et al. ............... 707/10 |
| 2007/0202923 | A1 | 8/2007 | Jung et al. |
| 2007/0288715 | A1 | 12/2007 | Boswell et al. |
| 2008/0008439 | A1* | 1/2008 | Liu et al. ....................... 386/46 |
| 2008/0028037 | A1* | 1/2008 | Moyer et al. ................. 709/217 |
| 2008/0034394 | A1* | 2/2008 | Jacobs et al. ................. 725/98 |
| 2008/0077526 | A1 | 3/2008 | Arumugam |
| 2008/0126943 | A1* | 5/2008 | Parasnis et al. .............. 715/730 |
| 2008/0140849 | A1* | 6/2008 | Collazo ........................ 709/229 |
| 2008/0155600 | A1 | 6/2008 | Klappert et al. |
| 2008/0187279 | A1* | 8/2008 | Gilley et al. ................... 386/52 |
| 2008/0189617 | A1* | 8/2008 | Covell et al. ................ 715/738 |
| 2008/0267369 | A1* | 10/2008 | Parlamas et al. ........ 379/93.01 |
| 2008/0270881 | A1* | 10/2008 | Meyer et al. ................. 715/202 |
| 2008/0301737 | A1* | 12/2008 | Hjelmeland Almas et al. 705/14 |
| 2009/0049373 | A1* | 2/2009 | Sharma et al. ............... 715/234 |
| 2009/0094331 | A1* | 4/2009 | Nobori et al. ................ 709/205 |
| 2009/0164641 | A1* | 6/2009 | Rogers et al. ................ 709/227 |
| 2009/0228919 | A1 | 9/2009 | Zott et al. |
| 2009/0254827 | A1* | 10/2009 | Gonze et al. ................. 715/716 |
| 2009/0259944 | A1* | 10/2009 | Wu ............................... 715/738 |
| 2009/0282470 | A1* | 11/2009 | Yang et al. .................... 726/12 |
| 2010/0027974 | A1 | 2/2010 | Ansari |
| 2010/0094728 | A1* | 4/2010 | Denning et al. ............... 705/27 |
| 2010/0137028 | A1 | 6/2010 | Farris et al. |
| 2010/0138746 | A1* | 6/2010 | Zarom ......................... 715/720 |
| 2010/0174993 | A1* | 7/2010 | Pennington et al. ......... 715/738 |
| 2010/0198860 | A1* | 8/2010 | Burnett et al. ............... 707/769 |
| 2010/0205628 | A1 | 8/2010 | Davis et al. |
| 2010/0265939 | A1* | 10/2010 | Parlamas et al. ............ 370/352 |
| 2010/0281042 | A1* | 11/2010 | Windes et al. ............... 707/756 |
| 2010/0283586 | A1* | 11/2010 | Ikeda et al. ............. 340/10.42 |
| 2010/0313135 | A1* | 12/2010 | Johnson et al. .............. 715/738 |
| 2010/0325552 | A1* | 12/2010 | Sloo et al. .................... 715/738 |
| 2011/0007901 | A1* | 1/2011 | Ikeda et al. .................. 380/270 |
| 2011/0014912 | A1* | 1/2011 | Herrmann et al. ............ 463/25 |
| 2011/0030020 | A1 | 2/2011 | Halttunen |
| 2011/0035692 | A1* | 2/2011 | Sandone et al. .............. 715/769 |
| 2011/0060998 | A1* | 3/2011 | Schwartz et al. ............ 715/738 |
| 2011/0090898 | A1* | 4/2011 | Patel et al. ................... 370/352 |
| 2011/0107227 | A1* | 5/2011 | Rempell et al. .............. 715/738 |
| 2011/0125594 | A1* | 5/2011 | Brown et al. ............ 705/14.73 |
| 2011/0138354 | A1* | 6/2011 | Hertenstein et al. ......... 717/115 |
| 2011/0156879 | A1* | 6/2011 | Matsushita et al. .......... 340/10.1 |
| 2011/0161396 | A1* | 6/2011 | Filbrich et al. .............. 709/203 |
| 2011/0214148 | A1* | 9/2011 | Gossweiler et al. .......... 725/46 |
| 2011/0228768 | A1* | 9/2011 | Gelter et al. ................. 370/389 |
| 2011/0231265 | A1* | 9/2011 | Brown et al. ............ 705/14.73 |
| 2011/0231565 | A1* | 9/2011 | Gelter et al. ................. 709/231 |
| 2011/0231566 | A1* | 9/2011 | Gelter et al. ................. 709/231 |
| 2011/0289419 | A1* | 11/2011 | Yu et al. ...................... 715/738 |
| 2011/0296454 | A1* | 12/2011 | Xiong et al. ................. 725/30 |
| 2011/0296465 | A1 | 12/2011 | Krishnan et al. |
| 2012/0072846 | A1* | 3/2012 | Curtis ......................... 715/738 |
| 2012/0110464 | A1* | 5/2012 | Chen et al. ................... 715/738 |
| 2012/0166560 | A1* | 6/2012 | Nobori et al. ................ 709/206 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101577650 | 11/2009 |
| CN | 101778198 | 7/2010 |
| CN | 101815073 | 8/2010 |

### OTHER PUBLICATIONS

Webopedia computer dictionary, session cookie.*

Webopedia computer dictionary, web identifier.*

Webopedia computer dictionary, user session.*

www.vbulletin.com, Best way to generate Random, Unique ID's.*

www.vbulletin.com, Best way to generate Random, Unique ID's, Internet Archive Wayback Machine, Jan. 16, 2009.*

webopedia-com—session-identifier—Nov. 19, 2011.*

www-vbulletin-com—best-way-to-generate-random-unique-ses-sion-ids—Nov. 19, 2011.*

www-vbulletin-com—best-way-to-generate-random-unique-ses-sion-ids-wayback-archive—Nov. 19, 2011.*

ask—search—q=mobile+device+server+display+device&qs.*

Ask—Search—q=session+identifier+random&qsrc=0&o=0&I—Nov. 19, 2011.*

webopedia-com—session_cookie—Nov. 19, 2011.*

webopedia-com—user_session—Nov. 19, 2011.*

Ask Search Internet Search, session identifier random, printed on Nov. 19, 2011.

Webopedia computer dictionary, session cookie, printed on Nov. 19, 2011.

Webopedia computer dictionary, web identifier, printed on Nov. 19, 2011.

Webopedia computer dictionuy, user session, printed on Nov. 19, 2011.

www.vbulletin.com, Best way to generate Random, Unique ID's, printed on Nov. 19, 2011.

Officials communication from the USPTO in U.S. Appl. No. 13/245,001, dated Dec. 8, 2011.

U.S. Appl. No. 13,245,001, filed Sep. 26, 2011.

Hachman, M., "Snapstick's Media Streaming App/Box: Hands on," www.pcmag.com/article2/0,2817,2375455,00.asp, 2 pages, (Jan. 8, 2011).

Dolcourt, J., CES: Snapstick takes on Apple TV, Google TV, http://news.cnet.com/8301-17938_105-20025100-1.html, 3 pages, (Dec. 9, 2010).

Shaivitz, M., "The Web to Your TV, With a Flick of a Wrist? Slapstick Says Yes," http://techcocktail.com/the-web-to-our-tv-with-a-flick-of-a-wrist-slapstick-says-yes-2010-12, 2 pages, (Dec. 10, 2010).

Snapstick—Home, "Snapstick," http://www.snapstick.com/, 2 pages, printed on Mar. 2, 2011.

Paul, I., Hands on: YouTube Leanback, PCWORLD, http://www.pcworld.com/article/200769/hands_on_youtube_leanback.html, 3 pages, (Jul. 9, 2010).

Using AirPlay, Article HT4437, http://support.apple.com/kb/HT4437, 3 pages, (Apr. 18, 2011).

Cheng, J., "Stream AirPlay video to regular TV? Apple might make it happen," http://arstechnica.com/apple/news/2011/03/stream-air-play-video-to-a-regular-tv-apple-migh . . . , 1 page, printed on Jun. 7, 2011.

"Using the Play To Feature to stream media," http://windows.microsoft.com/en-US/windows7/using-the-play-to-feature-to-stream-media, 3 pages, printed on Jun. 7, 2011.

**Appx164**

US 8,356,251 B2

Page 3

"YouTube—Leanback," http://www.youtube.com/t/leanback, 1 page, printed on Jun. 7, 2011.

"Yahoo!7 TV Guide for iPhone, iPod touch and iPad on the iTunes App Store," http://itunes.apple.com/au/app/yahoo-7-tv-guide/id42471992?mt=8, 2 pages, printed on Jun. 7, 2011.

Hu, C., et al., "Mobile Media Content Sharing in UPnP-Based Home Network Environment," Journal of Information Science and Engineering 24, 1753-1769. (2008).

Fallahkhair, S., et al., "Dual Device User interface Design for Ubiquitous Language Learning: Mobile Phone and Interactive Television (iTV)," Proceedings of the 2005 IEEE Int'l Workshop on Wireless an Mobile Technologies in Education, 8 pages, 2005.

* cited by examiner



FIG. 1



FIG. 2

| Transmission Code | | | | |
|---|---|---|---|---|
| UserID | TargetID | MediaPlayerID | Command | Data |

**FIG. 3**

| Single Connection Look-up Table | |
|---|---|
| Display Device | User - Smartphone |
| 2 | A |
| 1 | C |
| 3 | D |
| 4 | B |

**FIG. 4**

26

| Universal API Adapter | | |
|---|---|---|
| Universal Command | MediaPlayerID | Specific Player Command |
| New Video | YouTube | yt_loadVideo |
| | Ted.com | getVideo |
| | Vimeo | loadNewVideo |
| Pause | YouTube | yt_pauseVideo |
| | Ted.com | pauseVideo |
| | Vimeo | pause |

**FIG. 5**



FIG. 6

U.S. Patent        Jan. 15, 2013        Sheet 5 of 9        US 8,356,251 B2



FIG. 7A

| Sync-code Look-up Table | | |
|---|---|---|
| IP Address | Cookie | Sync-code |
| 169.343.231.234 | erjg988dhuj | 435-05-342 |

FIG. 7B



FIG. 8

FIG. 9

Appx170



FIG. 10



FIG. 11



FIG. 12



Playlist and Video Links

FIG. 13



FIG. 14C

FIG. 14B

FIG. 14A



**Group Connection Look-up Table**

| Display Device | Group | User – Smartphone |
|---|---|---|
| 2 | X | A",C*,D |
| 1,3 | Y | B**,E |

" = Group Moderator,
* = Control of Display Device

**FIG. 15**

**FIG. 14E**

**FIG. 14D**

US 8,356,251 B2

**1**

# PLAY CONTROL OF CONTENT ON A DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION(S)

This application is a continuation of U.S. application Ser. No. 13/157,821, filed on Jun. 10, 2011, which in turn claims the benefit of priority of U.S. Provisional Patent Application No. 61/477,998, filed on Apr. 21, 2011.

## BACKGROUND

This disclosure relates to play control of content on a display device. Such display devices include, for example, television displays used by consumers in their home for viewing videos and other media that are either provided from the Web or previously stored. In particular, the disclosure relates to the creation, storage, manipulation and access of media playlists used in conjunction with display devices and control of the display devices.

Web media often is played on computers rather than television displays. Although it is known to connect a computer to a television set in order to watch Web media, it is difficult to control such a system within the typical scenario for television watching where the viewer is positioned some distance from the television. Furthermore, although a wireless device can enable the user to control the television from a distance, it can be difficult to view a web browser display on the television set and may interfere with normal television program viewing by other persons.

Given the desire to watch various World Wide Web media on a family's primary television set, and to control this operation from the comfort of one's couch, there is a need to operate a television set or other display remotely from a personal computing device, such as a mobile phone. It also is desirable to allow a user to perform a general Web search to locate and capture Web media, and to control a television or other display remotely using the personal computing device.

## SUMMARY

Various aspects of the invention are set forth in the claims.

For example, according to one aspect, a system for presenting and controlling content on a display device includes a network, a server system coupled to the network and comprising one or more servers, a display device coupled to the network and having a display, and a personal computing device operable to transmit a first message according to a specified format over the network to the server system. The server system stores an association between the personal computing device and the display device. The first message identifies user-selected content and a media player to play the content. The server system is operable, in response to receiving the first message from the personal computing device, to provide to the display device a second message identifying the user-selected content and the media player to play the content. In response to receiving the second message, the display device is operable to obtain a first media player needed to play the content, to load the media player and to present the content on the display.

In some implementations, the display device is operable, in response to receiving the second message, to obtain the first media player from the content provider only if the first media player is not already loaded in the display device.

In some implementations, the personal computing device is operable to transmit a message according to a specified

**2**

format over the network to the server system. The message can include a command for controlling playing of the content on the display device. The server system is operable, in response to receiving the message, to convert the command into a corresponding command recognizable by the media player if the command received from the personal computing device is not recognizable by the media player. The server system is operable to provide to the display device a message that includes the corresponding command, and the display device is operable, in response to receiving the message from the server system, to execute the command.

In some implementations, the personal computing device is, for example, a mobile phone, and the display device is a television set. Other personal computing devices or display devices can be used in other implementations. The network can include, for example, the Internet.

In some implementations, the server system stores a look-up table that includes a synchronization code uniquely associated with the display device. A message from the personal computing device can include the synchronization code, and in response to receiving the message from personal computing device, the server system can use the synchronization code and the look-up table to identify the display device on which the content is to be played. The synchronization code can be different from an IP address associated with the display device and/or a media access control address associated with the display device.

In various implementations, the system can facilitate allowing a personal computing device to be used to select different content to be played on a remote display even if different media players are required to present the different content. The system also can allow the user to control how the content is displayed on the display device using the personal computing device. For example, user-initiated play commands can be passed from the user's personal computing device, through the server system, to the display device.

Other aspects, features and advantages will be apparent from the following detailed description, the accompanying drawings, and the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating an example of a system according to the invention.

FIG. **2** illustrates various details of the flow of information and signals according to some implementations.

FIG. **3** illustrates an example of a transmission code incorporated into a message from a personal computing device.

FIG. **4** illustrates an example of a look-up table that forms part of a server system.

FIG. **5** illustrates an example of entries in a universal API adapter.

FIG. **6** is a flow chart showing steps for display device to load a video player and video.

FIG. **7**A illustrates an example of a display device including a synchronization code.

FIG. **7**B illustrates an example of a synchronization code look-up table.

FIGS. **8-13** illustrate examples of various scenarios in which the invention can be used.

FIGS. **14**A through **14**E illustrate examples of display screens that may appear on a user's personal computing device in accordance with the invention.

FIG. **15** illustrates further information that can be stored in the look-up table in the server system.

## DETAILED DESCRIPTION

As shown in FIG. **1**, a system **10** facilitates synchronizing a connection between two or more devices **20**, **22** connected

US 8,356,251 B2

3

to the Internet **21** or other computer network. The connection is designed to be made by a first device (e.g., a personal computing device) **20** that acts as a controller and a second device (e.g., a television set **22** with a display **23**) that acts as a receiver to play content selected by a user of the first device and to respond to commands that originate at the personal computing device. The personal computing device **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The television set **22** is operable to link back to a server system **24** from which the television set receives commands. When a user makes a selection using the personal computing device **20** for particular content to be displayed on the television display **23**, a signal is sent through the Internet (or other network) **21** to the server system **24**. A corresponding command signal then is passed along to the connected television set **22**, which acts on a transmission code contained within the signal and performs specified commands. For example, in some scenarios, the command instructs the television set **22** to access a content provider **30** through the Internet **21**, load a specific media player, load the media player-specific content (e.g., a video) and play the content on the television display **23**. The user can use the personal computing device **20** to control how the content is played on the television display **23**. The user may subsequently visit the same or another Web site using the personal computing device **20** to select different content (e.g., a second video) to be played on the television display **23**. In that case, another signal would be sent through the server system **24** to the television set **22**. A transmission code associated with this command signal instructs the television set **22** to load a new media player (if needed) over the Internet and to load the specified video file to be played on the display **23**. Thus, the system **10** allows a personal computing device **20** to be used to select different content to be played on a remote display **23** even if different media players are required for the different content. The user also can control how the content is displayed (e.g., play, pause, stop, rewind, fast forward, etc.) on the display **23** using the personal computing device **20**. The user-initiated play commands are passed from the user's personal computing device **20**, through the server system **24**, to the television set **22**.

Although the following detailed discussion describes videos as an example of the type of content to be played on the display **23**, the system **10** can be used for other types of content as well. Thus, depending on the implementation, the content may include one or more of the following: video, audio, interactive video game, streaming media, multimedia, images, slides (e.g., a PowerPoint presentation) or other types of dynamic content. Furthermore, in the following discussion, it is assumed that the personal computing device **20** is a mobile phone that includes a display, an internal microprocessor or other processing circuitry, a keypad, keyboard, touchscreen, mouse, trackball, or other device to receive user selections and other input, and a transceiver to establish communications to the Internet **21** or other communications networks. More generally, however, the personal computing device **20** can be any type of handheld or other Internet-enabled personal computing device, including personal computers, e-books, kiosks, tablets, smart phones, media players, and motion and touch sensory interfaces. In some cases, input from the user can be received in forms other than tactile input (e.g., acoustic or speech).

FIG. **2** illustrates further details of the flow of information and signals according to some implementations. The personal computing device (e.g., mobile phone) **20** is operable to display an application or web site that contains information and links to content providers **30** on the Internet **21**. The user

4

operates the mobile phone **20** so as to start the application or access the web site (block **100**). In some implementations, a logo appears on the mobile phone's display. By selecting the logo, the user causes a menu to expand and present various options. The options can include, for example: (i) add new content to a playlist, (ii) play a listed item on a secondary device, (iii) play a listed item on the mobile phone **20**. If the user selects to add new content to the playlist, the user is presented with a screen that allows him to enter user-defined search parameters or to select predefined search parameters to request video data. The search parameters are sent from the mobile phone **20** as part of a request for video data that satisfy the search parameters (block **102**). The request is transmitted via the Internet **21** and through the server system **24** to the appropriate content provider web site. In response, the content provider **30** provides metadata (e.g., titles, links to the videos) for one or more video files that satisfy the search parameters (block **104**). The metadata can be provided to the mobile phone **20**, for example, in the form of an XML data file. Upon receiving the data file, the mobile phone **20** displays a list of one or more videos based on the information received from the content provider **30** (block **106**).

If desired, the user can take one of several actions, including selecting one of the videos from the displayed list to be played on the television display **23** or initiating a command with respect to a video that already has been loaded to the television set **22** (block **108**). The mobile phone **20** then formats and transmits a message to the server system **24** (block **110**). The message from the mobile phone **20** contains a transmission code that includes data regarding the user information (e.g., user identification or account number), the secondary display it wants to connect to (e.g., television set **22** with display **23**), the location and name of the media player for the selected video, the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon. An example of the format of a transmission code from the mobile phone **20** to the server system **24** is illustrated in FIG. **3**. Different formats and/or different information may be appropriate for other implementations.

The message from the mobile phone **20** is transmitted over the Internet **21** and is received by the server system **24** (block **112**). Based on information in the message from the mobile phone **20**, the server system **24** verifies that the user has an account (block **114**), and the contents of the message, as well as the date and time of receipt of the message, are added to a personal computing device database **32** (block **116**) which forms part of a switchboard **28**. In general, all messages from a particular user's personal computing device **20** are stored in the database **32** corresponding to an account for the particular user. Thus, the database **32** stores a record of all messages received from a user's personal computing device **20**, as well as the user's identification, an indication of the target device **22**, an identification of the media player that is required for the selected video, and an identification of the selected video.

The switchboard **28** also includes a look-up table **34** that stores a correspondence between a particular personal computing device (such as mobile phone **20**) and target devices (e.g., the television set **22**) to which the user command is directed. An example of the look-up table **28** is illustrated in FIG. **4**. In this example, it is assumed that, at most, a single connection is established at any given time between a particular mobile phone and a display device. However, as explained below, other scenarios are also possible to establish group connections (e.g., multiple mobile phones connected to the same display device). The server system **24** performs a target verification (block **118**), which includes checking whether a connection to a particular display device already is estab-

US 8,356,251 B2

5

lished for the mobile phone **20** and, if so, checking the identification of the display device. During the target verification, if the look-up table indicates that there is no connection established between the mobile phone **20** and a particular display device, then the server system **24** sends a message to the mobile phone **20** to prompt the user to identify the device on which the video is to be displayed.

A user can identify the device on which the video is to be displayed in one of several ways, depending on the implementation. In some implementations, the user can select the display device from a list of devices displayed on the mobile phone **20**. The list can include a field populated with names or identifications of display devices that previously have been initialized for connection. Alternatively, the user can select the display device by entering a synchronization code uniquely associated with the particular display device. As illustrated in FIG. **7**A, the synchronization code **48** can be displayed, for example, on a splash page of the display device as text on the screen or as an image such as a QR code and can be entered into the mobile phone **20**, for example, manually by the user or by scanning the code into the mobile phone. The code can be scanned, for example, using optical scanning or RFID techniques. Preferably, the synchronization code is different from the IP address associated with the device **22**. The IP address also can be different from the media access control (MAC) address associated with the device **22**. For example, in some implementations, the synchronization code is generated randomly and assigned to the display device **22** each time it connects to the server system **24**. Thus, a particular display device **22** may have an IP address, a MAC address, a web or browser cookie, and a synchronization code ("sync code") assigned to it at any given time. This information can be stored, for example, in a look-up table in the server system **24**. An example of entries in such a look-up table are illustrated in FIG. **7**B.

Once the synchronization code is entered into, or captured by, the mobile phone **20**, it is sent from the mobile phone **20** to the server system **24**, which stores the information in the look-up table **36** so as to establish a connection between the mobile phone **20** and the display device **22** through the server system **24**.

Once a connection is established between the mobile phone **20** and the display device **22**, signals sent from the mobile device **20** to its associated database **32** are copied to a database **34** associated with the target device (e.g., television set **24**) based on the correspondence between the mobile device and the target device listed in the look-up table **36** (block **122**). Thus, the database **32** entries associated with a particular display device (e.g., television set **24**) provide a record of the messages received for that display device, as well as an indication of the identification of the device that sent each message, an indication of the media player required to play the video, and an indication of the selected video.

In the illustrated implementation, the command in the transmission code (see FIG. **3**) contains a JavaScript reference to control the media player needed to play the selected video. Various types of video players may use different JavaScript commands to control their respective playback. Therefore, in the illustrated implementation, a universal adapter **26** is provided to interpret and convert a standard or universal command (e.g., play, pause, etc.) into the specific command recognized by the media player. Each time a signal is received from the mobile device **20**, the API adapter **26** checks and identifies the specific media player that is being requested. Based on this information, the system loads the appropriate set of protocols or application programming interfaces (APIs) from its library and converts the incoming commands from

6

the mobile device **20** into the correct JavaScript (or other programming) code used by the target device **22** to control the specific player (block **120**). The server system **24** then copies the converted version of the message to the database **34** associated with the target device **22**, as indicated above in connection with block **122**.

The universal adapter **26** can be implemented, for example, as a look-up table. Examples of entries in such a look-up table are illustrated in FIG. **5**. Thus, for a universal command "New Video," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "yt_loadVideo" for YouTube). Similarly, for a universal command "Pause," the universal adapter **26** provides the corresponding command for each of several specific media players (e.g., "pauseVideo" for Ted.com). Other universal commands and the corresponding command(s) for one or more media players also can be stored by the universal adapter **26**.

The display device **22** periodically checks the entries in the database **34** to determine if there are any new messages/commands directed to it (block **124**). For example, in some implementations, the display device **22** polls the associated database **34** at some predetermined time interval. In some implementations, instead of the display device **22** periodically checking whether there are any messages for it in the database **34**, the server system **24** can push the messages to the display device **22**. In any event, the system is arranged so that the display device **22** receives the messages intended for it.

When the display device **22** receives a message from the server system **24** (block **126**), the display device executes the message (block **128**). In some cases, the media player required to play the video indicated in the message is not presently loaded in the display device **22**. For example, the received command may be to "play" a particular video. As indicated by FIG. **6**, if the media player needed to play the video is not already loaded in the display device **22**, the display device **22** requests and obtains a copy of the appropriate media player **40** and a copy of the video file **42** from a content provider **30**, loads the media player and then presents the video on the display **23** (FIG. **2**, block **130**). Likewise, as indicated by FIG. **6**, if the appropriate media player already is loaded in the display device, but the particular video is not, then the display device **22** requests and obtains a copy of the video file **42** from the content provider **30** and proceeds to play the video. To allow the display device **22** to switch between different video players (i.e., to load and unload different video players), a software program can be stored on the display device and/or the web site to establish a secure connection back to the server system **24**.

Once the video is playing on the display device **22**, the user of the mobile phone **20** can control the playing of the video by entering appropriate commands (e.g., pause, fast forward, rewind, stop, play, etc.) through the mobile phone. Each command is incorporated into a message including a transmission code (FIG. **3**) as described above. The message is transmitted to the server system **24**, which copies the message into database entries associated with the particular display device **22** (i.e., after performing any conversion of the command by the API adapter **26**). Once the message is retrieved by or sent to the display device **22**, the display device proceeds to execute the command.

The system and methods described here allow a user of a mobile phone or other personal computing device to create a playlist based on videos (or other types of content) from multiple sources and to play back each video using a single interface that can be used to control different media players.

**Page 15 of 20**

US 8,356,251 B2

7

As mentioned above, the system and methods described above also can be used with types of content other than video. In that case, different types of user-initiated commands may be available to control the content displayed on the display **23**. For example, for interactive video games, the user-initiated commands can include control commands appropriate for the particular game.

Although the implementation of FIG. **1** illustrates the display device **22** as a television set with a display screen **23**, other types of display devices can be used as well (e.g., a laptop or personal computer).

The systems and methods can be used in various scenarios to play back videos (or other content). Examples of several scenarios that can be implemented using the system described above are described in the following paragraphs. For example, a first scenario involves a single user's smartphone connecting to a single display device (FIG. **8**). In this scenario, the user turns on, for example, her display device (e.g., personal computer with a display monitor), opens up a browser and accesses a website associated with the server system **24**. The user then clicks on a link that launches the software program to establish a secure connection back to the server system **24**. The software program opens a splash page (see FIG. **14**A), and a sync-code is displayed on the monitor. The user then opens the appropriate application on her smartphone. In the smartphone application, the user accesses a "Connect" screen from which he can select one of several listed display devices (see FIG. **14**B). Alternatively, the user can enter the sync-code displayed on the computer monitor (see FIG. **14**B). The user then clicks on a SEND button which causes a message including the sync-code to be sent the server system **24**. In response, the server system **24** establishes a connection between the user's smartphone and the selected display device through a look-up table as described above with respect to FIG. **4**. The user can use a search tool in the smartphone application to find a video. In response to the search, a list of videos satisfying the search appears on the smartphone (see FIG. **14**C). When the user selects a video from the list displayed on the smartphone, the information is provided through the server system **24** to the personal computer. In some implementations, a pop-up window may appear on the smartphone listing one or more options for the user to take regarding the selected video. Such options can include, for example, play the video on the selected display device (e.g., the personal computer), play the video on the smartphone, or add the video to the playlist on the smartphone. If the user chooses to have the video played on the display device (e.g., the personal computer), the personal computer obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video on the monitor as described previously. In some implementations, a message is displayed on the user's smartphone indicating that the selected video is playing and providing additional information about the selected video (see FIG. **14**D). The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from her smartphone.

A second scenario involves saving a selected video to a playlist on a single user's smartphone, and subsequently playing the video on a display device (FIG. **9**). In this scenario, the user opens the appropriate application on his smartphone and searches for videos using the search tool displayed in the application. When a list of videos is displayed on the smartphone in response to the search request, the user selects one or more videos to add to his playlist. At that time, or at a later time, the user can connect to a display device through the server system **24**. To do so, the user opens the playlist on his

8

smartphone and selects a video. The information is provided through the server system **24** to the display device, which obtains a copy of the required video player and the selected video from an appropriate content provider over the Internet and begins to play the video. The user can control playing of the video (e.g., pause, fast forward, rewind, play, etc.) from his smartphone.

A third scenario involves multiple users' smartphones and a single display device (FIG. **10**). For example, a user may want to share and watch videos with a group of friends watching together on a single display device. In this situation, the user can access the application or web site to set up a group and serve as the moderator for the group. The user then can send out a request to other members of the group, or other users can send a request to the moderator to join the group. Users can search for other users based, for example, on username or from a contact list. The moderator then can select a user in the group to control the display device. FIG. **14**E illustrates an example of a screen on the user's smartphone that allows the user to connect with other users to form a group and to select which member of the group controls the display device (e.g., by selecting a member of the group from the list "Me, Guest 1, Guest 2, . . . " near the top of the screen). Alternatively, the moderator can set it up so that control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. Regardless of who has control of the display device **22**, each user in the group retains control of his own smartphone. The look-up table **36** in the server system **24** stores the connections established between the personal computing devices of the users in the group and the display device (see FIG. **15**).

A fourth scenario involves one user's smartphone and multiple display devices (FIG. **11**). In this example, a user opens the application on his smartphone to establish a connection to a first display device and then repeats the process for multiple display devices. A list of devices that the user's smartphone is connected to is displayed on the smartphone. The user can choose to control all devices simultaneously or one at a time. To do so, the user selects from the list the display device(s) he wants to control. The user then can search for videos using his smartphone. In response to the user selecting a particular video, the selected video is played on the selected display device(s).

A fifth scenario involves multiple users' smartphones and multiple connected display devices (FIG. **12**). For example, a user may want to share and watch videos with a group of friends, who may be in different locations each of which has a separate display device. Each user establishes a connection from her smartphone to the display device where she is located. One of the users uses the application or web site to establish a group, with the user who establishes the group serving as the group moderator. The user can send out a request to other users to join the group or other users can send a request to the moderator to join the group. In some implementations, users can search for other users based on username or from a contact list. The moderator chooses which member of the group has control of the display device. Alternatively, the moderator can set it up control is passed to each member of the group in turn automatically, or so that the next turn can be determined by consensus of the entire group, via some form of voting. The signal sent from the smartphone of the group member who has control is sent (via the server system **24**) to all display devices within the group. Regardless of which group member has control of the display devices, each user retains control of her own smartphone. The look-up table **36** in the server system **24** stores the connections estab-

US 8,356,251 B2

9 | 10

lished between the personal computing devices of the users in the group and the display devices (see FIG. **15**).

A sixth scenario involves sharing video links and a playlist (FIG. **13**). For example, a user within a group can share a video playlist and video links via an Instant messaging system built-in to the application. Users also can post video links or a video playlist to third-party web sites (e.g., social networking sites). Other users can view the video link and playlist within the application. When a video from the list is selected, it plays on the selected device.

The system and methods can be used by a wide variety of users in addition to individual viewers. For example, companies that provide on-line video platforms that host videos for other individuals or companies can obtain useful advantages by integrating the platforms with the server system **24**. Programming hooks can be created in the API so that the on-line video platform's media player can communicate with the server system **24**. When media player commands for an on-line video platform are added to the system **24**, the media player's API is placed in an API library and is stored in the API adapter **26**. The on-line video platform can then offer customers the ability to add videos to their own mobile web sites that are enabled to operate with the server system **24**.

The system and methods also can be used by content providers. For example, the content provider may want to deliver its media on-line. The content provider can use an on-line video platform that is enabled to operate with the server system **24**. In some implementations, the content provider is allowed to add links to videos for that web site (i.e., mobile site or an application). The link facilitates synchronization to the secondary device **22** (e.g., a television set) and allows the end-user to load and control the video on the secondary device.

As used in this disclosure, terms such as "first," "second," etc. with respect to the messages are used simply as labels to distinguish the various messages from one another. Such terms do not imply that there cannot be any other messages prior to the first message or that there cannot be other messages between the first and second messages.

Implementations of the subject matter and the operations described in this specification can include digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can include one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially-generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or can be included in, a computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially-generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can include operations performed by a data processing apparatus on data stored on one or more computer-readable storage devices or received from other sources. The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub-programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. Elements of a computer include a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data.

Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto-optical disks, or optical disks. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile, audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non-volatile memory, media and memory devices, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

Although this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation. Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the

US 8,356,251 B2

11

combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described herein and the attachments hereto should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, although particular implementations have been described, other implementations are within the scope of the claims.

What is claimed is:

**1**. A machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media player players, the method comprising:

assigning, by a server system, a synchronization code to the display device;

receiving, in the server system, a message from a personal computing device that is separate from the server system and separate from the display device, wherein the message includes the synchronization code;

storing, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code;

receiving, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player,

converting, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player; and

storing, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command.

**2**. The method of claim **1** including:

checking, in the server system, the identity of the media player identified in the one or more signals from the personal computing device;

loading an appropriate set of protocols or application programming interfaces from a library based on the identity of the media player; and

12

converting the command from the personal computing device into corresponding code to control the media player.

**3**. The method of claim **1** wherein converting the command into corresponding programming code to control the media player includes using information in a look-up table.

**4**. The method of claim **3** wherein the look-up table stores a plurality of specific commands, each of which represents, respectively, a corresponding command for a different media player.

**5**. The method of claim **1** wherein the universal command represents an instruction to play the video content, to stop playing the video content or to pause playing the video content.

**6**. The method of claim **1** wherein the video content is an interactive video game.

**7**. The method of claim **1** wherein the video content is streaming media.

**8**. The method of claim **1** wherein the synchronization code is uniquely associated with the display device on which the video content is to be played.

**9**. The method of claim **8** wherein the synchronization code is different from an IP address associated with the display device and is different from a MAC address associated with the display device.

**10**. The method of claim **8** wherein assigning a synchronization code includes assigning a randomly generated code to the display device each time the display device connects to the server system.

**11**. A system for controlling playing of video content on a display device that loads any one of a plurality of different media players, the system comprising:

a server system;

a first database storing a relationship between a personal computing device and the display device based on a synchronization code assigned by the server system to the display device and received by the server system in a message from the personal computing device, wherein the personal computing device is separate from the server system and separate from the display device; and

a second database;

wherein the server system is configured to receive one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device,

one or more non-transitory computer-readable media storing instructions that when executed by the server system, cause the server system to perform operations including converting the universal playback control command into corresponding programming code to control playing of the video content of the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player;

the server system being further configured to store in the second database information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display

US 8,356,251 B2

**13**

device by the particular media player in accordance with the universal playback control command.

12. The system of claim 11 including:

library storing protocols or application programming interfaces,

wherein the server system is configured to check the identity of the media player identified in the one or more signals from the personal computing device, load an appropriate set of protocols or application programming interfaces from the library based on the identity of the media player, and convert the command from the personal computing device into a corresponding programming code used by the display device to control the media player.

13. The system of claim 11 including:

a look-up table storing a plurality of commands each of which is for a particular type of media player,

wherein the server system is configured to convert the command into corresponding programming code to control the media player based on information in the look-up table.

14. The system of claim 11 wherein the look-up table stores a correspondence between the universal command and a plurality of specific commands, each of which is for a different media player.

15. The system of claim 14 the server system is configured to convert the universal command by selecting from among the plurality of specific commands stored in the look-up table.

16. The system of claim 11 wherein the universal command represents an instruction to play the video content, to stop playing the video content or to pause playing the video content.

17. The system of claim 11 wherein the video content is an interactive video game.

18. The system of claim 11 wherein the video content is streaming media.

19. The system of claim 11 wherein the synchronization code is uniquely associated with the display device on which the video content is to be played.

20. The system of claim 19 wherein the synchronization code is different from an IP address associated with the display device and is different from a MAC address associated with the display device.

21. The system of claim 19 wherein the server system is configured to assign as the synchronization code a randomly generated code each time the display device connects to the server system.

22. An automated machine-implemented method of presenting video content on a display device that loads any one of a plurality of different media player, the method comprising:

displaying, by the display device, a synchronization code that was assigned to the display device by a server system, the server system subsequently storing, based on a message from a personal computing device that is sepa-

**14**

rate from the server system and the display device, an association between the display device and the personal computing device, the message from the personal computing device including the synchronization code;

retrieving, by the display device from a server system, first information that specifies a first video file to be acted upon, that identifies a first media player for playing the first video file, and that indicates corresponding programming code to control playing of the first video file on the display device by the first media player in accordance with a first playback control command, wherein the server system previously received, from the personal computing device, one or more signals specifying the first video file identifying the first media player and including the first playback control command;

obtaining, by the display device, over the Internet the first media player for playing the first video file;

loading the first media player in the display device;

executing the first playback control command with respect to the first video file using the first media player;

subsequently retrieving, by the display device from the server system, second information that specifies a second video file to be acted upon, that identifies a second media player different from the first media player for playing the second video file, and that indicates corresponding programming code to control playing of the second video file on the display device by the second media player in accordance with a second playback control command, wherein the server system previously received, from the personal computing device, one or more signals specifying the second video file, identifying the second media player and including the second playback control command;

obtaining, by the display device, over the Internet the second media player for playing the second video file;

loading the second media player in the display device; and

executing the second playback control command with respect to the second video file using the second media player.

23. The method of claim 22 wherein the display device comprises a television set with a display screen.

24. The method of claim 22 wherein the display device comprises a laptop or personal computer.

25. The method of claim 22 wherein each of the first and second commands represents an instruction to play the respective video file, to stop playing the respective video file or to pause playing the respective video file.

26. The method of claim 22 wherein the display device checks whether the respective media player needed to play the particular one of the video files already is loaded in the display device before obtaining a copy of the media player over the Internet.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,356,251 B2                                    Page 1 of 1
APPLICATION NO.     : 13/245001
DATED               : January 15, 2013
INVENTOR(S)         : David Strober

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 11, line 24, Claim 1, change "player players," to -- players, --;

Col. 12, line 55, Claim 11, change "of" to -- by --;

Col. 13, line 4, Claim 12, before "library" insert -- a --;

Col. 13, line 13, Claim 12, after "code" delete "used by the display device";

Col. 13, line 50, Claim 22, change "player," to -- players, --;

Col. 14, line 5, Claim 22, change "a" to -- the --;

Col. 14, line 14, Claim 22, change "file" to -- file, --.

Signed and Sealed this
Ninth Day of April, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitations of <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u> and Federal Circuit Rule 32(b)(1) because it contains 12,854 words, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u> and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated:  April 11, 2024

<u>/s/ I. Sasha Mayergoyz</u>
I. Sasha Mayergoyz
JONES DAY
110 North Wacker Dr.
Suite 4800
Chicago, IL 60606
(312) 782-3939

*Counsel for Appellant Google LLC*